O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| FERMIN GUERRERO,<br><br>              Petitioner,<br><br>        v.<br><br>DAVID DAVEY,[1]<br><br>             Respondent. | Case No. CV 10-8257-ODW (DFM)<br><br>Final Report and Recommendation<br>of United States Magistrate Judge |

This Report and Recommendation is submitted to the Honorable Otis D. Wright, II, United States District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.[2]

---

[1] California's inmate-locator website shows that Petitioner is housed at Corcoran State Prison. See CDCR Inmate Locator, http://inmatelocator. cdcr.ca.gov/search.aspx (search for inmate number V10257). Because Davey is Corcoran's current warden, he is substituted in under Federal Rule of Civil Procedure 25(d) as the proper Respondent.

[2] The Court issued its original Report and Recommendation on February

# I.

## FEDERAL COURT PROCEEDINGS

On October 15, 2010, Fermin Guerrero ("Petitioner") constructively filed a Petition for Writ of Habeas Corpus by a Person in State Custody, challenging his 2003 convictions for first-degree murder and various enhancements.[3] Dkt. 1 ("Petition").[4] Petitioner also filed an "Application for Certificate of Appealability Excusing Potential Procedural Default Under A.E.D.P.A. Time Limitations," arguing that he is entitled to equitable tolling based on his attorney's misconduct. Dkt. 3 ("Application"). On April 20, 2011, Respondent moved to dismiss the Petition as time barred and partially unexhausted. Dkt. 24. On July 5, 2011, Petitioner filed an opposition along with declarations and other evidence. Dkt. 33. On November 17, 2011, the previously-assigned Magistrate Judge issued a Report and Recommendation ("R&R"), recommending that the motion to dismiss be granted because the

---

7, 2017. Dkt. 181. The Court now issues this Final Report and Recommendation to address arguments presented in Respondent's Objections (Dkt. 185, "Resp't Objections"), Petitioner's Objections (Dkt. 186, "Pet. Objections"), and the parties' replies to the objections (Dkt. 187; Dkt. 188). Because these changes do not affect the Court's conclusions, the parties have not been given an opportunity to file additional objections.

[3] Under the "mailbox rule," a pro se prisoner's habeas petition is constructively filed when he gives it to prison authorities for mailing to the court clerk. Hernandez v. Spearman, 764 F.3d 1071, 1074 (9th Cir. 2014); see also Houston v. Lack, 487 U.S. 266, 276 (1988). Under this rule, a court generally deems a habeas petition filed on the day it is signed, Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010), because it assumes that the petitioner turned the petition over to prison authorities for mailing that day, see Butler v. Long, 752 F.3d 1177, 1178 n.1 (9th Cir. 2014) (per curiam) (as amended). Here, Petitioner signed and dated the Petition on October 15, 2010. See Petition at 8.

[4] All citations to the Petition use the CM/ECF pagination.

Petition was time barred and partially unexhausted. Dkt. 36. Petitioner filed objections, Dkt. 37, and on April 10, 2012, the Magistrate Judge ordered Respondent to file a supplemental brief addressing Petitioner's equitable-tolling claim. Dkt. 39. Respondent did so on August 16, 2012. Dkt. 48.

On October 23, 2013, the District Judge accepted the R&R and dismissed the Petition with prejudice. Dkts. 54, 56. After Petitioner appealed, Dkt. 57, this Court issued an indicative ruling under Federal Rule of Civil Procedure 62.1, stating that the Magistrate Judge had issued an amended report and recommendation on October 18, 2013, but because of a clerical error it was never docketed and the judgment and order accepting the original R&R were issued in error. Dkt. 61. The Court asked the Ninth Circuit to remand the case to allow the Court to vacate the judgment and conduct further proceedings. Id.

On December 12, 2013, the Ninth Circuit remanded the case, Dkt. 62, and on December 17, the District Judge vacated the judgment and order accepting the R&R, Dkt. 63.[5] On March 5, 2014, the Magistrate Judge issued an Amended Report and Recommendation ("Amended R&R"), finding that Petitioner alleged sufficient facts to warrant an evidentiary hearing on his equitable-tolling claim and recommending that the motion to dismiss be denied. Dkt. 67. Respondent filed objections, Dkt. 72, and on April 11, 2014, the District Judge accepted the Amended R&R and denied the motion to dismiss without prejudice, Dkt. 73. On April 28, 2014, the Magistrate Judge appointed the Office of the Federal Public Defender ("FPD") to represent Petitioner. Dkt. 76.

On July 22, 2015, this case was transferred to the undersigned

---

[5] The Ninth Circuit thereafter dismissed Petitioner's appeal for lack of jurisdiction. Dkts. 65 (order), 70 (mandate).

Magistrate Judge. Dkt. 99. On August 10, 2015, Respondent filed an Answer and Memorandum of Points and Authorities. Dkt. 103. On November 19, 2015, Petitioner moved for leave to amend and lodged a proposed First Amended Petition ("FAP"). Dkt. 111. On December 15, 2015, Respondent opposed the motion for leave to amend, Dkt. 114, and on January 12, 2016, Petitioner replied, Dkt. 117.

On January 26, 2016, the Court granted Petitioner's motion for leave to amend, ordered the FAP filed as of November 19, 2015, and set a date by which Respondent must file a motion to dismiss. Dkt. 118.

On March 8, 2016, Respondent filed a motion to dismiss, arguing that both the original Petition and the FAP are time barred. Dkt. 125 ("Mot. Dismiss"). On April 19, 2016, Petitioner filed an Opposition to Motion to Dismiss First Amended Petition and Motion for Partial Summary Judgment and a separate statement of uncontroverted facts. Dkt. 133 ("Opp'n Mot. Dismiss"). On May 24, 2016, Respondent moved to strike the statement of uncontroverted facts, Dkt. 140, and on May 27, Petitioner opposed, Dkt. 142. On June 2, 2016, Respondent filed a reply to Petitioner's opposition to the motion to dismiss. Dkt. 145.

On June 22, 2016, the Court set an evidentiary hearing for September 28 and granted Petitioner authority to depose Petitioner's attorney, Lawrence Harrison, and subpoena Petitioner's mother, Ana Castro, and sister, Maria del Rosario Galindo.[6] Dkt. 153. The parties deposed Harrison on August 11, 2016, and they stipulated that his deposition testimony would be used in lieu of testimony at the evidentiary hearing. See Dkt. 170 ("Harrison Dep."). On September 28 and 29, 2016, the Court held the evidentiary hearing, at which

---

[6] In some of the documents filed in this Court, Galindo was referred to by her maiden name, Guerrero.

Petitioner, Castro, and Galindo testified and exhibits were received.[7] At the end of the hearing, the Court granted Respondent's request that he be permitted to investigate Petitioner's prison records and submit a status report in 30 days. 3 Tr. 21-22.

On October 28, 2016, Respondent filed a status report and attached copies of prison regulations and records. Dkt. 175 ("Status Report"). Respondent stated that he did not require additional time for further investigation. Id.

As discussed below, after considering the testimony and evidence received at the evidentiary hearing, the record, and the parties' legal arguments, the Court recommends that Respondent's motion to dismiss the FAP be granted in part and denied in part and that Petitioner's motion for partial summary judgment and Respondent's motion to strike be denied as moot.

///

///

---

[7] The transcript from September 28 is referred to as "1 Tr." and the one from the morning of September 29 is referred to as "2 Tr." The exhibits Petitioner introduced into evidence at the hearing are referred to as "Pet. Ex." and those Respondent introduced are referred to as "Resp. Ex." On the afternoon of September 29, 2016, the Court heard argument from counsel and made certain rulings. The transcript from that hearing is referred to as "3 Tr."

Before the evidentiary hearing, Petitioner filed applications for writs of habeas corpus ad testificandum for two inmates who were also allegedly inadequately represented by Harrison. Dkts. 158, 159. Respondent filed an ex parte application to exclude those and other proposed witnesses' testimony, Dkt. 160, which Petitioner opposed, Dkt. 161. At the end of the evidentiary hearing, the Court denied the applications for writs of habeas corpus ad testificandum, finding that sufficient evidence had been presented regarding Petitioner's entitlement to equitable tolling, and it granted the ex parte application to exclude the evidence. 3 Tr. 19-21.

## II.

## PETITIONER'S CLAIMS

The identity of claims raised in the original Petition bears on the timeliness of claims raised in the FAP. The Court therefore sets out in detail the claims raised in both petitions.

The original Petition asserts the following claims:

- <u>Ground One</u>: The trial court violated Petitioner's due process rights by admitting evidence that Petitioner possessed several firearms when it was established that those firearms were not used in the murder. Petition at 5, 24-37.

- <u>Ground Two</u>: The trial court violated Petitioner's due process rights by failing to sua sponte instruct the jury that Petitioner's out-of-court statements should be considered with caution. <u>Id.</u> at 5, 37-42.

- <u>Ground Three</u>: Petitioner's due process and Sixth Amendment rights were violated when the trial court denied defense counsel's request for a continuance and thus did not allow defense counsel sufficient time to prepare for trial ("Ground 3a") and when counsel failed in various ways to conduct an adequate pretrial investigation or establish an informed and substantial strategic defense ("Ground 3b"). <u>Id.</u> at 6, 43-94. Specifically, counsel was ineffective for:

  - o prematurely announcing ready for trial, <u>id.</u> at 45 (subclaim A),

  - o failing to corroborate Kathy Lainez's testimony that Petitioner's car was gray on the day of the murder, <u>id.</u> at 64, present evidence from a body shop to show that

Petitioner's car was painted because it had been in an accident, id. at 55-56, 59-60, present witnesses to that car accident, id. at 60, argue these points to the jury, id. at 61, or properly cross-examine Jimmy Richardson about the color of Petitioner's car on the day of the murder, id. at 55, 63 (subclaim B),

  o failing to adequately cross-examine and corroborate the testimony of Catalina and Lawrence Avalos[8] by investigating and presenting witnesses to support their testimony regarding the type and color of the shooter's car, investigating the content of Catalina's 911 call, or highlighting Lawrence's testimony that the Camaro used in the shooting had driven by earlier that day, id. at 67-79 (subclaim C), and

  o failing to interview and present testimony from Raul Macias's family members about the police's execution of a search warrant, id. at 80-86 (subclaim D).

- **Ground Four**: Cumulative error undermined the fundamental fairness of Petitioner's trial, violating his Fifth, Sixth, and Fourteenth Amendment rights. Id. at 6, 95-98.

The FAP asserts the following claims:

- **Ground One**: Trial counsel was constitutionally ineffective by failing in various ways to investigate or present reasonably available exculpatory and impeachment evidence. FAP 45-89.

---

[8] Because Catalina and Lawrence Avalos share the same last name, the Court refers to them individually by their first names and collectively as "the Avaloses."

Specifically, counsel was ineffective for:

- o prematurely declaring ready for trial, without having conducted any investigation, <u>id.</u> at 49-50 (subclaim C),[9]

- o failing to obtain investigative notes from the Public Defender's office, <u>id.</u> at 51-52 (subclaim D),

- o failing to introduce Catalina's photographic lineup statement to corroborate her testimony that Petitioner was not the shooter, <u>id.</u> at 53-55 (subclaim E),

- o failing to interview witnesses, including the Avaloses' neighbors, Frederico Hernandez, Richard Adams, and "Teri," who could have corroborated that the shooter's car was green and that the shooter drove by the scene earlier that day; Macias, who would have provided information suggesting that Richardson, not Petitioner, was the shooter; and Macias's cousins, Gabriel Marin and Lorenzo Quezada, who would have rebutted the prosecution's claim that Macias was from Paramount and associated with a gang, <u>id.</u> at 56-67 (subclaim F),

- o failing to interview Jimmy Richardson, who would have: revealed that law enforcement paid him to provide information implicating Petitioner in the shooting, provided information rebutting the prosecution's claim that Petitioner had confessed to committing the shooting,

---

[9] The parties refer to the FAP's ineffective assistance of counsel subclaims by the subsection of the FAP in which each was discussed. For convenience, the Court uses the same letter denominations. There is no subclaim A or B because subsection A set forth the standard of review and subsection B appears to be a summary of Petitioner's subclaims.

and revealed that a coworker drove a green Camaro, <u>id.</u> at 67-70 (subclaim G),

- o failing to rebut Richardson's claim that Petitioner altered his Camaro because it was "hot" with Richardson's prior inconsistent statement and records from the body shop that performed the work, <u>id.</u> at 70-72 (subclaim H),
- o failing to investigate or present evidence that the victim was killed by the T-Flats Street Gang, <u>id.</u> at 72-75 (subclaim I),
- o failing to investigate evidence that Petitioner's younger cousins, not Petitioner, were responsible for gang graffiti found in Petitioner's home, <u>id.</u> at 75-79 (subclaim J), and
- o  failing to object to the prosecutor's false and improper statements in closing argument, including statements that "[t]here is no issue in this case," that witnesses described the shooter's car as maroon, that the Avaloses never mentioned before trial that Petitioner was not the shooter, that defense counsel wrote out the Avaloses' statements in advance, and that Richardson had already been sentenced before informing on Petitioner, <u>id.</u> at 79-89 (subclaim K).

- <u>Ground Two</u>: The trial court violated Petitioner's due process rights by denying defense counsel's requested continuance. <u>Id.</u> at 89-93.

- <u>Ground Three</u>: The prosecutor violated Petitioner's due process rights by failing to disclose material impeachment evidence regarding Richardson. <u>Id.</u> at 93-100.

- Ground Four: The trial court violated Petitioner's right to a fair trial by admitting multiple forms of evidence demonstrating his possession of several firearms when it was conclusively established that none was the murder weapon. Id. at 100-17.
- Ground Five: The trial court prejudicially erred in failing to sua sponte instruct the jury that it must determine whether Petitioner made an extrajudicial admission, and if so, that certain of the statements must be viewed with caution as set forth in CALJIC No. 2.71. Id. at 118-23.
- Ground Six: The cumulative effect of the constitutional violations rendered Petitioner's trial fundamentally unfair. Id. at 123-26.

### III.

### STATE COURT PROCEEDINGS

On August 12, 2003, a Los Angeles County Superior Court jury convicted Petitioner of first-degree murder and found true gun and gang enhancements. 1 Clerks Transcript ("CT") 232-33. On September 19, 2003, the trial court sentenced him to sixty years to life in prison. Id. at 241-42.

Petitioner appealed, raising claims corresponding to the original Petition's Grounds One and Two and the FAP's Grounds Four and Five. Lodged Document ("LD") 2, 3. On March 22, 2005, the California Court of Appeal struck a 10-year sentence for the gang enhancement but otherwise affirmed the judgment. LD 6. Petitioner filed a petition for review in the California Supreme Court, raising the same two claims. LD 7. The California Supreme Court summarily denied the petition on June 8, 2005. LD 8.

About nine years later, on January 26, 2014, Petitioner constructively filed a habeas petition in the California Supreme Court, raising claims

corresponding to the original Petition's Grounds Three and Four and some of the FAP's Grounds One and Six.[10] LD 14. On April 23, 2014, the California Supreme Court denied the petition with citations to People v. Duvall, 9 Cal. 4th 464, 474 (1995), and In re Swain, 34 Cal. 2d 300, 304 (1949), indicating that the claims were not raised with sufficient particularity. LD 15.

On January 12, 2016, Petitioner, now represented by the FPD, filed a second habeas petition in the California Supreme Court, raising claims corresponding to the FAP's Grounds One through Six. See Dkt. 182-1. On July 13, 2016, the California Supreme Court directed the respondent to file an informal response to the petition, which it did on October 18. Dkt. 182-2; Dkt. 182-3. On November 23, 2016, Petitioner filed a reply to the informal response. Dkt. 182-4. On March 29, 2017, the California Supreme Court summarily denied the petition. Dkt. 189-1.

## IV.

## DISCUSSION

Neither party disputes that the FAP is untimely. Rather, Petitioner argues that he is entitled to sufficient equitable tolling to render the original Petition timely and that the FAP's claims either relate back to the Petition's timely claims or qualify for a later accrual date. Respondent opposes all of Petitioner's arguments.

For the reasons discussed below, Respondent's motion to dismiss the FAP should be granted as to Ground One's subclaims I, J, K, and part of subclaim F as well as part of Ground Six because they are untimely and do not relate back to the original Petition. As to the FAP's remaining claims, the motion to dismiss should be denied. The FAP's Ground Three and Ground

---

[10] The prison mailbox rule applies to state habeas petitions. Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003).

One's subclaim G are timely because they qualify for delayed commencement of the statute of limitations under 28 U.S.C. § 2244(d)(1)(D). Moreover, Petitioner is entitled to sufficient equitable tolling to render the original Petition timely, and the FAP's remaining subclaims of Ground One, as well as Grounds Two, Four, Five, and the other part of Ground Six were either raised in the original, timely Petition or relate back to the claims in it.

**A.** **Ground Three and Ground One's Subclaim G Are Timely Because They Qualify for a Later Accrual Date**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a one-year limitation period applies to a federal petition for writ of habeas corpus filed by a person in state custody. See 28 U.S.C. § 2244(d)(1). The limitation period applies to each claim in a habeas petition on an individual basis and runs from the latest of four alternative accrual dates. Mardesich v. Cate, 668 F.3d 1164, 1170-71 (9th Cir. 2012); 28 U.S.C. § 2244(d)(1)(A)-(D). Most commonly, the limitation period begins running under the first listed accrual date—"the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Here, Petitioner did not file a petition for writ of certiorari in the U.S. Supreme Court. Thus, his conviction became final on September 6, 2005, 90 days after the California Supreme Court denied review. See Zepeda v. Walker, 581 F.3d 1013, 1016 (9th Cir. 2009). Under § 2244(d)(1)(A), therefore, Petitioner had until September 6, 2006, to file a federal habeas petition. See Patterson v. Stewart, 251 F.3d 1243, 1246-47 (9th Cir. 2001).

Petitioner does not claim that he is entitled to a later accrual date under § 2244(d)(1)(B) or (C). But he does argue that subsection (d)(1)(D) applies to the FAP's Brady claim in Ground Three and some of its ineffective assistance of counsel subclaims in Ground One—specifically, subclaims G, I, J, and part

12

of F.[11] Opp'n Mot. Dismiss at 48-57. The Court concludes that Petitioner is entitled to a later accrual date for Ground Three and subclaim G only.

### 1. Law

The statute of limitations begins to run under § 2244(d)(1)(D) when the "factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Id. "Due diligence does not require 'the maximum feasible diligence,' but it does require reasonable diligence in the circumstances." Ford v. Gonzalez, 683 F.3d 1230, 1235 (9th Cir. 2012) (citation omitted). Although due diligence is measured by an objective standard, a court will also consider the petitioner's particular circumstances. Id. at 1235-36 (noting that court can consider petitioner's physical confinement, familial assistance, and government's representations in determining diligence).

### 2. Ground Three and Ground One's Subclaim G

In the FAP's Ground Three, Petitioner argues that prosecutor violated Petitioner's due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose material impeachment evidence regarding the government's main witness, Jimmy Richardson—that he was paid between $6,000 and $10,000 for providing incriminating information to police and testifying at Petitioner's trial. FAP at 93-100 & Ex. 11 (Richardson Declaration)[12]; Opp'n Mot. Dismiss, Ex. D (Farrand Decl. with attached email

---

[11] Petitioner also argues that he is entitled to a later accrual date for Ground One's subclaims E and H, but as discussed in Section IV.D, both of those subclaims relate back to timely claims in the original Petition. The Court does not address Respondent's arguments that those subclaims also warrant a later accrual date.

[12] Richardson's declaration was dated August 20, 2015, and states in relevant part:

from Respondent's counsel confirming that the Bureau of Alcohol, Tobacco, and Firearms paid Richardson $3,750 "for relocation and incidental fees" in association with Petitioner's case); Strickler v. Greene, 527 U.S. 263, 280-81 (1999) (holding that Brady's disclosure requirement applies to "impeachment evidence as well as exculpatory evidence"); Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th Cir. 2014) (holding that Brady's disclosure requirement applies to evidence that "impeaches a prosecution witness"); Bagley v. Lumpkin, 798 F.2d 1297, 1302 (9th Cir.1986) (holding that payments to witnesses are Brady material). Petitioner further asserts that Petitioner's convictions were based on false testimony because the prosecution elicited "testimony from Richardson that the entire extent of his bargain with law enforcement was that he would inform on [Petitioner] in exchange for a reduced sentence." FAP at 97-98 (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)). Petitioner argues that for these reasons, he could not have discovered Ground Three's factual predicate before his habeas counsel actually interviewed Richardson in August 2015. Opp'n Mot. Dismiss at 48-52.

Petitioner is entitled to a later accrual date for the FAP's Ground Three because he could not have earlier discovered its factual predicate with reasonable diligence. Before trial, Petitioner's attorney sent the prosecutor an informal request for information, including "any exculpatory evidence." Opp'n

---

In 2002, I gave information about [Petitioner] and the shooting in Paramount to several law enforcement agencies, including the FBI, the United States Secret Service, the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), and the Los Angeles County Sheriff's Department. In exchange for this information, the agents of the several agencies gave me between $6,000 and $10,000. I provided the information in exchange for this money, as well as to avoid prison time on other criminal charges I was then facing.

FAP, Ex. 11 at ¶ 5.

Mot. Dismiss, Ex. C. Counsel also requested Richardson's rap sheet and "the plea agreement given . . . in exchange for his testimony." Id. The prosecutor nevertheless failed to disclose that law enforcement paid Richardson to provide information about the shooting and for testifying against Petitioner. Opp'n Mot. Dismiss, Ex. D (Farrand Decl. ¶¶ 2-3 (stating that trial counsel's and deputy public defender's files did not "contain any documents or materials referring to or referencing any payments to Jimmy Richardson by any law enforcement agents or organizations")).

Nor did Richardson give Petitioner any reason to think that he had been paid for his testimony. At trial, Richardson was asked about his plea deal and testified only that he had pleaded guilty to two felonies, received a suspended sentence and felony probation, and agreed to cooperate with law enforcement by "get[ting] three gun buys and two counterfeit money buys" to help "get cases on other people dealing with guns and drugs." 4 RT 674-76. Richardson also testified that when he was arrested, he told police about Petitioner's statements that he had shot someone; Richardson failed to disclose that he had been paid for providing that information. See id. at 676, 682-83. And nothing shows that Petitioner learned of Richardson's deal in the years following the trial, while Petitioner was incarcerated and had a limited ability to investigate his claims. As discussed below, after his direct appeal was denied, Petitioner hired attorney Harrison to investigate potential claims and file a habeas petition, but Harrison failed to investigate Petitioner's claims or, it seems, perform any other legal work. As such, Petitioner, despite his reasonable diligence, had no reason to suspect that Richardson had been paid by law enforcement until the FPD's investigators interviewed Richardson in August 2015. Because Petitioner filed the FAP raising his Brady claim only a few months later, he is entitled to a later accrual date for the FAP's Ground Three. See Quezada v. Scribner, 611 F.3d 1165, 1168 (9th Cir. 2010) (finding that

15

petitioner was entitled to later accrual date under § 2244(d)(1)(D) because his repeated requests for witness-compensation information were rebuffed by silence or "outright denial"); <u>Agavo v. Neven</u>, No. 13-01741, 2015 WL 5601974, at *9 (D. Nev. Sept. 23, 2015) (finding that petitioner was entitled to later accrual date for <u>Brady</u> claim based on payment to witness because he was "not put on notice that the state had been making" such payments; "[a]t trial, the defense was led to believe that there were no payments" made to witness; and petitioner filed amended petition containing <u>Brady</u> claim "within months of finding evidence of alleged excessive payments" to witness). For these same reasons, Petitioner is also entitled to a later accrual date for Ground One's subclaim G, which asserts that counsel was ineffective for failing to interview Richardson because Richardson would have revealed that law enforcement paid him for providing information implicating Petitioner in the shooting, among other things. <u>See</u> FAP at 67-70.

Respondent nevertheless faults Petitioner for failing to ask Richardson earlier about the payments. Respondent contends that the factual predicate of this claim "was readily discoverable at the time of trial—thirteen years ago—by merely asking Richardson," Mot. Dismiss at 36-37 (emphasis omitted), pointing to Richardson's statement in his declaration that "[i]f I had been interviewed by [Petitioner's] attorney or investigator, I would have told them the information in this declaration" and that he "would also have testified to these things at trial, if asked about them." FAP, Ex. 11 at ¶ 9; <u>see also</u> Reply at 29-30. Respondent further contends that Petitioner "never alleges that he ever took any steps to discover if Richardson had any useful information" such as by attempting to locate or contact him, and that his counsel "did not even begin investigating this claim until one year after they were appointed to represent Petitioner." Mot. Dismiss at 37 (emphasis omitted). But Petitioner had no reason to investigate a <u>Brady</u> claim until he had reason to believe that

16

he possessed one. See Shelton v. Marshall, No. 10-01100, 2012 WL 2203022, at *9 (N.D. Cal. June 14, 2012) (finding that "[u]ntil there was reason for [petitioner] to suspect that he possessed a Brady claim, he did not have a reason to investigate such a claim"); see also Willis v. Jones, 329 F. App'x 7, 9, 17 (6th Cir. 2009) ("In order to file a timely petition under AEDPA, due diligence did not require [petitioner] to ask the state if it had withheld Brady material unknown to him."). The prosecutor, by contrast, was obligated throughout the judicial process to turn over impeachment evidence. See Amado, 758 F.3d at 1135-36 (holding that "[t]he prosecutor's obligation under Brady is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence" and that "defense counsel may rely on the prosecutor's obligation to produce that which Brady . . . require[s] him to produce"); Carter v. Bigelow, 787 F.3d 1269, 1273, 1282 (10th Cir. 2015) (finding that AEDPA limitation period did not begin running on Brady claim until post-conviction counsel received prosecution witnesses' declarations stating that police department had provided them with rent money, groceries, and other favorable treatment before they testified). Respondent's arguments fail.[13]

---

[13] In his Objections, Respondent asserts that the Court's finding conflicts with the Ninth Circuit's reasoning in Ford, 683 F.3d 1237-38. Resp't Objections at 12-13 & n.5. In Ford, the petitioner argued that he was entitled to a delayed accrual date because the prosecutor had withheld evidence that a prosecution witness had allegedly received lenient treatment in her own cases in return for testifying against him. 683 F.3d at 1232. The Ninth Circuit concluded that the petitioner's claims were untimely because their factual predicate could have been discovered at the time of his trial through the exercise of due diligence. Id. at 1232-33, 1236. The Ninth Circuit found that "[b]ased on the testimony offered at [petitioner's] trial, [petitioner] had reason to suspect that [the witness] may have sought and received some benefits for assisting law enforcement," noting that counsel even remarked at trial that the

### 3.     Ground One's Subclaims I, J, and part of F

Petitioner also argues that he is entitled to a later trigger date for FAP Ground One's subclaims I, J, and part of F because he was "incarcerated and pro se, without access to his case file, when he drafted the initial petition." Opp'n Mot. Dismiss at 52-57. Petitioner is not entitled to a later trigger date for subclaims J and F because he could have discovered their factual predicates at the time of trial with reasonable diligence. In subclaim J, Petitioner alleges that counsel failed to investigate "information that the alleged gang graffiti found in [Petitioner's] home—which the prosecution claims showed [Petitioner] was a gang member—was actually not put there by [Petitioner] but was instead drawn by [his] much-younger cousins during a visit." FAP at 75-76. Petitioner alleges that after seeing the photographs of the graffiti in court, his mother, Castro,

> immediately recalled how the graffiti had come to be in the house: it had appeared suddenly one day, during a visit by [Petitioner's] three younger cousins . . . . [Castro] had noticed the graffiti after the cousins left, and had asked [Petitioner] to paint over it, but [he] did not do so because the room was being renovated and the wall was going to be repainted soon anyway.

witness "did what she did because she was expecting a deal." Id. The Ninth Circuit also found that the "unique living arrangements and active assistance" of the petitioner's wife, who was the witness's sister and lived with the witness, "also gave [petitioner] access to information about whether [the witness] had received a deal." Id. Here, by contrast, it is clear that Petitioner had no reason to earlier suspect that Richardson had been paid by law enforcement, and in fact, the evidence at trial would have led him to the opposite conclusion. See Banks v. Dretke, 540 U.S. 668, 695 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed."). As such, the Court's reasoning does not conflict with Ford.

Id. at 77. Petitioner asserts that after court that day, Castro told Petitioner's trial counsel how the graffiti came to be on the wall of the house, but counsel failed investigate the issue or present any evidence about it. Id.

Petitioner necessarily knew, at the time of trial, that he was not responsible for the graffiti and that his counsel failed to present any evidence to that effect. Petitioner could have discovered the graffiti's origin simply by asking his mother, with whom he was in regular contact. See Ford, 683 F.3d at 1236 (finding that petitioner was not entitled to later accrual date when he had "reason to suspect" basis of claim "[b]ased on the testimony offered at [his] trial"); Macias v. Grounds, No. 11-3141, 2013 WL 1402844, at *4 (E.D. Cal. Apr. 5, 2013) (finding that petitioner was not entitled to later accrual date for claim based on family's exclusion from courtroom because "courtroom events" put him "on notice of a potential issue" and nothing "prevented him from asking his mother what had happened"), accepted by 2013 WL 3338652 (E.D. Cal. June 28, 2013).

Nor is Petitioner entitled to a later trigger date for part of subclaim F. In the relevant portion of subclaim F, Petitioner asserts that counsel failed to interview Macias and his cousins, Marin and Quezada. FAP at 60-67. Petitioner argues that had counsel interviewed Macias, he would have revealed that Richardson, not Petitioner, had sold him the murder weapon; that Richardson had called Macias the day before the police searched Macias's home, saying that he wanted the gun back; that Richardson talked about spending time in Paramount; and that a mutual coworker who was friendly with Richardson drove a green Camaro. Id. at 60-61. But given that Macias testified to much of that information at trial, see 5 RT 922-38, Petitioner was on notice that Macias was "central[] to the state's case," Opp'n Mot. Dismiss at 60, and he could have, with reasonable diligence, discovered earlier counsel's alleged failure to interview him. Even without his case file, nothing

prevented Petitioner from simply asking his trial counsel whether he had interviewed Macias. The same is true for Marin, who was discussed during Petitioner's trial, and Quezada, who was one of Petitioner and Richardson's coworkers. 4 RT 721-23, 731, 758-60.

Petitioner likely could not have discovered subclaim I at the time of trial, even with reasonable diligence, because he did not at that time have access to his case file, which contained the police reports suggesting gang involvement. But that does not matter because Petitioner, or his counsel, could have earlier discovered subclaim I, as well as J and F, even if they had not been discoverable at trial and despite Petitioner's incarceration and lack of access to his case file.

First, although Petitioner sent his case file to Harrison, he apparently had access to other copies of his reporter's and clerk's transcripts for most of his incarceration. See 1 Tr. 180-81 (Petitioner's testimony that ex-girlfriend sent him copies of "six volumes" of transcripts "and the clerk's transcripts"), 236-37 (Petitioner's testimony that an ex-girlfriend made copies of trial transcripts and sent them to him in prison, and that he had no contact with that ex-girlfriend after about 2005). Second, even accepting Petitioner's claim that he was unable to discover these subclaims because he was in prison and had sent his file to Harrison, Petitioner has failed to explain convincingly why he was not able to discover his additional claims once the Court appointed the FPD to represent him, on April 28, 2014. On that date, the Court appointed counsel "for the purpose of pursing Petitioner's equitable tolling and opposing any renewed Motion to Dismiss and for all future proceedings in this matter." Dkt. 76 (emphasis added). The Court also directed that the FPD be served with copies of the reporter's and clerk's transcripts, Respondent's filings, the Petition, and the Court's file. Id. At that point, Petitioner's counsel could have obtained Petitioner's full case file from trial counsel and investigated any

additional potential claims. But counsel did not do so until a year later, in April 2015, see Mot. Leave Amend, Ex. 4 (Farrand Declaration stating that she obtained trial counsel's file on April 6, 2015, and the public defender's file on April 17, 2015), and counsel did not file the FAP raising the new ineffective assistance of counsel claims until November 19, 2015.[14]

Because Petitioner's new ineffective assistance of counsel claims could have been discovered earlier with reasonable diligence, a later accrual date under § 2244(d)(1)(D) is not appropriate. See Cook v. Lewis, No. 14-2259, 2015 WL 4624291, at *6 (C.D. Cal. Aug. 3, 2015) (finding petitioner not entitled to later accrual date when "he nowhere explains why he did not request his file or any other documents from his attorney at any point in the 10 years following his conviction, nor does he allege that he requested his file but counsel failed to provide it to him"), appeal docketed, No. 15-56284 (9th Cir. Aug. 21, 2015); Dutcher v. Stewart, No. 08-015, 2009 WL 1935853, at *4 (D. Ariz. July 6, 2009) (finding petitioner not entitled to later trigger date under § 2244(d)(1)(D) based on inability to obtain legal file in part because he "waited well over ten years before requesting the file" and thus "did not act with due diligence to obtain the file").

In sum, under § 2244(d)(1)(D), the FAP's Ground Three and Ground One's subclaim G are entitled to a later accrual date of August 20, 2015, the

---

[14] Petitioner argues that counsel was reasonably diligent despite the delay because for the first year after counsel was appointed, "the focus of all parties' efforts in this case was the equitable tolling issue that prompted current counsel's appointment." Opp'n Mot. Dismiss at 57. The Court does not contest that counsel has diligently handled the equitable tolling issue. But Petitioner's argument must be viewed in light of the fact that counsel was appointed "for all further proceedings," not for the limited purpose of litigating Petitioner's equitable tolling claim. The year-long delay in even obtaining Petitioner's case file is too long, in this Court's opinion, to warrant a reasonable diligence finding for subclaims I, J, and F.

date Richardson signed his declaration. Because Petitioner filed his FAP raising those claims on November 19, 2015, just three months later, those claims are timely. Petitioner is not entitled to a later trigger date for any other claims.

**B. Petitioner's Remaining FAP Claims Are Timely Only Insofar As They Were in the Original Petition or Relate Back to It**

As to Petitioner's remaining claims, § 2244(d)(1)(A) applies. Under that subsection, absent tolling of some kind, AEDPA's one-year statute of limitation expired on September 6, 2006. Petitioner did not constructively file the original Petition and FAP until October 15, 2010, and November 19, 2015, respectively. Petitioner's remaining claims are time barred unless he can show that (1) the original Petition was timely due to statutory or equitable tolling and (2) the FAP's claims were either included in the original Petition or relate back to it.

**1. Timeliness of Original Petition**

      a.    Statutory Tolling

Under AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). But here, Petitioner did not constructively file his first state habeas petition until January 26, 2014, more than seven years after the limitation period expired. LD 14. He therefore is not entitled to any statutory tolling. See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("[S]ection 2244(d) does not permit the reinitiation of a limitation period that ended before the state petition was filed[.]").

      b.    Equitable Tolling

Petitioner contends that he is entitled to sufficient equitable tolling to render his original Petition timely because his attorney's misconduct prevented

timely filing despite Petitioner's reasonable diligence. For the reasons discussed below, the Court agrees.

i.    Relevant Law

In addition to statutory tolling, federal habeas petitions are subject to equitable tolling of the one-year limitation period in appropriate cases. Holland v. Florida, 560 U.S. 631, 645 (2010). To be entitled to equitable tolling, the petitioner must show both "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented his timely filing. Id. at 649 (citing Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). The Ninth Circuit has noted that its "sparing application of the doctrine of equitable tolling" is consistent with the Pace standard. Waldron-Ramsey v. Pacholke, 556 F.3d 1008, 1011 (9th Cir. 2009). Thus, "[t]he petitioner must show that 'the extraordinary circumstances were the cause of his untimeliness and that the extraordinary circumstances made it impossible to file a petition on time.'" Porter v. Ollison, 620 F.3d 952, 959 (9th Cir. 2010) (quoting Ramirez v. Yates, 571 F.3d 993, 997 (9th Cir. 2009)). "Indeed, 'the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule.'" Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (citation omitted, alteration in original).

Consequently, as the Ninth Circuit has recognized, equitable tolling will be justified in few cases. Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003); see also Waldron-Ramsey, 556 F.3d at 1011 ("To apply the doctrine in 'extraordinary circumstances' necessarily suggests the doctrine's rarity, and the requirement that extraordinary circumstances 'stood in his way' suggests that an external force must cause the untimeliness, rather than, as we have said, merely 'oversight, miscalculation or negligence on [the petitioner's] part, all of which would preclude the application of equitable tolling.'" (quoting Harris v. Carter, 515 F.3d 1051, 1054-55 (9th Cir. 2008), alteration in original)). Finally,

23

the petitioner bears the burden of demonstrating by a preponderance of the evidence that AEDPA's limitation period should be equitably tolled. See Pace, 544 U.S. at 418; Holt v. Frink, No. 15-01302, 2016 WL 125509, at *4 (N.D. Cal. Jan. 12, 2016) (collecting cases).

ii.    Facts Determined at Evidentiary Hearing

On September 28 and 29, 2016, the Court held an evidentiary hearing regarding Petitioner's entitlement to equitable tolling. Having received testimony and evidence, the Court makes the following findings of fact:

On June 13, 2005, Petitioner's counsel on direct appeal, Patricia Scott, notified Petitioner by letter that the California Supreme Court had denied his petition for review and that she would be taking no further action on his behalf. Pet. Ex. 5; 1 Tr. 171-72. Scott advised him there were "several other legal avenues which you can pursue at this time, either on your own or with an attorney," such as filing a petition for writ of certiorari in the U.S. Supreme Court or "filing a petition for writ of habeas corpus in federal court." Pet. Ex. 5; 1 Tr. 171-72. Scott further advised Petitioner that a petition for certiorari must be filed by September 5, 2006, and that a federal petition must be filed "within one year and 90 days of the date your case was decided in the California Supreme Court (which was June 8, 2005)." Pet. Ex. 5. She returned his case file, which include the trial transcripts, the "murder book," the court decisions, and all documents she filed with the state court. 1 Tr. 179.

In June 2005, immediately after receiving Scott's June 13 letter, Petitioner sent Castro and Galindo a letter stating that a fellow inmate had recommended a "really good" lawyer, Harrison. 1 Tr. 17, 177-79. Petitioner enclosed Harrison's business card and asked them to hire Harrison to "help [Petitioner] . . . with his petition and help him file" it in "[f]ederal court" "within a year." 1 Tr. 17-18; see also 1 Tr. 122-23, 178-79 (Petitioner's testimony that he told Castro that he wanted Harrison to "represent me in the

24

federal appellate process in filing the petition for writ of habeas corpus, that [he] had the one-year deadline on"). Petitioner also sent his case file to Castro and Galindo so they could give it to Harrison. 1 Tr. 18-19, 179-80. At some point around 2005, Petitioner's former girlfriend sent him copies of his reporter's and clerk's transcripts. See 1 Tr. 180-81, 236-37.

On June 19, 2005, Petitioner wrote a letter to Scott, asking whether a petition for writ of certiorari would toll the time for filing a federal petition. Pet. Ex. 6; 1 Tr. 174-75. On June 23, 2005, Scott responded, explaining that "if you petition to the U.S. Supreme Court, the timeclock for the filing of a federal habeas petition begins upon the denial of the certiorari petition" and that Petitioner would then have "one year from [that] date to file in the federal district court." Pet. Ex. 7; 1 Tr. 175-76.

Galindo and Castro met with Harrison on June 28, 2005, at his office in San Dimas. 1 Tr. 19, 23, 123. The office contained a front desk, files, books, and folders. 1 Tr. 19,128; Harrison Dep. 32-22 (Harrison stating that his offices contained case files, law books, and reception desk). A receptionist and Harrison's wife were there. 1 Tr. 19, 123-24, 128. Harrison spoke to Galindo and Castro in English; because Castro spoke only Spanish, Galindo translated. 1 Tr. 20, 119, 125. Castro told Harrison that Petitioner needed to "submit an appeal regarding his case" in "federal court" before the one-year deadline. 1 Tr. 124, 127-28.

Harrison agreed to file a petition in federal court within a year, and he mentioned a date by which the petition needed to be filed.[15] 1 Tr. 20-21. Harrison said Petitioner had a "really good case" and that it would be a "good case for him to file the petition and get him out of prison." 1 Tr. 21. Harrison

---

[15] Galindo could not remember the exact date Harrison mentioned. 1 Tr. 20-21.

said he wanted to visit Petitioner in prison as soon as possible. 2 Tr. 128. Harrison's wife, who spoke Spanish, told Galindo and Castro that Harrison "is a really good lawyer"; she said she and Harrison "believe[d] in God" and were Catholic, like Galindo and Castro. 1 Tr. 25-26, 128; see also Harrison Dep. 33 (Harrison testifying that he was Catholic and that his offices probably contained religious items like statues and pictures). Harrison's wife said she was going to pray for Petitioner and light religious candles to help him. 1 Tr. 26.

Galindo and Castro paid Harrison $2,000 at the June 28 meeting. 1 Tr. 22-23, 124-25; Pet. Ex. 38 (June 28, 2005 receipt showing $2,000 received from "Ana Castro (Fermin)" for "attorney fees" for "L. Harrison, Esq."). They believed they were paying Harrison that money so he would file a petition within the one-year period. 1 Tr. 25. Harrison told Galindo and Castro that they could make payments "while the case was going," but he did not specify the amount or timing of such payments. 1 Tr. 23-24. Galindo and Castro did not sign a written contract. 1 Tr. 24-25.

After the meeting with Harrison, Galindo told Petitioner that "we went to see [Harrison] and that we gave him the $2,000, and that he was going to be [Petitioner's] lawyer to file the petition." 1 Tr. 28; see also 1 Tr. 129-30. Castro also sent Petitioner a letter saying that Harrison was Petitioner's attorney. 1 Tr. 184. Petitioner understood that Harrison was "going to file a petition on [his] behalf, also that he will be coming to see [him] soon." Id. About three weeks after the June 28 meeting, Galindo took Petitioner's case file to Harrison at his San Dimas office. 1 Tr. 28-29.

In the year following their first meeting with Harrison, Galindo and Castro spoke with him by phone or in person about every three weeks. 1 Tr. 29. Petitioner wrote to Galindo every 3 to 4 weeks and to his mother two or three times a month; he would ask how the case was going and whether the

26

petition had been filed. 1 Tr. 28-30, 130, 185-86. Petitioner asked them to make sure Harrison "would file the petition within the year." 1 Tr. 30-31, 186. Galindo and her mother responded to Petitioner's letters by "[i]mmediately" trying to contact Harrison. 1 Tr. 31. When they called Harrison on the phone, sometimes his wife would answer and say he was in court, and sometimes the phone would be disconnected for a period of time. 1 Tr. 32, 131-32. Eventually, after Harrison failed to call them back, Galindo and Castro would go see him in person. 1 Tr. 32, 131-32. Harrison would tell them "[d]on't worry about it," that he was "working on the petition" and it would "be filed within the year." 1 Tr. 31. Harrison also said Petitioner had a "good case." Id. Harrison said he would visit Petitioner in prison soon, and that visiting would be convenient because he had another client in Petitioner's prison and a daughter who lived in that area. 1 Tr. 31-33.

Meanwhile, on July 24, 2005, Petitioner wrote a letter to Castro, stating that he was "concerned the attorney you got for me hasn't written to me nor come to see me either, like you said he would." Pet. Ex. 8. Petitioner asked Castro to "call [Harrison] and ask him what's up"; he reminded her that "[t]ime doesn't stop and the time I have [set] is getting closer and closer." Pet. Ex. 8 (second brackets in original); 1 Tr. 186-88. Petitioner testified that in doing so, he was trying to remind Castro of the one-year deadline for filing a federal habeas petition. 1 Tr. 188.

On November 17, 2005, Petitioner wrote a letter to Harrison, stating that he had been "informed by my family that you are now the private attorney who will be representing me in my appeal." Pet. Ex. 9; 1 Tr. 188-90. Petitioner wrote that the last he knew of his case was that he had 90 days to file a petition for certiorari in the United States Supreme Court, and that he "hope[d] that [H]arrison [was] able to file it" during that period, adding, "[o]f course, if you thought that was the wise thing to do." Pet. Ex. 9; 1 Tr. 190-91. Petitioner

stated that he currently had "no idea how or where my appeal is at" and asked Harrison to notify Petitioner of any case developments. Pet. Ex. 9. Petitioner asked Harrison to visit him, saying that he had been "notified by my family that you had plans to do that." Id.

At some point, Galindo and Castro went to see Harrison at his San Dimas office only to discover that it was empty. 1 Tr. 34, 135-36. They got "nervous" and went home to look for Harrison's phone number. 1 Tr. 34. When the phone number on Harrison's business card did not work, Galindo and Castro looked through their paperwork until the found a different phone number. Id. They called that number and spoke to Harrison's wife, who said Harrison had moved to a different office, on Mission Inn Avenue in Riverside. Id.[16] Galindo and Castro immediately went to the new office to speak with Harrison. 1 Tr. 34-35.

Once there, Harrison told them, "don't worry about it, the case is going well," and said he was planning to visit Petitioner in prison. 1 Tr. 35. Galindo and Castro told Harrison that Petitioner had been sending him letters, but Harrison "just continued talking" without acting surprised or saying that he had not received them. 1 Tr. 35-36. Harrison asked for $1,000 to visit Petitioner in prison. 1 Tr. 36, 132-33.[17] On March 19, 2006, Galindo and Castro returned to Harrison's office and paid the $1,000. 1 Tr. 36-37; Pet. Ex. 39 (receipt dated March 19, 2006, for $1,000 cash paid by Ana Castro to "Law

---

[16] Although Galindo testified that they discovered the location of Harrison's new office by calling Harrison's wife, Castro testified that when they went to the San Dimas office and discovered it was closed, "there was a sign with the address of the office where he had moved to," on Mission Inn Avenue in Riverside. 1 Tr. 135-36.

[17] Castro testified that Harrison asked for $1,500, but she had only $1,000 so that is what she gave him. 1 Tr. 132-33.

Office of Lawrence Harrison").

On April 4, 2006, Petitioner wrote a letter to Harrison, stating that Harrison still had not visited and that Petitioner was becoming "very concerned and worried since I haven't been made aware of how or where my appeal stands." Pet. Exs. 10, 10.5; 1 Tr. 192-93. Petitioner stated that he had "been diligently attempting to reach you but have had no success." Pet. Ex. 10. Petitioner mailed the letter to Harrison's address on Mission Inn Avenue. Pet. Ex. 10.5; 1 Tr. 195. Around the time that Petitioner wrote the letter, Castro and Galindo were telling him that Harrison was saying that he would be "fighting [Petitioner's] petition with the federal courts soon." 1 Tr. 194.

Harrison later moved to an office on Emerson Street in Riverside; Galindo and Castro visited Harrison at his Riverside offices between four and six times. 1 Tr. 37-38, 42, 136-37. During those meetings, Harrison told Galindo and Castro that Petitioner's case was "going good." 1 Tr. 39-40.

A year after being hired, Harrison told Galindo and Castro that the petition had been filed "within that year" and that Petitioner's "case was going to be fine." 1 Tr. 40; 1 Tr. 132 (Castro's testimony that within first year after hiring him, Harrison told them that "everything was going well, that he had already filed the papers that he was working on for [Petitioner's] federal case"); 196 (Petitioner's testimony that Castro and Galindo told him that Harrison had said he had filed petition and everything was "moving along smoothly"). Galindo told Petitioner and "[h]e was happy because finally he heard good news regarding Mr. Harrison." 1 Tr. 41; 1 Tr. 134 (Castro's testimony that she told Petitioner that Harrison said he had filed petition), 196-97 (Petitioner's testimony that he was relieved that one-year mark was met). At that point, Petitioner understood that it was "a sit-and-wait game now, because typically it takes a while for the courts to respond to your petition." 1 Tr. 197. Other inmates had told Petitioner that "it took years sometimes for the courts to

29

respond" to a habeas petition. 1 Tr. 197-98.

Between 2007 and 2009, Galindo and Castro continued to talk to Harrison in person and on the phone. 1 Tr. 41. Harrison told them Petitioner's case had been filed, it was going well, and they were "waiting to receive a response."1 Tr. 42. Galindo sent Petitioner letters to tell him what Harrison had said. 1 Tr. 42-43, 200.

Meanwhile, on January 14, 2007, Petitioner wrote a third letter to Harrison, stating that Harrison's failure to contact Petitioner was "unprofessional" and that he was "very concerned to know that status of my appeal." Pet. Ex. 11; 1 Tr. 198-200. Petitioner asked Harrison to "re-assure me that all is moving as plan[ned]" and to "pay me a . . . visit to discuss [his case] in person." Pet. Ex. 11. Harrison did not respond to Petitioner's letter. 1 Tr. 200.

On March 1, 2007, Petitioner sent Harrison another letter, stating that he was "once again diligently . . . trying to establish communication with you." Pet. Ex. 12. Petitioner enclosed an article about a recent case, stating that he believed it applied to him because "as we speak I have a pending appeal/case." Pet. Ex. 12; 1 Tr. 201-03. Petitioner also said he was "still here awaiting patiently your expected attorney visit." Pet. Ex. 12. Harrison did not respond. 1 Tr. 203.

On December 17, 2007, Petitioner sent Harrison another letter, stating that he had been trying to establish contact with Harrison since November 2005 "with no success." Pet. Ex. 13; 1 Tr. 203-06. Petitioner stated that he would "appreciate a verification that you have been receiving my mail" and asked Harrison to send him "copies of all briefs, opinions and Petition filed to the Court." Pet. Ex. 13; 1 Tr. 206.

On April 8, 2008, Petitioner sent a letter to various legal aid and nonprofit organizations asking for help finding a criminal appeal attorney. Pet.

Ex. 15; 1 Tr. 208-09. Petitioner wrote that he was "being represented by a private attorney" but had "tried and failed to establish communication" with him. Pet. Ex. 15. Petitioner wrote that, as a result, he was "not aware of what stage or phase [his] appeal is currently in." Pet. Ex. 15; 1 Tr. 208-09. Petitioner never received a response to those letters. 2 Tr. 17-18.

On June 1, 2008, Petitioner sent Harrison another letter to "once again attempt communicating with" him and start a "dialogue w/regards to my appeal." Pet. Ex. 16; 1 Tr. 210-11. Petitioner asked that "copies of all briefs, opinions, and petitions filed to the courts be forwarded to me." Pet. Ex. 16. On January 8, 2009, Petitioner sent a letter to Harrison "stress[ing] [his] concern on our lack of communication" regarding his "pending appeal." Pet. Ex. 17; 1 Tr. 211-12. He asked Harrison to "update [him] on the status of [his] case" and send him copies of "all briefs, opinions, and petitions filed to & by the Courts." Pet. Ex. 17. On June 22, 2009, Petitioner sent Harrison another letter, again expressing concern over Harrison's lack of communication and asking for an update on his "appeal." Pet. Ex. 18; 1 Tr. 212-13.

At some point, Galindo and Castro went to Harrison's office on Emerson Street only to find it empty. 1 Tr. 43. When they called Harrison's phone number, they were told that he had moved to Hemet. 1 Tr. 43, 136-37. Galindo and Castro went to the Hemet office and saw Harrison, who told them "that the petition was not approved and that it will be going to through the Ninth Circuit." 1 Tr. 44; see also 1 Tr. 137. Galindo and Castro did not understand what Harrison meant and they "just told [Petitioner] what [Harrison] said." 1 Tr. 44; 1 Tr. 215-16 (Petitioner's testimony that around Aug. 2009, Castro told him that Harrison had said Petitioner's case was pending "with the Ninth Circuit Court of Appeals"). In response, Petitioner sent Galindo a letter asking her to ask Harrison to give him a "good explanation of his case and what was happening." 1 Tr. 44-45, 215-17.

31

Galindo and Castro went to Harrison's office and told him that they "needed something in writing, a letter, that he could give us so we could send [it] to [Petitioner]." 1 Tr. 45. Harrison agreed to give them a letter, but said he did not have time to write it then and they would have to come back to pick it up. Id. Because Galindo and Castro lived in San Bernardino, a 45-minute drive from Harrison's office, Galindo asked Harrison to email the letter to her; he agreed and they exchanged email addresses. 1 Tr. 45-46. When Harrison failed to email the letter, Galindo tried to email him several times in August 2009 to remind him to send the letter. 1 Tr. 46-55; Pet. Exs. 40 (Aug. 7, 2009 email), 41 (Aug. 10, 2009 email), 42 (Aug. 11, 2009 email), 43 (Aug. 13, 2009 email), 44 (copy of Aug. 13, 2009 email showing recipient's email address).[18] In the last email, dated August 13, 2009, Galindo wrote:

> I will like to know if your going to send me that letter that you advised to us in our last visit to you, my brother is really concern about his case and because he has never spoke to you he just wants to make sure what is the status on his case and what has been done. [I]f like you explained to us that appeal was done and it was not approve please explain that to him and also what are the options available for him at this time . . . .

Pet. Ex. 43. Harrison never responded to Galindo's emails.

In October 2009, Petitioner was transferred to Corcoran State Prison; his trial transcripts and other personal property were not initially provided to him

---

[18] Although Galindo sent her first two emails to the wrong email address, the last two were sent to the correct address: lawhyer@yahoo.com. See Pet. Exs. 42, 43, 44; see also Harrison Dep. 100 (Harrison's testimony that his email address was spelled "lawhyer"); Pet. Ex. 49 (declaration of state-bar attorney Brandon K. Tady stating that he had emailed Harrison at email address "lawhyer@yahoo.com" and that Harrison had responded).

at his new prison. 1 Tr. 217-18.

At Corcoran, Petitioner talked to a fellow inmate, who recommended that he write to the courts to find out the status of his case. 1 Tr. 219-20. On October 28, 2009, Petitioner wrote to the United States District Court for the Central District of California, stating that he believed his case was currently pending in the Ninth Circuit and asking for copies of any documents that had been filed in his case. Pet. Ex. 19; 1 Tr. 220-23. Petitioner also mentioned that he was currently housed at Corcoran State Prison and did not have access to his legal documents. Pet. Ex. 19, 1 Tr. 222.

Meanwhile, Galindo and Castro went to Harrison's office in Hemet to try to get the letter Harrison had promised to write. 1 Tr. 56-57, 138. When they arrived, Harrison's wife told them that Harrison was not there and had not left a letter for them. 1 Tr. 57. Galindo told Harrison's wife that they would wait for him to return. Id. Galindo, Castro, and Galindo's children waited in the car for five or six hours. 1 Tr. 57, 138. Galindo often used her cell phone to call Harrison's wife; although Galindo never saw a car drive up to the office, Harrison's wife eventually told them that Harrison had the letter ready. 1 Tr. 57-58. When Galindo went in to the office to pick up the letter, she saw Harrison, who looked "tired and sick." 1 Tr. 58-59; see also 1 Tr. 154-55. Galindo and Castro immediately sent the letter to Petitioner. 1 Tr. 59-60; see also 1 Tr. 154-55. Galindo later tried calling Harrison on the phone so she could get Petitioner's case file back but she was never able to reach him. 1 Tr. 59-60. Galindo never saw the case file again. 1 Tr. 60.

Around November 5, 2009, Petitioner sent Galindo a letter asking that she visit a website, http://appellatecases.courtinfo.ca.gov, to try to find information about his attorney, the court his case was in, and "what stage or how far in the courts we're in." 1 Tr. 61-63, 224-25; Pet. Ex. 20. Galindo tried to go to the website but was not able to use it to find information. 1 Tr. 62-63,

33

226-27. Petitioner later sent Galindo the web address for the California State Bar and asked her to search for information about Harrison. 1 Tr. 63-64. Around that same time, Petitioner sent Galindo a letter asking her to get his file back from Harrison and listing questions to ask Harrison about what was happening with Petitioner's case. 1 Tr. 64-67, 230.

Around November 12, 2009, Petitioner received a letter from the U.S. District Court, informing him that he had no case or appeal pending there. 1 Tr. 227-28. Petitioner thought his case could still be pending in the Ninth Circuit or the U.S. Supreme Court, but he did not rule out the possibility that a petition was never filed. Id. As soon as Petitioner received that letter, he started submitting requests to go to the law library so he could research issues related to his habeas petition, including ineffective assistance of counsel and equitable tolling. 2 Tr. 22-26.[19] Petitioner still had not received the letter Galindo had sent him from Harrison. 1 Tr. 228.

On December 4, 2009, Galindo sent Petitioner a letter telling him that the California State Bar's website showed that Harrison's bar membership was active but that in 2003, he had been suspended for 30 days and placed on probation.[20] 1 Tr. 63-64, 229-32; Pet. Ex. 22 (Dec. 4, 2009 letter). Galindo

---

[19] Petitioner testified that while he was at Corcoran, he could use the library once a month for an hour and a half. 1 Tr. 240. Petitioner testified that once he realized that he needed to prepare a federal petition, he "continued submitting . . . requests to attend the law library as much as possible." 2 Tr. 23, 29, 45-46. In his October 2016 Status Report, Respondent asserted that while at Corcoran, Petitioner was documented as having visited the law library on October 27, 2009 and April 5, July 23 and 30, and August 3 and 10, 2010. See Status Report & Ex. 4. Petitioner may have attended the library on November 17, 2009, and he was scheduled to attend the library on December 15, 2009, but he did not attend because he either was moving cells or had been transferred to a different unit. See Status Report & Ex. 4.

[20] The California State Bar website shows that in August 2003, Harrison

34

wrote that she would "go over [Petitioner's] letter carefully to write on a paper all the questions" and would make an appointment to see Harrison "so that he gives me the information in writing in order to send it to you." Pet. Ex. 22; 1 Tr. 65-66, 230. Galindo was unable to make an appointment with Harrison. 1 Tr. 66.

On December 10, 2009, Petitioner sent a letter to the California State Bar. Pet. Ex. 23. Petitioner wrote that he had hired Harrison, who had made "no attempt to contact [Petitioner]" but said he filed a "rebuttal to the honorable '9th Circuit.'" Pet. Ex. 23; 1 Tr. 232-33. Petitioner wrote that he had "recently discover[ed] from the courts that I had no pending case/appeal." Pet. Ex. 23. He asked the state bar to send him any available information about Harrison as well as a malpractice complaint. Id. Petitioner wrote that "due to the fact that I am mandated by the Court to file a response within a certain amount of time, I am very concerned that I have been misrepresented, or worst, scammed." Id. Petitioner believed that if he could show through a state-bar complaint that Harrison had defrauded him, that would help explain his delay in filing his federal petition. 2 Tr. 11.

Around this same time, in December 2009, Petitioner received the letter from Harrison that his sister had mailed to him.[21] 1 Tr. 233-34. In it, Harrison stated, "I was not your Appeal Attorney, however, since your Mother told me

---

was suspended for 30 days and placed on 3 years' probation for making false statements to a judge. See State Bar of Cal., Attorney Search, http://www.calbar.ca.gov/Home.aspx (search for Lawrence Victor Harrison); Felix v. McEwen, No. 12-741, 2016 WL 4445273, at *6 (C.D. Cal. June 17, 2016) (summarizing Harrison's disciplinary actions), accepted by 2016 WL 4445227 (C.D. Cal. Aug. 17, 2016).

[21] Petitioner testified that at Corcoran, he received personal mail, such as Galindo's letter enclosing the letter from Harrison, three to four weeks after it was sent. 1 Tr. 233.

of what had happened to you, I have stood bye [sic] looking for a collateral attack we could make for you." Pet. Ex. 24; 1 Tr. 234-35. Harrison wrote that he had "copies of your appeal and trial and went over them with care looking for a flaw." Pet. Ex. 24. He also wrote, "During all these years I have never talked with you," and "I am willing to continue being your lawyer but it is necessary for you to communicate with me, by letter at least." Id. Petitioner was confused by the letter and started to think that Harrison had been "lying [to] and deceiving" Petitioner and his family. 1 Tr. 235. At that point, Petitioner realized that he needed to get his files back from Harrison and "prepare [himself] to do something, to file [his] own petition, to do what I had to do." 1 Tr. 236. Petitioner had not yet received his property, including his trial transcripts, at his new prison. 1 Tr. 236-38.

Around January 2010, Petitioner received his trial transcripts and immediately began reading them. 1 Tr. 238-39. Petitioner read his transcripts every day from 6 a.m. to 9 p.m. 2 Tr. 23. He did not have any of his other legal documents, such as his appellate briefs. 2 Tr. 22. Based on what he had read in a book called the Habeas Corpus Handbook, Petitioner believed that he had to explain his delay in filing the petition or his petition would not be successful. 2 Tr. 36-37. Thus, Petitioner began drafting a "Certificate of Appealability" that explained why his petition was filed late. 2 Tr. 11-12, 36-37. Petitioner also asked Galindo to look for receipts from Harrison and send them to him. 2 Tr. 14.

On January 7, 2010, Galindo wrote to Petitioner, asking whether he had received the letter she had sent him from Harrison. Pet. Ex. 25; 1 Tr. 67-68, 2 Tr. 13-14. Galindo also said she would ask Castro to look for any receipts or "proof" from Harrison and they would send what she found to Petitioner. Pet. Ex. 25; 1 Tr. 69; 2 Tr. 14. Galindo asked whether Petitioner wanted her to work on a "complaint against attorney Harrison" or go pick up "the

36

documents" from him. Pet. Ex. 25; 1 Tr. 69-70; 2 Tr. 14-15. Galindo also suggested ideas for raising money to pay a new lawyer, such as organizing a car wash and asking relatives to donate money. Pet. Ex. 25; 1 Tr. 70-71. Petitioner asked Galindo to pick up all of his documents from Harrison. 2 Tr. 15.

On January 27, 2010, Petitioner wrote a letter to his former appellate counsel, Scott. Pet. Ex. 28; 2 Tr. 17-20. Petitioner explained that after his appeal was denied, his family had hired a private attorney "to represent me w/the further avenues that existed," but that he eventually wrote to the courts and "to my astounding surprise, I was told that I had no pending case/appeal w/their honorable courts." Pet. Ex. 28. He asked Scott to provide "[a]ny counsel and/or assistance." Pet. Ex. 28. Petitioner's letter to Scott was returned to him as undeliverable around March 23, 2010. Pet. Ex. 28; 2 Tr. 20-21.

In March 2010, Petitioner asked a clerk at the library for help obtaining his appellate briefs. 2 Tr. 26-27. The clerk called the court for Petitioner but was not able to get any information, and he suggested that Petitioner write to the court directly. Id.

On March 4, 2010, Petitioner received a letter from the state bar, stating that it was investigating his complaint regarding Harrison and asking for more information. Pet. Ex. 29; 2 Tr. 27-28. On March 11, 2010, Petitioner responded, providing more information and Castro's and Galindo's contact information. Pet. Ex. 30; 2 Tr. 28-29.

On April 7, 2010, Petitioner sent a letter to the Superior Court, asking for copies of his appellate briefs. 2 Tr. 30-31. On May 12, 2010, the Superior Court issued a minute order stating that it could not provide him with his "transcripts" and that he had to request them from the California Court of Appeal. Pet. Ex. 31; 2 Tr. 31-32. Petitioner received the order on or around

May 17, 2010. 2 Tr. 32-33. Petitioner wrote to the California Court of Appeal and asked it to send him copies of his briefs, but he received no response. 2 Tr. 38-39.

On May 29, 2010, the California State Bar suspended Harrison from the practice of law for 60 days, placed him on two years' probation, and ordered him to retake the MPRE exam, among other things. In the Matter of Lawrence Victor Harrison, Nos. 06-O-13792-DFM, 06-O-13797-DFM, 06-O-14825-DFM (State Bar Ct. Cal., Dec. 21, 2009), available at www.calbar.ca.gov (attorney search for Lawrence Victor Harrison). As part of that case, Harrison stipulated to six counts of misconduct in three matters; his misconduct included failing to tell a client about letters from the state courts or send him copies of the letters, failing to withdraw as counsel, allowing an appeal to be dismissed for failure to pay the filing fee, failing to appear for court hearings and pay sanctions, and failing to cooperate in disciplinary investigations. Id.

On June 17, 2010, Petitioner received a letter from a state bar investigator stating that the state bar had closed his complaint against Harrison because there was "insufficient evidence to take further action." Pet. Ex. 32; 2 Tr. 34-36. The investigator stated that she had tried to contact Galindo but received no response. Pet. Ex. 32; 1 Tr. 34. The investigator informed Petitioner that he could file a verified accusation against Harrison in the California Supreme Court within 60 days. Pet. Ex. 32; 2 Tr. 35-36.

On July 2, 2010, Petitioner sent another letter to the California Court of Appeal, asking for copies of his appellate briefs. 2 Tr. 38-39. On August 3, 2010, Petitioner filed a verified accusation against Harrison in the California Supreme Court. Pet. Ex. 33; 2 Tr. 42-45.

On August 19, 2010, the California Court of Appeal sent Petitioner copies of his opening and supplemental briefs on direct appeal. Pet. Ex. 34; 2 Tr. 39-40. Once Petitioner received the copies of his briefs, he "started to put

38

[his] entire petition together." 2 Tr. 40-41. On October 15, 2010, Petitioner mailed the original Petition and "Certificate of Appealability" to this Court. Dkts. 1, 3; Pet. Ex. 36; 2 Tr. 45-47.

On September 6, 2011, the California State Bar suspended Harrison from practicing law in California because he had failed to retake the MPRE exam, as previously ordered. See Order, In the matter of Lawrence V. Harrison, No. 06-O-13792 et al. (State Bar of Cal. Sept. 6, 2011), available at www.calbar.org (attorney search for Lawrence Victor Harrison). On May 11, 2014, Harrison was disbarred for failing to comply with probation conditions, improperly withdrawing from employment, failing to communicate with clients, failing to return unearned fees, failing to render an account of client funds, and failing to release a client file. In the matter of Lawrence V. Harrison, No. 12-O-14103-LMA (State Bar of Cal. Dec. 3, 2013), available at www.calbar.org (attorney search for Lawrence Victor Harrison); see also Harrison Dep. at 15 (Harrison testifying that he was disbarred).

### iii.    Analysis

Respondent argues that Petitioner is not entitled to equitable tolling because he failed to show that his family retained Harrison to file a federal habeas petition, that Harrison's misconduct was sufficiently egregious, or that Petitioner was reasonably diligent. Mot. Dismiss at 7-24. Petitioner contests all those arguments. Opp'n Mot. Dismiss at 9-31. For the reasons discussed below, Petitioner has established both extraordinary circumstances and that he acted diligently during the relevant time period. He is entitled to a period of equitable tolling.

### a)    Extraordinary Circumstances

Respondent argues that Petitioner has failed to establish that his family retained Harrison to file a federal habeas petition "as opposed to investigating claims and perhaps filing a petition for writ of certiorari or *state* habeas

petition." Mot. Dismiss at 7-8. But the evidence in fact shows that Petitioner and his family were concerned about pursuing Petitioner's remedies in federal—not state—court. For example, after learning that the California Supreme Court had denied his petition for review, Petitioner asked his appellate attorney a clarifying question about the deadline for filing a federal habeas petition. Pet. Ex. 6. Castro's earliest declaration, executed without the assistance of counsel in June 2011, stated that in June 2005 she and Galindo "went to visit" Harrison "to obtain his legal services as a lawyer for [Petitioner's] case" because Petitioner "had recently lost his appeal and he no longer had a lawyer to continue fighting his case in the federal courts." Resp. Ex. 101. And Galindo's earliest declaration, also executed without the assistance of counsel in June 2011, stated that she and Castro went to Harrison's office in June 2005 "to talk to him about representing my brother, [Petitioner], in Federal Court" because "he had just lost his appeal and he didn't have an attorney anymore to represent him and continue fighting his case." Resp. Ex. 104.

The evidence also shows that Petitioner and his family hired Harrison to file a federal habeas petition, not to take some other action in federal court. Petitioner repeatedly asked Harrison to send him copies of "all briefs, opinions, and <u>petitions</u> filed to the Courts." Pet. Exs. 13, 16, 17 (emphasis added).[22] Castro and Galindo testified that Harrison agreed to file a petition in federal court, that he later told them that he had filed a petition in federal court

---

[22] Although Petitioner, in his first letter to Harrison, asked whether Harrison had filed a petition for certiorari in the U.S. Supreme Court, Petitioner acknowledged that such a petition was optional and that Harrison might have decided not to file one. <u>See</u> Pet. Ex. 9 (Petitioner's letter to Harrison stating that he hoped that Harrison had been able to file a petition for writ of certiorari in the U.S. Supreme Court "in the time that was given us" "if you thought that was the wise thing to do").

within the one-year limitation period, and that sometime after that, he told them the petition was "not approved" and would be going to the Ninth Circuit. 1 Tr. 20-21, 25, 27-28, 31, 40-42, 44, 124-25, 127-28, 137-38, 184-85. Petitioner, Castro, and Galindo all testified that Castro and Galindo had informed Petitioner of Harrison's representations. 1 Tr. 41-44, 134-35, 184-85, 194-97, 200, 215-16. Harrison's own letter to Petitioner stated that Harrison had not represented Petitioner on appeal but "stood bye [sic] looking for a collateral attack we could make for you,"[23] that Harrison had "copies of your appeal and trial and went over them with care looking for a flaw," and that he would "do anything I can to help you get free." Pet. Ex. 24. And when Petitioner became concerned that Harrison might not have filed anything on Petitioner's behalf, Petitioner wrote to the Central District of California, which is exactly where a federal habeas petition would have been filed. Pet. Ex. 19. Petitioner also stated in that letter that he believed that the district court had denied his petition and that it was currently pending in the "9th Circuit," which is where an appeal of a denial of a federal habeas petition would properly have been filed. Id. The Court finds that Petitioner and his family retained Harrison to file a habeas petition in federal court.

Harrison's August 2016 deposition testimony to the contrary was incredible. At the deposition, Harrison denied that Petitioner's family had hired him to file a federal habeas petition and claimed that Castro had in fact paid him $2,000 to "stand by" to represent Petitioner in a different federal case—a "trial for [possession of] a machine gun before the Central District of California." Harrison Dep. 66, 69, 76, 81-82. Harrison testified that Petitioner was never tried in that case because authorities "didn't want to bring [him]

---

[23] At his deposition, Harrison confirmed that a habeas petition is a "collateral attack." Harrison Dep. 25.

41

from prison." Id. at 66, 78, 162-64. But nothing was happening in Petitioner's federal machine-gun case in June 2005 that would have prompted Petitioner or his family to hire private trial counsel. Rather, the case's docket shows that Petitioner was charged with possession of a machine gun and other crimes in the Central District of California in March 2003, and that the Federal Public Defender's Office represented Petitioner in that case. See Complaint, United States v. Guerrero, No. 03-cr-0058 (C.D. Cal. Mar. 5, 2003), ECF No. 1; Pet. Exs. 45. Two weeks later, the complaint was dismissed without prejudice and Petitioner was transferred to the custody of the State of California for proceedings on the murder charge at issue in this case. See Order, Guerrero, No. 03-0058 (C.D. Cal. Mar. 17, 2003), ECF No. 10; Pet. Ex. 45. An indictment was filed in August 2003, see Indictment, Guerrero, No. 13-0058 (C.D. Cal. Aug. 8, 2003), ECF No. 11, but nothing else happened until October 2006, when the indictment was dismissed and the arrest warrant was recalled and quashed. See Mot. Dismiss & Order, Guerrero, No. 13-0058 (C.D. Cal. Oct. 16, 2006), ECF No. 20; Pet. Ex. 46. By contrast, the California Supreme Court denied Petitioner's petition for review in his murder case on June 8, 2005, LD 8, just a couple weeks before Castro and Galindo first met with Harrison.

Moreover, Petitioner testified that he never told Castro and Galindo about the federal machine-gun charges and never asked them to hire a lawyer to represent him in that case, 1 Tr. 181-83, and Castro and Galindo testified that they did not know anything about the machine-gun case and did not help Petitioner hire a lawyer for it. 1 Tr. 15-16, 22, 88-89, 129. Petitioner also testified that the charges against him in that case were dropped, he was rebooked on murder charges in his state case, and he did not hear anything further about the case after that. 1 Tr. 181-82. At the end of the evidentiary hearing, Respondent's counsel stated that Respondent was not taking the

position that Harrison had been hired to represent Petitioner in the federal machine-gun case because no evidence supported that claim. 3 Tr. 4-5. The Court therefore discredits Harrison's testimony that Castro hired him to represent Petitioner in a federal trial, and it concludes that Harrison generally lacks credibility.[24]

Respondent also argues that Petitioner failed to establish that Harrison affirmatively represented that he had filed a federal petition. Mot. Dismiss at 15. But as previously discussed, Castro and Galindo both testified that Harrison told them that he had filed a federal petition within the one-year limitation period, and that he later said the petition had been denied and

_____

[24] Harrison's deposition testimony was often evasive and internally inconsistent. For example, Harrison claimed that he did not remember when he was admitted to the California State Bar or when he was disbarred, Harrison Dep. 15, and he was evasive when asked whether he would write letters to clients when they asked for a response, id. at 44-46, and whether he had ever written letters to another client, id. at 43-44 (Harrison testifying "when I was one [year old], I didn't write any. When I was two, I don't believe I wrote any. . . . [w]hen I was ten, I don't believe I wrote any"), 48. Harrison also initially testified that he did not remember Petitioner's case, id. at 65-66, but then stated that it was "a trial for a machine gun before the Central District of California," and that he had hired an investigator in connection with it, id. at 66, 75-76. He twice claimed that he knew "nothing" about Petitioner's murder trial in state court, id. at 76, 87, and he claimed that he did not know whether Petitioner had appealed his murder conviction, id. at 77. But Harrison also stated that Castro had asked him to "look into [Petitioner's] appeal," id. at 69-72, and he claimed that he "went to the court of appeals and got the records" regarding it, id. at 106. Harrison also denied having received any of Petitioner's letters other than one regarding Petitioner's "treatment at the prison," id. at 85-95, but then Harrison testified that he "became concerned because [Petitioner] kept . . . sending me messages that I was his attorney on appeal and I knew I wasn't," id. at 106. As previously discussed, state bar records show that Harrison has a long history of professional misconduct, which ultimately led to his disbarment. For these reasons, too, the Court finds that Harrison is not a credible person.

43

would be going to the Ninth Circuit. That testimony is consisted with Petitioner's letters to Harrison and others, which demonstrate Petitioner's belief that he had a "pending appeal/case," see Pet. Exs. 12, 15, 18, 19, and that Harrison had filed briefs and "petitions" with the court, see Pet. Exs. 13, 16, 17, as well as Galindo's August 2009 email to Harrison stating that Harrison had "explained" that the "appeal was done" and "not approve[d]." Pet. Ex. 43. The Court therefore finds that Harrison misled Petitioner and his family to believe first that he was preparing a federal petition, then that he had filed it within the limitation period, and finally, that the district court had denied the petition and it would be appealed to the Ninth Circuit.

"'[A] garden variety claim of excusable neglect,' such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." Holland, 560 U.S. at 651-52 (citations omitted). But when an attorney's misconduct is "sufficiently egregious," it may constitute an extraordinary circumstance that warrants equitable tolling. Spitsyn, 345 F.3d at 800-01; Doe v. Busby, 661 F.3d 1001, 1011-12 (9th Cir. 2011). Here, Harrison's failure to file a federal habeas petition on Petitioner's behalf, and his misleading Petitioner and his family to believe that he had done so, are sufficiently egregious to create an extraordinary circumstance warranting equitable tolling.

The Ninth Circuit has acknowledged that "affirmatively misleading a petitioner to believe that a timely petition has been or will soon be filed can constitute egregious professional misconduct." Luna v. Kernan, 784 F.3d 640, 647 (9th Cir. 2015). In Doe v. Busby, for example, the petitioner hired counsel to file a federal habeas petition more than a year before the AEDPA deadline, paid him a $20,000 advance, provided his case file, and repeatedly inquired about the progress of his case. 661 F.3d at 1012. The attorney nevertheless failed to file any petition "in spite of his numerous promises to the contrary"

and then took six months to return the petitioner's files. Id. In Spitsyn v. Moore, the petitioner hired his attorney nearly a full year before the AEDPA deadline, and the petitioner and his mother contacted the attorney numerous times, by telephone and in writing, seeking action. 345 F.3d at 801. The attorney nevertheless "completely failed to prepare and file a petition." Id. And despite the petitioner's request that the attorney return the case file, he failed to do so until two months after the limitation period expired. Id. And in Luna v. Kernan, the attorney voluntarily dismissed the petitioner's timely federal habeas petition for no good reason; failed to file a new petition before the AEDPA deadline; and in response to petitioner's inquiry just before the limitation period expired, misled the petitioner to believe that a new, fully exhausted petition would be filed "shortly." 784 F.3d at 646-47.

Harrison's misconduct was at least as egregious as the misconduct in those cases. Petitioner's family hired Harrison in June 2005, more than two months before the AEDPA limitation period began to run, and he agreed to file a petition in federal court within the one-year limitation period. 1 Tr. 19-22, 25, 28, 123-25, 183-84; Pet. Ex. 38. Three weeks later, still well before the AEDPA limitation period began to run, Galindo delivered Petitioner's case file to Harrison at his office. 1 Tr. 28-29. Galindo and Castro consistently checked in with Harrison in person and by phone both before and after the AEDPA deadline, and Petitioner consistently wrote letters to Galindo and Castro, asking them to make sure the petition was filed within the limitation period. 1 Tr. 29-30, 41, 56-57, 130, 185-86; Pet. Ex. 8. After Harrison failed to visit Petitioner in person, as he had promised, Petitioner wrote him several letters, asking for an update on his case and copies of court filings; Harrison failed to respond to any of those letters. See Pet. Exs. 9, 10, 11, 12, 13, 16, 17.

Before the AEDPA deadline, Harrison consistently reassured Castro and Galindo that he was working on the petition, that it was going well, and that it

would be filed within the year. 1 Tr. 31, 35, 39-40. Around the time of the AEDPA deadline, he told Castro and Galindo that the petition had been filed within the limitation period,1 Tr. 40-41, 132, and at some later point, he told them that the petition had been denied and would be "going through" the Ninth Circuit, 1 Tr. 44; see also 1 Tr. 137. Petitioner first discovered that Harrison might not have filed a petition in November 2009, when Petitioner received a letter from the Central District of California saying that he had no case or appeal pending there. 1 Tr. 227. Harrison's misconduct was sufficiently egregious to constitute an extraordinary circumstance. See Holland, 560 U.S. at 652 (finding extraordinary circumstances might be present when attorney "failed to communicate with his client over a period of years" and "failed to file [petitioner's] federal petition on time despite [petitioner's] many letters that repeatedly emphasized the importance of his doing so").

Moreover, although Petitioner learned in November 2009 that Harrison had not filed a federal habeas petition, Petitioner's property, which included his trial transcripts, was not delivered to him at his new prison until January 2010. 1 Tr. 237-38; 2 Tr. 15. The Ninth Circuit has held that a complete lack of access to legal files may constitute grounds for equitable tolling. Ramirez, 571 F.3d at 998; Lott v. Mueller, 304 F.3d 918, 924-25 (9th Cir. 2002) (finding that petitioner's temporary transfers to different prison, during which he had no access to legal file, may warrant equitable tolling). Here, the original Petition raised four claims—two that were raised on direct appeal and two that Petitioner himself researched and drafted. Because Petitioner could not have begun preparing his own federal habeas petition until he received, at a minimum, his trial transcripts, the Court finds that extraordinary circumstances existed until January 1, 2010.[25]

_____

[25] In his Objections, Respondent seems to contend that the extraordinary

At the evidentiary hearing, defense counsel argued that "extraordinary circumstances" existed until October 2010, when Petitioner filed the original Petition. 3 Tr. 14-17. The Court disagrees. Counsel argued that even after receiving the District Court's letter in November 2009, Petitioner might have been unsure of whether his appeal was pending in the Ninth Circuit. Id. at 15-16. But Petitioner himself testified that when he received the District Court's letter, in November 2009, he realized that his petition might not have been filed. 1 Tr. 227-28. He also testified that "[a]s soon as [he] heard from the courts," he started submitting requests to "go to the law library" so he could study the law governing federal habeas petitions and his potential claims. 2 Tr. 23-25. He also testified that when he received Harrison's letter in December 2009, he realized that he needed to "prepare [himself] to do something, to file [his] own petition, to do what I had to do." 1 Tr. 236. At least by January 2010, when Petitioner received his trial transcripts, he was on notice that he could no longer depend on Harrison and needed to prepare and file his own federal habeas petition.

Counsel also argued that extraordinary circumstances existed until October 2010 because Harrison never returned Petitioner's legal file. 3 Tr. 18-19. But Petitioner testified that he had access to his trial transcripts for most of his incarceration, other than between October 2009, when he was transferred to Corcoran, and January 2010, when his property was delivered to him there. Although counsel argued that Petitioner had only his transcripts and not the "murder book" or "appeal briefs," 4 Tr. 18, that appears to be at least partially untrue, because Petitioner cited the "murder book" in the original Petition. See

---

circumstances ended in November 2009, when Petitioner discovered that Harrison might not have filed a federal habeas petition. See Resp't Objections at 7 & n.3. Because Petitioner lacked access to his transcripts during that time and until January 2010, however, Respondent's argument is not persuasive.

Petition at 73 (citing "Murder Book p.12").[26] In any event, even if Petitioner

lacked access to the murder book, that would not warrant equitable tolling

because he fails to point to any information in it that he needed to file his

federal Petition. See Chaffer v. Prosper, 592 F.3d 1046, 1049 (9th Cir. 2010)

(finding petitioner's claimed lack of access to legal files insufficient to warrant

equitable tolling when he did not point to specific instances when he needed

particular document but did not have access to it). And finally, although

Petitioner did not have copies of his appellate briefs for some period of time,

that does not constitute extraordinary circumstances because he could have

obtained them by requesting them from the state court, which he eventually

did.

### b) Diligence

"To determine if a petitioner has been diligent in pursuing his petition,

courts consider the petitioner's overall level of care and caution in light of his

or her particular circumstances." Doe, 661 F.3d at 1013. In cases in which

attorney misconduct constitutes the extraordinary circumstances, courts

consider "whether the petitioner expeditiously secured counsel to file the

---

[26] Petitioner at some point must have had access to other documents, or at least, was familiar with their contents, such as notes from Detective Boyd Zumwalt; notes from the public defender's investigator Richard Fox; and the Avaloses' declarations, which were obtained by trial counsel's investigator, see Petition at 46, 49, 66-68, 72-73 (citing pages of Fox's notes as "Defense Exh. F," pages of "Det. Zumwalt's notes," and Avaloses' declarations as "Defense Exh. A"). Petitioner also included as part of his Petition several pages from his petition for review that was filed in the California Supreme Court. Compare Petition at 24-42 with LD 7 at 2-20. It is not clear from the record when Petitioner obtained the petition for review or from what source. See Pet. Ex. 34 (letter from California Court of Appeal stating that it was providing "copies of the Appellant's opening brief filed on May 5, 2004 and appellant's supplemental brief filed on May 26, 2004"); LD 7 (petition for review file stamped on May 5, 2005).

habeas petition[;] the frequency and nature of the attorney-client communications[;] when, in light of the petitioner's education and background, he reasonably should have sought new counsel[;] and whether the petitioner had the means to consult alternate counsel." Id. (citations omitted).

In Luna v. Kernan, the Ninth Circuit described two different methods for determining the time period during which a petitioner must show that he exercised reasonable diligence. 784 F.3d at 650-51. Under a "stop clock" approach, "the statute-of-limitations clock stops running when extraordinary circumstances first arise, but the clock resumes running once the extraordinary circumstances have ended or when the petitioner ceases to exercise reasonable diligence, whichever occurs earlier." Id. at 651; see also Gibbs v. Legrand, 767 F.3d 879, 891-92 (9th Cir. 2014). Thus, "[u]nder a pure stop-clock approach, a petitioner needs to show diligence only during the period he seeks to have tolled – i.e., the period during which the extraordinary circumstances prevented timely filing" and "[t]here is no need to show diligence after the extraordinary circumstances have ended." Id.

The Ninth Circuit noted, however, that an earlier equitable-tolling case, Spitsyn, 345 F.3d at 801-02, "requires a petitioner to show diligence through the time of filing, even after the extraordinary circumstances have ended." Luna, 784 F.3d at 651. The Ninth Circuit stated that

> [a]t some point, our circuit may need to decide whether it makes sense to follow the stop-clock approach and at the same time impose a diligence-through-filing requirement. If the objective of the stop-clock approach is to give petitioners one full year of unobstructed time to prepare a federal habeas petition, a separate diligence-through-filing requirement appears to thwart that objective. However, under current circuit law, we must apply both the diligence-through-filing requirement imposed by Spitsyn and

49

the stop-clock approach adopted in Gibbs.

Luna, 784 F.3d at 651-52 (citation omitted); accord Bobadilla v. Gipson, __ F. App'x __, 2017 WL 908550, at *1 (9th Cir. Mar. 8, 2017); but see id. at *2 (Murguia, J., dissenting) (finding that stop-clock and diligence-through-filing tests are "irreconcilable" and that courts should apply only the "more practical 'stop-clock' rule" because it is "a definitive test and is consistent with 'the policy objectives of the statute of limitations'" (citation omitted)).

Applying the "stop-clock" approach first, Petitioner was reasonably diligent from June 2005, when he hired Harrison, until January 2010, when the extraordinary circumstances preventing him from filing a petition ended. First, Petitioner expeditiously secured counsel to file a habeas petition: as previously discussed, Castro and Galindo hired Harrison more than two months before the AEDPA limitation period began to run. Petitioner also sent his case file to Galindo, who delivered it to Harrison just a few weeks after he was hired. Castro and Galindo, often at Petitioner's request, contacted Harrison every few weeks, either by phone or in person, and they paid him an additional $1,000 to visit Petitioner in prison. When that visit did not happen, Petitioner wrote letters to Harrison, both before and after the AEDPA deadline, asking for updates and copies of any briefs, opinions, or petitions filed in court. Although Harrison never responded to those letters, he assured Castro and Galindo that he was preparing the petition, and about a year after he was hired—which would have been around June 2006—Harrison told them that he had filed a petition within the one-year limitation period. At that point, Petitioner believed it was a "sit and wait game" because the courts sometimes took "years" to respond to a habeas petition. 1 Tr. 197-98.

Thereafter, Castro and Galindo continued to talk with Harrison in person and by phone; he told them that Petitioner's case was going well and they were "waiting to receive a response." 1 Tr. 42. But because Petitioner had

not heard from Harrison directly, in April 2008 he wrote to legal aid and nonprofit organizations and asked for assistance. Pet. Ex. 15. When Harrison eventually told Castro and Galindo that Petitioner's petition was denied and would be appealed to the Ninth Circuit, Petitioner asked them to have Harrison provide a "good explanation" of his case's status. 1 Tr. 44-45, 216-17. Accordingly, around August 2009, Castro and Galindo started trying to obtain a letter from Harrison; they finally obtained it at some later point after waiting outside Harrison's office for several hours.

In October 2009, Petitioner wrote to the United States District Court, seeking information about his case. Around November 2009, he asked Galindo to search the California Courts of Appeal website for information about his case, search the California State Bar website for information about Harrison, and get his file back from Harrison. Petitioner also began submitting requests to go to the law library so he could begin research for his habeas petition. 2 Tr. 23-26. In December 2009, Petitioner reported Harrison's misconduct to the state bar, asking it for "all [the] information" it could provide about Harrison; he also requested that it send him a malpractice complaint form. Pet. Ex. 23.

Petitioner's education and means to secure new counsel also weigh in his favor. In light of Petitioner's and his family members' levels of education, it is unlikely that they should have earlier realized that they needed to seek new counsel. Petitioner attended 11th grade but did not complete it, and he did not receive his GED until 2014, while in prison and long after he had filed his original Petition. 1 Tr. 162-63. Petitioner had never seen a written contract for the hiring of an attorney. 1 Tr. 165. Galindo completed continuation high school but did not have a college degree. 1 Tr. 12-13. And Castro, who spoke only Spanish, completed elementary school in Mexico but did not attend middle or high school. 1 Tr. 20, 119-20. Petitioner also testified that he kept Harrison as his lawyer because Petitioner did not have money to hire someone

51

else, 1 Tr. 201; that testimony was consistent with Galindo's January 2010 letter, which suggested ideas for raising money for a new lawyer, such as organizing a car wash and asking relatives in Mexico to donate money. Pet. Ex. 25.

Thus, a preponderance of the evidence shows that Petitioner was reasonably diligent during the time period in which the extraordinary circumstances existed. Under the "stop-clock" approach described in Luna, Petitioner is entitled to equitable tolling from when his conviction became final, on September 6, 2005, until he had access to his trial transcripts at his new prison, presumably around January 1, 2010. The limitation period expired one year later, on January 3, 2011.[27] Petitioner constructively filed his original Petition on October 15, 2010, more than two months before the limitation period expired. Under the stop-clock analysis, therefore, the original Petition is clearly timely.

Even under the more onerous the "diligence-through-filing" approach described in Luna, equitable tolling is warranted because the preponderance of the evidence shows that Petitioner was reasonably diligent in the nine months between when the extraordinary circumstances ended, in January 2010, and

---

[27] Time calculations for federal habeas corpus petitions are governed by the Federal Rules of Civil Procedure. See Stewart v. Lattimore, No. 09-0965, 2010 WL 3582535, at *5 (E.D. Cal. Sept. 10, 2010) (citing R. 12, Rs. Governing § 2254 Cases in the U.S. Dist. Cts., 28 U.S.C. foll. § 2254). Federal Rule of Civil Procedure 6 provides that when a period of time is stated in days or a longer unit of time, "include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday." Fed. R. Civ. P. 6(a)(1)(c). Because January 1, 2011, fell on a Saturday (and was also a legal holiday), the last day of the limitation period was Monday, January 3, 2011. See, e.g., Haney v. Dexter, No. 08-4535, 2009 WL 212423, at *2 (C.D. Cal. Jan. 27, 2009) ("Because that date fell on the weekend, [p]etitioner had until [the following] Monday[] . . . to file his [p]etition in federal court.").

when he constructively filed his Petition, in October 2010. During that time, Petitioner read his trial transcripts, 1 Tr. 238-39; 2 Tr. 15, 23; and began visiting the prison's law library, 2 Tr. 22-26. Because Petitioner believed that his petition would be "unsuccessful" if he did not explain to the Court why it was filed late, he also began drafting an "Application for Certificate of Appealability" explaining his circumstances and requesting equitable tolling. 2 Tr. 11-12. Petitioner asked Galindo to look for receipts from Harrison and send them to him, 2 Tr. 14, and to pick up his case file from Harrison, 2 Tr. 15. He wrote to Scott, his appellate counsel, for advice. Pet. Ex. 28. Petitioner asked a prison law clerk for help obtaining his appellate briefs and later wrote a letter to the superior court and two letters to the state appellate court, seeking copies of his briefs. 2 Tr. 26-27, 30-34, 36-40. He also responded to the state bar's letter seeking more information regarding his complaints about Harrison, Pet. Ex. 30; 2 Tr. 27-29, and filed a verified accusation against him in the California Supreme Court, Pet. Ex. 33, 2 Tr. 42-45. Once Petitioner received copies of his appellate briefs in August 2010, he began putting his petition together; he filed his 99-page Petition, along with his "Application for Certificate of Appealability" and supporting exhibits, just two months later.[28] 2 Tr. 41; Petition; Application. Under either approach described in <u>Luna</u>, therefore, Petitioner is entitled to sufficient equitable tolling to render the original Petition timely.[29]

---

[28] A few pages of the original Petition are photocopies of Petitioner's opening brief on direct appeal. <u>Compare</u> Petition at 95-98 <u>with</u> LD 2 at 38-39. But many of the Petition's 99 pages are photocopies of Petitioner's petition for review that was filed in the California Supreme Court. <u>Compare</u> Petition at 24-42 <u>with</u> LD 7 at 2-20. It is not clear from the record when Petitioner obtained the petition for review or from what source. <u>See</u> <u>supra</u> n. 22.

[29] In his Objections, Respondent argues that the "lynchpin of the R&R's

In his Objections, Respondent contends that Petitioner is not entitled to equitable tolling under the "diligence-through-filing" approach because he was not reasonably diligent after the extraordinary circumstances ended. Resp't Objections at 5-10. In support of his argument, Respondent states that in the recent unpublished decision in <u>Bobadilla v. Gipson</u>, 2017 WL 908550, at *2,

reasoning is that Petitioner could not have prepared his original Petition until he had his appellate briefs." Resp't Objections at 8. But as discussed above, the Court in fact finds that Petitioner's lack of his appellate briefs was not an extraordinary circumstance that prevented him from filing his Petition sooner, but that his attempts to obtain the briefs from the state courts was one of several factors showing that he exercised reasonable diligence in the months before filing his Petition. <u>See</u> <u>supra</u> Section IV.B.1.b.iii. Respondent further argues that Petitioner was not reasonably diligent because he could have taken additional steps to obtain his appellate briefs and could have contacted legal aid organizations for help, rather than just requesting the briefs from the state courts. Resp't Objections at 8-9. The record shows, however, that Petitioner also asked his sister to obtain Harrison's file—which presumably would have included the briefs—as early as January 2010, but she was not able to get the file from Harrison. 2 Tr. 15. In any event, the United States Supreme Court has clarified that only "reasonable diligence" is required for equitable tolling, not "maximum feasible diligence." <u>Holland</u>, 560 U.S. at 653. For the reasons discussed above, Petitioner has met that standard. Finally, Respondent argues that Petitioner's work on his state-bar complaint was "irrelevant to whether he was diligent in filing his federal petition," Resp't Objections at 9, but Petitioner testified at the hearing that part of his "plan" after learning that Harrison had not filed a federal petition was "to file a Complaint with the State Bar hoping that I can show how Mr. Harrison defrauded me or lied to me or misled me. And hoping that I can use that to help me explain to the courts why the delay" in filing his federal Petition. 2 Tr. at 10-11. Given that the Court would not have reached the merits of Petitioner's habeas claims had it found that his Petition was untimely, Petitioner's work on his bar complaint shows that he was reasonably diligent in pursuing habeas relief. <u>See</u> Doe, 661 F.3d at 1013 (finding that petitioner exercised reasonable diligence warranting equitable tolling in part because he filed grievances against attorney with state authorities).

the Ninth Circuit "applied <u>Holland</u> to find that a petitioner was not reasonably diligent in filing his federal petition 11 months after his attorney belatedly told him that the California Supreme Court had denied his petition for review." Resp't Objections at 6. But in <u>Bobadilla</u>, the petitioner was notified in November 2012 that the AEDPA limitation period would expire in January 2013, but he nevertheless "took no action" until November 2013, when he filed his federal habeas petition. <u>Bobadilla</u>, 2017 WL 908550, at *2. That petition, moreover, was simply "word-for-word recitations of the 'Argument' headings from the table of contents of his petition for review to the Supreme Court of California," which had been in the petitioner's possession since September 2011. <u>Id.</u> Here, by contrast, between the end of the extraordinary circumstances and the filing of the Petition, Petitioner researched and drafted new habeas claims and a "Certificate of Appealability" arguing that the Petition was not time barred; sought help from family, other prisoners, and his former counsel; and requested additional records, among other things. The reasoning in <u>Bobadilla</u> does not apply here.

### 2. Relation Back of Remaining FAP Claims to Original Petition

Claims that appeared for the first time in the FAP must be dismissed unless Petitioner can show that they "relate back" to one or more of the original Petition's timely claims. <u>See</u> <u>Mayle v. Felix</u>, 545 U.S. 644, 655 (2005) (citing Fed. R. Civ. P. 15(c)). A new claim must share a "common core of operative facts" with a timely claim in the pending petition. <u>Id.</u> at 664. Thus, an amended petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." <u>Id.</u> at 650. The "time and type" language in <u>Mayle</u> refers "not to the claims, or grounds for relief," but "to the facts that support those grounds." <u>Nguyen v. Curry</u>, 736 F.3d 1287, 1297 (9th Cir. 2013) (emphasis omitted).

The FAP's subclaim C of Ground One and Grounds Two, Four, and Five are the same claims that were timely raised in the original Petition as subclaim A of Ground 3b and Grounds 3a, One, and Two, respectively. These FAP claims, by definition, share a same common core of operative facts with claims in the original Petition.

The FAP's remaining claims—most of Ground One and the part of Ground Six that relates to the FAP's new claims—were first raised in the FAP, which was filed on November 19, 2015, nearly four years after the January 2011 AEDPA deadline. They are untimely unless Petitioner can show that they share a common core of operative facts with claims in the Petition.

### a. Ground One's Subclaims D, H, and Part of F

Respondent concedes that certain of the FAP's ineffective assistance of counsel subclaims relate back to the original Petition. <u>See</u> Reply at 18. The Court therefore finds that the following subclaims relate back to the claims in the original Petition: subclaim D, alleging that trial counsel failed to obtain the public defender's investigative notes; subclaim H, alleging that trial counsel failed to rebut Richardson's testimony that Petitioner altered his car because it was "hot" or impeach Richardson with his prior inconsistent statement; and the portion of subclaim F alleging that counsel failed to interview witnesses regarding the color of the shooter's car.[30] <u>Id.</u> Respondent's motion to dismiss those subclaims must be denied.

### b. Ground One's Subclaim E

At trial, Catalina Avalos testified to the effect that Petitioner was not the shooter, <u>see, e.g.</u>, 3 RT 445-46, and the prosecution attempted to impeach that testimony in various ways. In the original Petition's Ground 3(b), Petitioner

---

[30] Respondent also concedes that Ground One's subclaim C relates back to the original Petition, <u>see</u> Reply at 18, but subclaim C was in fact raised in the original Petition as subclaim A of Ground 3b.

alleged, in relevant part, that trial counsel was constitutionally ineffective because he "was not prepared to rebut or counter" the prosecution's impeachment of Catalina "and, ultimately, [he] failed to provide readily accessible and available evidence or testimony that would assist her veracity [and] credibility." Id. at 68. He argued that counsel should have obtained and introduced a tape of Catalina's 911 call and the testimony of other witnesses to the shooting. Id. at 71-72. In the FAP's subclaim E, Petitioner argues that trial counsel should have "bolstered" Catalina's credibility by "introducing into evidence a photographic lineup that [she] gave approximately seven months before trial, in which she did not circle or mark [Petitioner's] photograph but instead identified another person as looking similar to the shooter." FAP at 53.

Thus, the original Ground 3(b) and the FAP's subclaim E both allege that counsel was ineffective for failing to adequately investigate and introduce evidence bolstering Catalina's testimony to the effect that Petitioner was not the shooter, and they differ only in citing specific evidence that should have been uncovered and introduced. The FAP's subclaim E relates back to the original Petition's Ground 3(b). See Rodriguez v. Adams, 545 F. App'x 620, 622 (9th Cir. 2013) (finding new ineffective assistance of trial counsel claim alleging that counsel failed to investigate two potentially exculpatory witnesses related back to original claim that counsel was ineffective for failing to investigate three other witnesses because "the rationale for why [petitioner's] counsel allegedly should have investigated those individuals prior to trial and presented their testimony at trial share a common basis").

        c.     Ground One's Part of Subclaim F

In part of subclaim F, Petitioner argues that counsel was constitutionally ineffective for failing to interview (1) Macias, who would have provided information suggesting that Richardson, not Petitioner, was the shooter, and (2) Macias's cousins, Gabriel Marin and Lorenzo Quezada, who would have

rebutted the prosecution's claim that Macias was from Paramount and associated with a gang. FAP at 60-67. Petitioner contends that these portions of subclaim F relate back to the original Petition's claim that counsel was ineffective for failing to interview Macias's family members, arguing that "[b]oth the original petition and FAP allege that trial counsel ineffectively failed to interview the same category of witnesses (Macias and his relatives) for the same purpose (bolstering Macias's credibility at trial)." Opp'n Mot. Dismiss at 41. But in fact, the original Petition argued only that counsel was ineffective for failing to interview the members of Macias's family who were in his parents' home when the police searched it—specifically, Macias's mother, father, two sisters, and two brothers. Petition at 83. Petitioner argued that those family members would have corroborated Macias's account of the police's tactics during the search and bolstered his testimony that he implicated Petitioner instead of Richardson as the person who sold him the gun because he was "just trying to get [the police] out of my house because my family was scared." Id. The FAP's new claims that counsel should have interviewed different people—Macias and his cousins—in order to uncover entirely different evidence do not share a common core of operative facts with the original Petition's claim. Relation back is not warranted.

> d.    Ground One's Subclaim I

In the FAP's subclaim I, Petitioner argues that trial counsel was constitutionally ineffective for failing to investigate or present evidence that the victim was killed by the T-Flats Street Gang. FAP at 72-75. Although the original Petition includes claims that counsel was ineffective for failing to investigate and present evidence regarding other issues—such as Catalina's and Macias's credibility and the color of Petitioner's car—none mention the T-Flats Street Gang or argue that it was somehow involved in the shooting. Thus, the facts underlying subclaim I are different from those underlying the

original Petition's claims. <u>United States v. Ciampi</u>, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney misfeasance.").

In his Objections, Petitioner argues that subclaim I relates back to the original Petition's ineffective assistance of counsel claims because they all "argue that trial counsel was deficient for failing to perform the same act: interviewing witnesses identified in police reports." Pet. Objections at 5. Petitioner points to the original Petition's statements that counsel was ineffective for failing to interview potential witnesses who were identified in a police officer's notes and who had "favorable testimony for the defense." <u>Id.</u> at 5-6. But Petitioner construes his original claims too broadly. Regarding the witnesses identified in the police reports, the original Petition argued only that they would have "corroborated Catalina's & Lawrence['s] testimony of the type & color of the car the shooter was driving." Petition at 72; <u>see also </u>id. at 72-73 (arguing that detective's notes showed that certain witnesses were "able to see the shooter's automobile leaving the scene of the crime" and that such witnesses' testimony "was germane to the Avalo[ses'] testimony of the type and 'Green' color of the Camaro."); <u>id.</u> at 74 ("[C]onsidering the officer's notes and the positive indication that the testimony was favorable to . . . the defense and corroborated the Avalos[es'] testimony, counsel's failure to investigate and interview any other witnesses was in fact unreasonable."); <u>id.</u> ("Within these notes existed witnesses who, at a minimum, would have corroborated & substantiated the Avalos[es'] testimony of the color of the car the shooter was driving (i.e. Green)."); 76-77 ("counsel had a duty and obligation to provide the available corroborating testimony that undoubtedly would give credibility and substantiate the Avalos[es'] testimony of the type & color of the shooter's

car"); 77-78 (arguing that "testimony of the witnesses identified on the officer's records was very relevant" and that failure to investigate them was "prejudicial" because "available testimony would have left no doubt as to the type & color of the shooter's car"). New subclaim I, by contrast, does not simply identify additional eyewitnesses whose testimony would have bolstered the Avaloses' credibility or supported their testimony regarding the color and type of the shooter's car; rather, it identifies an entirely different category of potential witnesses—the victim's siblings and others familiar with the T-Flats street gang—whose testimony would have shown that the victim might have been killed by a member of that gang, possibly as a result of a dispute that originated in prison. See FAP at 72-75.

The authority Petitioner cites does not support his argument. Rather, it shows only that a new claim may relate back to an earlier claim when it identifies additional evidence within the same category of evidence identified in the earlier claim and offered for the same purpose. See Pet. Objections at 3-5. In Rodriguez v. Adams, for example, the original claim alleged that counsel was ineffective for failing to interview three potential exculpatory witnesses who were present during the crime, and the amended claim, which was first raised in a supplemental traverse, simply added two more potentially exculpatory witnesses who were also present during the crime. See 545 F. App'x 620, 622-23 (9th Cir. 2013). The Ninth Circuit found the new claim related back to the original claim because

> [t]he individuals identified in [petitioner's] original petition and supplemental traverse were all potential percipient witnesses who were present at the same underlying event. Consequently, the rationale for why [petitioner's] counsel allegedly should have investigated those individuals prior to trial and presented their testimony at trial share a common basis.

<u>Id.</u> As previously discussed, unlike the new claims in <u>Rodriguez</u>, the FAP's subclaim I identifies new potential witnesses and argues that they should have been interviewed for reasons entirely unrelated to the claims in the original Petition. As such, it does not relate back. [31]

      e.      Ground One's Subclaims J and K

In subclaim J, Petitioner argues that trial counsel was ineffective for failing to investigate evidence that Petitioner's younger cousins, not Petitioner, were responsible for the alleged gang graffiti in Petitioner's home. FAP at 75-79. In subclaim K, he argues that trial counsel failed to object to various "false and improper" statements by the prosecutor in closing argument. FAP 79-87.

---

[31] Petitioner also relies on <u>Valdovinos v. McGrath</u>, but as he acknowledges, <u>see</u> Pet. Objections at 3, that decision was vacated by the Supreme Court. <u>See</u> <u>Horel v. Valdovinos</u>, 562 U.S. 1196 (2011). In any event, <u>Valdovinos</u> is distinguishable. There, the Ninth Circuit noted that the original petition alleged that counsel was ineffective for failing to "adequately investigate suppressed exculpatory evidence upon learning of it" and that the amended petition "simply adds more evidence that counsel did not uncover in its original investigation." 598 F.3d 568, 575-76 (9th Cir. 2010). The amended petition therefore merely added "newly discovered evidence" supporting the original claim by providing a "more concrete basis for demonstrating prejudice." <u>Id.</u>; <u>see also</u> Order, Valdovino<u>s v. McGrath</u>, No. 02-01704 (N.D. Cal. Mar. 20, 2007), Dkt. 48 (underlying district court order granting amendment and noting that petitioner "alleges that the newly discovered exculpatory evidence lends greater support to the prejudice prong of his first ineffective assistance of counsel claim because, if his trial counsel had asked for a continuance when he learned, during the trial, that the prosecution had withheld exculpatory evidence, he would likely have discovered this additional undisclosed exculpatory evidence."). Here, by contrast, Petitioner is seeking to add a new, different ineffective assistance of counsel claim: that counsel was ineffective for failing to interview a set of witnesses who could have potentially testified regarding the T-Flats gang's involvement in the shooting. As discussed, that does not relate back to his earlier claim that counsel failed to interview an entirely different set of witnesses who saw the shooter's car and could testify as to its color and type.

None of the claims in the original Petition pertains to the alleged gang graffiti or any other evidence regarding Petitioner's gang membership or to any improper statements during the prosecutor's closing argument. See generally Petition. Because subclaims J and K do not share a "common core of operative facts" with any claim in the original Petition, they do not relate back.

### f. Ground Six

In Ground Six, Petitioner alleges that the cumulative effect of the constitutional violations alleged in the FAP rendered his trial fundamentally unfair. FAP 123-26. This claim relates back to the original Petition only to the extent that it is based on the cumulative effect of the errors in the FAP's grounds that have been found to be either timely or to relate back to the original Petition. The portion of Ground Six that is premised on grounds that have been found to be untimely or not relate back must be dismissed. See Castillo v. Baker, No. 04-00868, 2016 WL 845307, at *16 (D. Nev. Mar. 2, 2016) (finding that because petitioner's "cumulative error claim incorporates all his other claims; it relates back to his original petition, and is timely, to the extent that his other claims relate back and are timely"); Nordlof v. Clark, No. 07-4899, 2010 WL 761294, at *10 (N.D. Cal. Mar. 3, 2010) (finding that cumulative-error claim did not relate back to original petition to extent it was based on untimely claims of error).

### 3. Conclusion

In sum, Petitioner should be permitted to proceed on the following claims from the FAP:

- Ground One: Trial counsel was constitutionally ineffective for:
  - prematurely declaring ready for trial, without having conducted any investigation, FAP at 49-50 (subclaim C),
  - failing to obtain investigative notes from the Public Defender's office, id. at 51-52 (subclaim D),

- failing to introduce Catalina's photographic lineup statement to corroborate her testimony that Petitioner was not the shooter, id. at 53-55 (subclaim E),

- failing to interview witnesses, including the Avaloses' neighbors, Frederico Hernandez, Richard Adams, and "Teri," who could have corroborated that the shooter's car was green and that the shooter drove by the scene earlier that day, id. at 56-67 (portion of subclaim F),

- failing to interview Richardson, who would have revealed that law enforcement paid him to provide information implicating Petitioner in the shooting, provided information rebutting the prosecution's claim that Petitioner had confessed to committing the shooting, and revealed that a coworker drove a green Camaro, id. at 67-70 (subclaim G), and

- failing to rebut Richardson's claim that Petitioner altered his Camaro because it was "hot" with Richardson's prior inconsistent statement and records from the body shop that performed the work, id. at 70-72 (subclaim H).

- <u>Ground Two</u>: The trial court violated Petitioner's due process rights by denying defense counsel's requested continuance. Id. at 89-93.

- <u>Ground Three</u>: The prosecutor violated Petitioner's due process rights by failing to disclose material impeachment evidence regarding Jimmy Richardson. Id. at 93-100.

- <u>Ground Four</u>: The trial court violated Petitioner's right to a fair trial by admitting multiples forms of evidence demonstrating his possession of several firearms when it was conclusively established that none was the murder weapon. Id. at 100-17.

63

- **Ground Five**: The trial court prejudicially erred in failing to sua sponte instruct the jury that it must determine whether Petitioner made an extrajudicial admission, and if so, that certain of the statements must be viewed with caution as set forth in CALJIC No. 2.71. <u>Id.</u> at 118-23.
- **Ground Six**: The cumulative effect of the constitutional violations listed above rendered Petitioner's trial fundamentally unfair. <u>Id.</u> at 123-26.

**C.    Petitioner's Motion for Partial Summary Judgment and Respondent's Motion to Strike Should Be Denied as Moot**

In his opposition to the motion to dismiss, Petitioner argues that he is entitled to partial summary judgment on the timeliness of his original federal Petition. Opp'n Mot. Dismiss at 2-27. Petitioner attached to his opposition a statement of uncontroverted facts. Dkt. 133-1. Respondent thereafter moved to strike the statement of uncontroverted facts. Dkt. 140.

Because the Court has now held an evidentiary hearing, made factual findings, and found that Petitioner is entitled to equitable tolling, Petitioner's motion for partial summary judgment and Respondent's motion to strike Petitioner's statement of uncontroverted facts should be denied as moot.

///
///
///
///
///
///
///
///
///

## V.

## CONCLUSION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Report and Recommendation; (2) directing that Respondents' Motion to Dismiss be granted in part and denied in part, and (3) denying as moot Petitioner's motion for partial summary judgment and Respondent's motion to strike Petitioner's statement of uncontroverted facts.

Dated: April 17, 2017

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge