O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| FERMIN GUERRERO,<br><br>　　　　　Petitioner,<br><br>　　　　v.<br><br>RAUL LOPEZ,<br><br>　　　　　Respondent. | Case No. CV 10-8257-ODW (DFM)<br><br>Final Report and Recommendation of United States Magistrate Judge |

This Final Report and Recommendation is submitted to the Honorable Otis D. Wright, II, United States District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## BACKGROUND

**A.**　**Federal Court Proceedings**

On October 15, 2010, Fermin Guerrero ("Petitioner") filed a Petition for Writ of Habeas Corpus by a Person in State Custody, challenging his 2003

convictions for first-degree murder and various enhancements.[1] See Dkt. 1. Petitioner also filed an "Application for Certificate of Appealability Excusing Potential Procedural Default Under A.E.D.P.A. Time Limitations," arguing that he is entitled to equitable tolling based on his attorney's misconduct. Dkt. 3. On April 20, 2011, Respondent moved to dismiss the Petition as barred by the statute of limitations and partially unexhausted. See Dkt. 24.

On March 5, 2014, the previously assigned Magistrate Judge issued an Amended Report and Recommendation, finding that Petitioner had alleged sufficient facts to warrant an evidentiary hearing on his equitable-tolling claim and recommending that the motion to dismiss be denied. See Dkt. 67. On April 11, 2014, the District Judge accepted the Amended Report and Recommendation and denied the motion to dismiss without prejudice. See Dkt. 73. On April 28, 2014, the Court appointed the Office of the Federal Public Defender ("FPD") to represent Petitioner. See Dkt. 76.

On July 22, 2015, this case was transferred to the undersigned Magistrate Judge. See Dkt. 99. Respondent requested that he be permitted to defer the equitable-tolling issue and answer the Petition, see Dkt. 100, and on August 10, 2015, he filed an Answer and Memorandum of Points and Authorities. See Dkt. 103. On November 19, 2015, Petitioner moved for leave to amend and lodged a proposed First Amended Petition ("FAP"). See Dkt.

---

[1] Under the "mailbox rule," a pro se prisoner's habeas petition is constructively filed when he gives it to prison authorities for mailing to the court clerk. Hernandez v. Spearman, 764 F.3d 1071, 1074 (9th Cir. 2014); see also Houston v. Lack, 487 U.S. 266, 276 (1988). Under this rule, a court generally deems a habeas petition filed on the day it is signed, Roberts v. Marshall, 627 F.3d 768, 770 n.1 (9th Cir. 2010), because it assumes that the petitioner turned the petition over to prison authorities for mailing that day, see Butler v. Long, 752 F.3d 1177, 1178 n.1 (9th Cir. 2014) (per curiam) (as amended). Here, Petitioner signed and dated the Petition on October 15, 2010. See Petition at 8.

111. On December 15, 2015, Respondent opposed the motion for leave to amend, see Dkt. 114, and on January 12, 2016, Petitioner replied, see Dkt. 117. On January 26, 2016, the Court granted Petitioner's motion for leave to amend, ordered the FAP filed as of November 19, 2015, and set a date by which Respondent must file a motion to dismiss. See Dkt. 118.

On March 8, 2016, Respondent moved to dismiss the FAP, arguing that both the original Petition and the FAP were time-barred. See Dkt. 125. On April 19, 2016, Petitioner filed an opposition and motion for partial summary judgment, see Dkt. 133, and on June 2, 2016, Respondent filed a reply, see Dkt. 145. On September 28 and 29, 2016, the Court held an evidentiary hearing regarding Petitioner's entitlement to equitable tolling. See Dkts. 167-68.

The Court issued a Final Report and Recommendation on April 17, 2017. See Dkt. 190. On April 25, 2017, the District Judge accepted the Final Report and Recommendation, granted Respondent's motion to dismiss the FAP in part and denied it in part, and denied Petitioner's motion for partial summary judgment. See Dkt. 191.

Respondent filed an answer to the FAP's remaining claims on June 22, 2017. See Dkt. 194 ("Answer"). On August 21, 2017, Petitioner filed a traverse. See Dkt. 200 ("Traverse").

**B.     The FAP's Remaining Claims**

- Ground One: Trial counsel was constitutionally ineffective for:
    - prematurely declaring ready for trial, without having conducted any investigation, see FAP at 49-50 (Subclaim C);
    - failing to obtain investigative notes from the Public Defender's office, see id. at 51-52 (Subclaim D);
    - failing to introduce Catalina Avalos's photographic

3

lineup statement to corroborate her testimony that Petitioner was not the shooter, see id. at 53-55 (Subclaim E);

o failing to interview witnesses, including the Avaloses' neighbors, Frederico Hernandez, Richard Adams, and "Teri," who could have corroborated that the shooter's car was green and that the shooter drove by the scene earlier that day, see id. at 56-67 (portion of Subclaim F);

o failing to interview Richardson, who would have revealed that law enforcement paid him to provide information implicating Petitioner in the shooting, provided information rebutting the prosecution's claim that Petitioner had confessed to committing the shooting, and revealed that a coworker drove a green Camaro, see id. at 67-70 (Subclaim G); and

o failing to rebut Richardson's claim that Petitioner altered his Camaro because it was "hot" with Richardson's prior inconsistent statement and records from the body shop that performed the work, see id. at 70-72 (Subclaim H).

- Ground Two: The trial court violated Petitioner's due process rights by denying defense counsel's requested continuance. See id. at 89-93.

- Ground Three: The prosecutor violated Petitioner's due process rights by failing to disclose material impeachment evidence regarding Jimmy Richardson. See id. at 93-100.

- Ground Four: The trial court violated Petitioner's right to a fair trial by admitting multiple forms of evidence demonstrating his

possession of several firearms when it was conclusively established that none was the murder weapon. See id. at 100-17.

- Ground Five: The trial court prejudicially erred in failing to sua sponte instruct the jury that it must determine whether Petitioner made an extrajudicial admission and, if so, that certain of the statements must be viewed with caution as set forth in CALJIC No. 2.71. See id. at 118-23.

- Ground Six: The cumulative effect of the constitutional violations listed above rendered Petitioner's trial fundamentally unfair. See id. at 123-26.

## C.   State-Court Proceedings

On August 12, 2003, a Los Angeles County Superior Court jury convicted Petitioner of first-degree murder and found true gun and gang enhancements. See Lodged Document ("LD") 12, 1 Clerk's Transcript ("CT") 232-33.[2] On September 19, 2003, the trial court sentenced him to 60 years to life in prison. See id. at 241-42.

Petitioner appealed, raising claims corresponding to the FAP's Ground Four and the state-law portion of Ground Five. See LD 2-3. On March 22, 2005, the California Court of Appeal struck a 10-year sentence for the gang enhancement but otherwise affirmed the judgment. See LD 6. Petitioner filed a petition for review in the California Supreme Court, raising the same two claims. See LD 7. The California Supreme Court summarily denied the petition on June 8, 2005. See LD 8.

---

[2] Lodged documents referenced herein correspond to the following docket entries and notices of lodging: Dkt. 25, Notice of Lodging, LD 1-11; Dkt. 104, Notice of Lodging, LD 12-15; and Dkt. 195, Supplemental Notice of Lodging, LD 16-17).

Nearly 9 years later, on January 26, 2014, Petitioner filed a habeas petition in the California Supreme Court, raising claims corresponding to some of the FAP's Grounds One and Six.[3] See LD 14. On April 23, 2014, the California Supreme Court denied the petition with citations to People v. Duvall, 9 Cal. 4th 464, 474 (1995), and In re Swain, 34 Cal. 2d 300, 304 (1949), indicating that the claims were not raised with sufficient particularity. See LD 15.

On January 12, 2016, Petitioner, now represented by the FPD, filed a second habeas petition in the California Supreme Court, raising all of the grounds in the FAP. See Dkt. 182, Notice of Lodging, Petitioner's Lodged Document ("Petitioner's LD") 1. Petitioner also filed three volumes of exhibits in support of his petition. See LD 16. On July 13, 2016, the California Supreme Court directed the respondent to file an informal response to Petitioner's ineffective assistance of counsel claims and his due process claim based on the prosecutions' failure to disclose that Richardson "received monetary benefits in exchange for his testimony against [P]etitioner." Petitioner's LD 2. The respondent filed an informal response on October 18, 2016. See Petitioner's LD 3. On November 23, 2016, Petitioner filed a reply to the informal response along with several exhibits. See Petitioner's LD 4-5. On March 29, 2017, the California Supreme Court summarily denied the petition. See Petitioner's LD 6.

**D.** **Summary of Evidence**

The Court has independently reviewed the state-court record and finds the following to be an accurate recitation of what the evidence showed at trial. See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

---

[3] The prison mailbox rule applies to state habeas petitions. Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003).

6

### 1. Testimony Regarding the Shooting Incident

At approximately 10:20 p.m. on July 14, 2002, Catalina Avalos and her son, Lawrence, were in the front yard of their home on Virginia Avenue in the city of Paramount. See 3 Reporter's Transcript ("RT") 424, 431-33; 4 RT 605, 610. Catalina's ex-husband was also outside, working on his truck. See 3 RT 432; 4 RT 610, 615. Catalina and Lawrence both testified that Catalina's ex-husband—Lawrence's father—was a member of the East Side Paramount gang ("ESP") and that ESP controlled the area where they lived. See 3 RT 424-25; 4 RT 605-06. Catalina testified that she and her children had a "friendly relationship" with her ex-husband, that he still stayed at her house, and that she saw him on a "regular day basis" unless he was away for his work as a truck driver. 3 RT 432, 491.

Catalina and Lawrence saw a Hispanic man, later identified as Jose Ortiz, walking north on the east side of the street. See 3 RT 432-33; 4 RT 615-16. They then saw a Camaro, which was also heading north, stop next to the man. See 3 RT 433; 4 RT 619-20. Catalina noticed that the Camaro was emerald or forest green, with colored graphic lines drawn on the passenger-side wheel well. See 3 RT 433, 454. Lawrence saw that it was a dark color, either black, blue, or green. See 4 RT 625. He was certain that it was not grey, red, or burgundy. See 4 RT 648-49. The Camaro's driver and Ortiz appeared to converse for a moment. See 3 RT 433, 437; 4 RT 620. The driver then drove forward, made a u-turn, and parked about two houses down from the Avaloses' home. See 3 RT 437-38; 4 RT 621-22. The driver got out of the car, hesitated, and then began walking toward Ortiz. See 3 RT 438-39; 4 RT 621. At the same time, the Avaloses saw Ortiz walk back toward the driver, crossing the street diagonally. See 3 RT 439; 4 RT 623. He was carrying a gun behind his back. See 3 RT 439; 4 RT 623. The driver told Ortiz, "Put your gun away, dog. Let's talk about this like men," or words to that effect. 3 RT 440; 4

RT 623-24. Ortiz put his gun back in his waistband or pocket and continued to walk toward the driver. See 3 RT 440; 4 RT 623-24. Without speaking, the driver pulled out a gun and began shooting at Ortiz, discharging at least five to seven shots. See 3 RT 440-41; 4 RT 624-25. As Ortiz staggered and fell to the ground, the driver either walked up to him and shot him several more times while standing or shot him two more times after getting back into his car. See 3 RT 441; 4 RT 627-28. The driver then drove away. See 3 RT 441; 4 RT 627-28. Lawrence estimated that the driver fired 15 shots in all. See 4 RT 627.

At trial, Catalina described the shooter as a male Hispanic who was "kind of dark," slender, and wearing a baseball cap and leather sandals. 3 RT 442, 447-48. Lawrence described the driver as a tall, thin Hispanic man in his 20s.[4] 4 RT 630-33, 635. He recalled that he had seen the Camaro drive by earlier that day at about 1:00 p.m. and again at 4:00 p.m., and that it had returned to the scene the day after the shooting. See 4 RT 638-39, 647-48, 651-52. Both Catalina and Lawrence examined the photographs of a Camaro and said the Camaro driven by the shooter had the same body style as the car in the photographs. See 3 RT 435; 4 RT 618-19.

Both Catalina and Lawrence testified that Petitioner did not look like the shooter.[5] See 3 RT 444-45, 459-50; 4 RT 639-41, 650-53. Catalina testified that the shooter had a more narrow face and was taller, thinner, younger, and darker-skinned than Petitioner. See 3 RT 447-48, 452-53, 458-60. She testified

[4] Lawrence testified that the shooter "looked dark and when he moved, he looked lighter" and that Lawrence "couldn't really tell" what kind of complexion he had. See 4 RT 631-32, 641-42. He estimated that 46 feet were between him and the shooter. See 4 RT 631-32.

[5] Catalina and Lawrence first gave this information to a defense investigator, who had prepared statements for them to sign. See 3 RT 444-45, 458, 485-86; 4 RT 639-40. Catalina's statement was read to the jury. See 3 RT 486.

that she told a defense investigator that Petitioner was not the shooter, but she did not tell the sheriff's department or the district attorney's office, even after the preliminary hearing. See 3 RT 445. Lawrence testified that the shooter was taller and skinnier than Petitioner. See 4 RT 650-51.

Investigator Boyd Zumwalt investigated the shooting. See 5 RT 1056, 1078. When he arrived at the scene, he observed expended shell casings, projectiles, a bloody shirt, and some sandals. See 5 RT 1056. He also observed an unfired weapon that belonged to Ortiz. See 5 RT 1059. Catalina told the investigating officers that she had seen the shooting and thereafter saw a hard-top green Camaro drive away at a high rate of speed. See 5 RT 1060-61, 1079. Four days later, Zumwalt returned to interview Catalina, who referred him to her ex-husband, who was not at home, for information about the shooting. See See 5 RT 1061-62, 1094. The officer left his pager number for Catalina's ex-husband, but he was never contacted. See 5 RT 1062, 1081-82. Zumwalt testified that Catalina's ex-husband was an ESP member. See 5 RT 1062-63.

In July 2002, Kathy Lainez was Petitioner's girlfriend. See 5 RT 986, 1007. Lainez lived in Los Angeles and had never been to Petitioner's home in Rialto. See 5 RT 984-85. She saw him mostly on the weekends and never saw any graffiti associated with Petitioner, nor had she seen him with guns. See 5 RT 985-86. Lainez testified that Petitioner was not a gang member. See 5 RT 984.

On July 14, 2002, Lainez and her aunt returned home together from a trip to Miami. See 5 RT 989-90, 1005. Her plane arrived at 1:00 or 1:30 pm and Petitioner met her at the airport. See 5 RT 990, 1004. They drove in Petitioner's Camaro to her home in Los Angeles. See 5 RT 991-92. Lainez testified that the Camaro was dark burgundy when Petitioner bought it but it was gray on July 14, 2002. See 5 RT 991-92, 1014. The car was never green. See 5 RT 1003, 1014. After leaving her home, Lainez and Petitioner went to a

nearby motel for 2 or 3 hours. See 5 RT 992-93. Lainez first estimated that they arrived at the motel at 3:00 or 4:00 p.m. and stayed until 9:00 p.m., but when she was shown motel records, she realized that they actually arrived there shortly after 6:00 p.m. and checked out at 8:14 p.m. See 5 RT 992-97. From the motel, Petitioner and Lainez got food from a Jack-in-the-Box and ate in the car in front of Lainez's home. See 5 RT 995, 999, 1008-09. Petitioner then left to go home. See 5 RT 999-1000. Lainez was not sure where she or Petitioner was at 10:20 p.m., the time of the shooting. See 5 RT 999-1001, 1004.

In July 2002, Jimmy Richardson worked with Petitioner at Thor California, which was located in Moreno Valley in Riverside County. See 4 RT 670-71. Petitioner and Richardson drove together to work. See 4 RT 671-72. Richardson testified that Petitioner owned a burgundy Camaro in July 2012, but he later acquired a Buick Regal and Toyota Camry. See 4 RT 672-73, 680-81, 725. Richardson knew that Petitioner was an active member of a Paramount street gang. See 4 RT 677-78. Although Petitioner lived in Rialto, he told Richardson that he had "gone back" to Paramount. 4 RT 678. Petitioner always had a weapon with him, which he usually kept in his car. See 4 RT 681. Petitioner carried a nine-millimeter Beretta handgun with "night sights" and a special clip that held additional bullets. 4 RT 681, 685-88.

One Monday morning in July 2002, Petitioner told Richardson that over the weekend he had to "smoke some fool" who was "mad-dogging him" in Paramount. 4 RT 676-77, 681-82. Petitioner described how he drove up the block, turned around, and got out of his car. See 4 RT 681-82. Petitioner said that the man had a gun and he told the man to put the gun away to "handle it" like men. See 4 RT 681-82. Petitioner then described how he shot the man, and once he was on the ground, shot him again "point blank." 4 RT 682-84. Petitioner then showed Richardson a nine-millimeter Beretta with a long clip,

10

saying it was the gun used in the shooting. See 4 RT 685.

A week or two later, Petitioner handed Richardson a copy of a newspaper article that described Ortiz's murder. See 4 RT 696-99. The article's description of the incident was consistent with Petitioner's. See 4 RT 700. The article referred to the perpetrator as "the unknown assailant," and thereafter Richardson began calling Petitioner "the unknown." 4 RT 701.

According to Richardson, Petitioner continued to drive the Camaro for two weeks before he had it repainted gray. See 4 RT 681, 684, 725-26. After that, Richardson testified, Petitioner had other body work done on the Camaro, including replacing the headlights and rims. See 4 RT 680-81, 684-85. Petitioner told Richardson that the Camaro was "hot" because it had been used in the shooting. 4 RT 681, 725.

Raul Macias worked at Thor California and knew Petitioner and Richardson. See 5 RT 910. He did not spend any personal time with Petitioner and saw him only at work. See 5 RT 910, 917. Macias testified that in November 2002, he bought a nine-milimeter Beretta handgun from Richardson for $400. See 5 RT 912-13, 917. Macias testified that Richardson was telling people at work that he had a Beretta handgun for sale, and when Macias expressed interest, Richardson arranged to meet him after work at 5:00 p.m. at a gas station in Riverside. See 5 RT 925-27. Petitioner and another man, "Steve," were also present. 5 RT 925, 927. Richardson handed the gun to Macias, and Macias paid him the next day. See 5 RT 926-27.

**2. Testimony and Evidence Regarding the Investigation**

In October 2002, Richardson was arrested by the United States Secret Service and the Department of Alcohol, Tobacco, and Firearms ("ATF"), and he was charged in state court for offenses involving counterfeit money and methamphetamine. See 4 RT 673-74. Richardson had purchased some of the counterfeit money and a large amount of the methamphetamine from

Petitioner. See 4 RT 673-76, 754.

Richardson pleaded guilty to two felonies and received a suspended sentence based on his agreement to cooperate with law enforcement in counterfeit and sting operations. See 4 RT 674-76, 727, 754. At some point in November 2002, Richardson told federal authorities about Petitioner's admission to the murder. See 4 RT 676, 712-13, 755-58. Richardson also reported that Petitioner had sold the gun used in the shooting to a coworker at Thor California. See 4 RT 714, 721-22, 758. On December 23, 2002, federal authorities contacted Zumwalt and told him about Richardson's statements. See 5 RT 1063-64. Zumwalt personally interviewed Richardson on December 30, 2002. See 5 RT 1064.

On January 8, 2003, Richardson called Petitioner on a monitored phone in an effort to elicit corroborating and incriminating statements. See 4 RT 702-03; 5 RT 1064-65. During the telephone call, Petitioner referred to work being done on his Camaro. See 4 RT 703-05; CT 158-61. On January 9, 2003, Richardson wore a "wire" to a meeting with Petitioner to buy methamphetamine. 4 RT 705, 731-32; 5 RT 1065-66. During the taped conversation, Petitioner discussed firearms, discussed the body work being done on his car, responded to a question from Richardson about "Paramount," and discussed other gang-related incidents. 4 RT 715-16, 728-29, 734, 737-38; CT 163-67. At one point, Richardson tried to shift the conversation to Ortiz's murder, asking, "Ain't no shit ever happened over that shit out back? Remember that?" 4 RT 715-16; CT 166. Petitioner responded, "From 18th?" and asked, "What dude?" CT 166. Richardson said, "Out there in Paramount." Id. Petitioner responded, "The last one I did—will be the last of the month, 40." Id. Richardson laughed, and Petitioner said, "Oh yeah, that fool from Paramount?" Id. Richardson did not understand what "18th" meant

12

at the time.[6] 4 RT 716.

On January 14, 2003, Zumwalt returned to Paramount to interview Catalina and Lawrence Avalos about the shooting. See 5 RT 1067-68, 1082-83. At that time, Catalina described the shooter as a Hispanic, 18-to-21-year-old man wearing a brown silky shirt and a baseball cap. See 5 RT 1075-76. Lawrence described the shooter as a light-skinned Hispanic man in his 20s wearing blue or black pants. See 5 RT 1076-77; 4 RT 630.

Also on January 14, 2003, investigators showed Catalina a six-pack photographic lineup; she circled a photograph as depicting someone who "look[ed] similar" to the shooter.[7] 3 RT 457, 483-84. At that time, she told the investigator that based on the time that she saw the person and where she was standing, she was not comfortable making an identification. See 3 RT 484.

On March 6, 2003, federal agents and Zumwalt went to Macias's home and asked whether he had a gun in the house. See 5 RT 915-16, 1070-73. Macias said that he did and, in front of the officers, he retrieved a loaded nine-

---

[6] Some evidence suggested that Ortiz was an 18th Street gang member. See 3 RT 389-90 (counsel saying outside presence of jury that Ortiz had tattoo that said "XVIII"); 5 RT 1027 (stating that coroner's report was marked as Exhibit 24 and autopsy report was marked as Exhibit 25); 6 RT 1209 (admitting those exhibits into evidence); LD 17 at 3 (autopsy report listing tattoos, including one saying "XVIII"). Catalina described Ortiz as a "cholo," which Zumwalt explained was slang for gang member. 5 RT 1083. The gang expert, Lyle Raymond, testified that if an 18th Street gang member was walking in ESP's neighborhood, he was going to "get challenged" by other gang members. 5 RT 971-72.

[7] The six-pack photographic lineup was contained in the police file provided to Petitioner's trial counsel but it was not introduced as an exhibit at trial. See LD 16, Ex. 4 (Farrand Decl. at ¶ 7). The lineup, which was submitted to the state court on habeas corpus, included Petitioner's photo, but that was not the one Catalina selected as looking similar to the shooter. See LD 16, Ex. 4, Ex. 25; FAP at 54, Ex. 25.

millimeter Beretta from a floor heating vent. See 5 RT 915-16, 1074. Macias told officers that he had purchased the handgun from Petitioner for $400.[8] See 5 RT 920; CT 168-69. Macias said he had hidden it in the floor vent so his brother would not find it. See CT 170. Macias also stated that he and Petitioner were from the same neighborhood and that Macias was in a gang called "MTC."[9] CT 173.

At trial, Macias explained that he lied during the police interview and that it was in fact Richardson who had sold him the gun. See 5 RT 920, 922. Macias testified that he had lied because the police had threatened to charge Macias with the crime if he did not implicate Petitioner. See 5 RT 922-23. Macias also testified that when the officers arrived at his home, their guns were drawn and they forced him and his family to exit the home with their hands up and lie on the floor with their arms and legs spread.[10] See 5 RT 928-32. Macias was frightened for his family and himself, so he showed the police where the gun was hidden. See 5 RT 932-33. When the officers activated the tape recorder, they told him to say that Petitioner had sold him the gun. See 5 RT 933-34, 936. Macias testified that they also told him not to mention that Richardson was involved in the gun exchange or that he had called Macias before the search to ask whether he still had the gun. See 5 RT 937-38.

---

[8] A recording of Macias's interview was played for the jury. See 5 RT 919.

[9] Lyle Raymond, a gang expert, testified that MTC, or Mexicans Taking Control, started in Paramount and was a group of younger Hispanic males. See 5 RT 953-54. Raymond also testified that the graffiti found in Petitioner's home was of MTC and "PRMT," indicating Paramount. 5 RT 958-59.

[10] Zumwalt testified that Macias and his family were not required to lie down on the ground and that Macias's account was "a fabrication." 5 RT 1091-92.

14

On March 6, 2003, the ATF executed a search warrant at Petitioner's home. See 4 RT 741. During the search, Special Agent Greg Estes saw what appeared to be graffiti on the inside walls of the house. See 4 RT 742-43. He also recovered a box of nine-millimeter ammunition and an extended magazine that used that ammunition. See 4 RT 743-44. Estes determined that the magazine fit the Beretta nine-millimeter handgun recovered from Macias's home. See 4 RT 745-46. Estes recovered an assault weapon from Petitioner's bedroom, a pistol magazine compatible with a .40-caliber handgun, and a photo of Petitioner pointing a .40-caliber handgun at a person flashing a gang sign. See 4 RT 746-49.

The Secret Service executed a search warrant at Thor California on the same day. See 4 RT 750-51. At that location, Special Agent Michael Gutierrez searched Petitioner's Buick and found a nine-millimeter handgun under the floor mat on the driver's side. See 4 RT 751-53.

Ortiz's autopsy revealed that he suffered ten gunshot wounds. See 5 RT 1026, 1028, 1031. The coroner recovered bullets from each of the fatal wounds to Ortiz's chest. See 5 RT 1028, 1035. He also retrieved bullet fragments associated with other nonfatal wounds. See 5 RT 1028-29, 1035. A ballistics analysis showed that the bullets and fragments retrieved from Ortiz's body and the casings and bullets recovered from the crime scene were fired from the Berretta handgun seized from Macias's home. See 5 RT 1045-48, 1050, 1053-54.

A gang expert, Lyle Raymond, testified that Petitioner was an admitted member of ESP. See 5 RT 958. Raymond testified that ESP "claims" the neighborhood where the shooting took place. 5 RT 957-58. Raymond also testified that a family in which a husband and father is an ESP member may have problems if a family member were to testify against another ESP member who is charged with a crime. See 5 RT 960.

At some point, Zumwalt examined Petitioner's Camaro and determined that it had been metallic maroon before it had been painted gray. See 5 RT 1097.

### 3.    Defense Evidence

Ovidio Lainez is Kathy Lainez's father. See 5 RT 1099-100. He recalled that Kathy returned home from her trip to Florida at about 2:00 p.m. on July 14, 2002, and that Petitioner had been with her at that time. See 5 RT 1100-01. Frances Levern, Kathy Lainez's aunt, testified that she and Kathy returned to Los Angeles from Florida at 1:00 or 1:30 p.m. on July 14, 2002, and that Petitioner met Kathy at the airport and the two of them left together. See 6 RT 1205-07.

**IV.**

**STANDARD OF REVIEW**

Petitioner's claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, federal courts may grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Overall, AEDPA presents "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, — U.S. —, 134 S. Ct. 10, 16 (2013). AEDPA presents a difficult to meet and highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt. See Cullen v. Pinholster, 563 U.S. 170, 180-81 (2011). The prisoner bears the burden to show that the state-court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, a state-court determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of that ruling. Id. at 101 (citation omitted). Federal habeas corpus review therefore serves as "a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at 102-03 (citation omitted).

Here, Petitioner raised Ground Four on direct appeal and the California Court of Appeal rejected it in a reasoned decision. See LD 2-3, 6. The California Court of Appeal did not specifically address the federal constitutional portion of Ground Four but it rejected the related state-law claim on the merits. See LD 6. "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 568 U.S. 289, 301 (2013). Petitioner has failed to rebut that presumption.[11] The

---

[11] Petitioner argues that the Court should review Ground Four de novo because "the state evidentiary claim raised here does not subsume the federal habeas violation, and the state court denied relief while 'mak[ing] no reference to federal law.'" Traverse at 49 (quoting Johnson, 568 U.S. at 301). Petitioner's argument is insufficient to rebut the "strong presumption" that that state court denied Petitioner's federal due process claim on the merits. See Johnson, 568 U.S. at 302 (noting that presumption is "a strong one that may be rebutted only in unusual circumstances"). The state appellate court's determination that the admission of the gun evidence did not violate state law because it was

California Supreme Court summarily denied Petitioner's subsequent petition for review. See LD 7, 8. Petitioner also raised Ground Four in a habeas petition to the California Supreme Court, which summarily denied it. See Petitioner's LD 1, 6. Because the state courts at no point expressly addressed Ground Four's federal constitutional claim, the Court conducts an independent review of the record to determine whether the state courts were objectively unreasonable in applying controlling federal law. See Haney v. Adams, 641 F.3d 1168, 1171 (9th Cir. 2011) (independent review "is not de novo review of the constitutional issue, but only a means to determine whether the 'state court decision is objectively unreasonable'" (citation omitted)); see also Richter, 562 U.S. at 98, 102 (holding that petitioner still has burden of "showing there was no reasonable basis for the state court to deny relief," and reviewing court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision" and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" Supreme Court precedent).

Petitioner also raised the state-law portion of Ground Five on direct appeal and the California Court of Appeal denied it in a reasoned decision. See

relevant and did not create a danger of undue prejudice would necessarily lead to the conclusion that no federal due process violation occurred. See id. at 301 (stating that "if the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits"); Thiecke v. Kernan, __ F. App'x __, 2017 WL 2445056, at *1-2 (9th Cir. June 6, 2017) (applying AEDPA deference to claims including due process claim based on admission of evidence because "although the California Court of Appeal's opinion discusses California law, the relevant California standards are 'at least as protective' as the relevant federal standards, so 'the federal claim[s] may be regarded as having been adjudicated on the merits'" (quoting Johnson, 568 U.S. at 301)). Thus, the highly deferential standard of review established by AEDPA applies to Ground Four.

LD 2-3, 6. The California Supreme Court summarily denied Petitioner's subsequent petition for review. See LD 7-8. Petitioner first raised the federal portion of Ground Five in a habeas corpus petition to the California Supreme Court, which summarily denied it. See Petitioner's LD 1, 6. Because no reasoned state-court decision on the federal portion of Ground Five exists, the Court conducts an independent review of the record to determine whether the state supreme court, in summarily denying that claim, was objectively unreasonable in applying controlling federal law. See Haney, 641 F.3d at 1171; Richter, 562 U.S. at 98, 102.

Petitioner initially raised portions of Ground One and Ground Six in a habeas petition in the California Supreme Court, which denied the petition on procedural grounds. See LD 14-15. Petitioner then raised Grounds One, Two, Three, and Six in a habeas petition to the California Supreme Court, which summarily denied them. See Petitioner's LD 1, 6. Because no reasoned state-court decision on Grounds One, Two, Three, and Six exist, the Court conducts an independent review of the record to determine whether the California Supreme Court, in summarily denying those claims, was objectively unreasonable in applying controlling federal law. See Haney, 641 F.3d at 1171; Richter, 562 U.S. at 98, 102.

## V.

## DISCUSSION[12]

**A.**    **Failure to Disclose Impeachment Evidence (Ground Three)**

Petitioner contends that the prosecutor violated his due process rights under Brady and Napue by failing to disclose material impeachment evidence regarding the government's main witness, Jimmy Richardson—specifically,

---

[12] The Court addresses the issues in an order different from that followed by the parties.

that law enforcement agencies paid him between $6,000 and $10,000 for information about the Paramount shooting. See FAC at 93-100, Ex. 11.

### 1.    Evidence Presented on Habeas Review

In 2016, Petitioner submitted to the California Supreme Court with his habeas corpus petition a declaration from Richardson in which he stated that Petitioner had driven a burgundy Camaro that he later had painted gray, and that Richardson had been "friendly" with a different employee at Thor who drove a green Camaro. LD 16, Ex. 11. Richardson stated that he did not remember that employee's name. See id. Richardson also stated that during the recorded conversation with Petitioner that was played at trial, Petitioner said "the last one I did—will be the last of the month, 40" but that Richardson did not know what that phrase meant and did not believe that Petitioner was admitting the Paramount shooting. Id. Richardson stated that, had defense counsel asked him, before or during trial, what that phrase meant, Richardson would have said he did not know. See id. Richardson also stated:

> [A]t some point when I knew him, [Petitioner] took his Camaro to a body shop for repairs. Shortly before he took the Camaro to the body shop, he mentioned that the Camaro had been in a crash. If [Petitioner's] trial counsel had asked me about this before or during trial, I would have said that [Petitioner] had a car crash in the Camaro shortly before having the repairs done on it.

Id. Finally, Richardson stated that he had been paid for providing information to law enforcement:

> In 2002, I gave information about [Petitioner] and the shooting in Paramount to several law enforcement agencies, including the FBI, the United States Secret Service, the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), and the Los Angeles County Sheriff's Department. In exchange for this information, agents of

20

the several agencies gave me between $6,000 and $10,000. I provided the information in exchange for this money, as well as to avoid prison time on the other criminal charges I was then facing.

Id.[13]

Richardson also stated that before Petitioner's trial, no one working on Petitioner's defense ever spoke to or interviewed him. See id. at 65. He stated he would have revealed that he had been paid had he been asked about it by defense counsel or an investigator before or during trial. See id.

**2.    Brady**

Petitioner contends that that the prosecution's failure to disclose law enforcement's payments to Richardson violated Brady.

a.    Applicable Law

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Three elements must be proved to establish a Brady violation: (1) the evidence at issue was favorable to the defendant, either as exculpatory evidence or impeachment material; (2) the evidence was suppressed by the state, either willfully or inadvertently; and (3) prejudice resulted from failure to disclose the evidence. United States v. Wilkes, 662 F.3d 524, 535 (9th Cir. 2011). Suppression of evidence is prejudicial if a reasonable probability exists that had the evidence been disclosed to the defense, the result of the trial would have been different. See Sivak v. Hardison, 658 F.3d 898, 911-12 (9th Cir.

---

[13] Respondent has confirmed that Richardson was paid $3,750 by ATF for "relocation and incidental expenses in relation to [Petitioner's] case." Petitioner's LD 5 at 14. Trial counsel's file contained no evidence of any payments. See id. at 7.

2011). Thus, suppression of "merely cumulative" evidence generally is not prejudicial under Brady. United States v. Kohring, 637 F.3d 895, 902 (9th Cir. 2011).

          b.     Discussion

On habeas review, and in light of AEDPA deference, the Court cannot conclude that the California Supreme Court was objectively unreasonable in denying Petitioner's Brady claim. It is undisputed that law enforcement paid Richardson, the key witness against Petitioner, several thousand dollars; it is also undisputed that this evidence was never disclosed to the defense. This evidence was impeachment material that was favorable to the defense. See Amado v. Gonzalez, 758 F.3d 1119, 1134 (9th Cir. 2014) (holding that Brady's disclosure requirement applies to evidence that "impeaches a prosecution witness"); Barker v. Fleming, 423 F.3d 1085, 1095 (9th Cir. 2005) ("It is well settled that evidence impeaching the testimony of a government witness falls within the Brady rule[.]"); Bagley v. Lumpkin, 798 F.2d 1297, 1302 (9th Cir. 1986) (holding that payments to witnesses are Brady material). As a result, the prosecution was obligated to produce it to the defense, which it apparently failed to do. See Amado, 758 F.3d at 1135-36 (holding that "defense counsel may rely on the prosecutor's obligation to produce that which Brady . . . require[s] him to produce").[14]

But it would not have been objectively unreasonable for the California Supreme Court to conclude that Petitioner failed to show a reasonable probability that the outcome of his trial would have been different had the prosecution disclosed that additional impeachment evidence. At trial, the jury

---

[14] Respondent attempts to avoid this conclusion by arguing that the payments may have been for "witness relocation" or to "reimburse Richardson for expenses" and, thus, could not have impacted his credibility. Answer at 37-37. This argument is unpersuasive and the Court rejects it.

22

heard evidence that Richardson was arrested in October 2002 for possession of about $600 in counterfeit currency and an ounce of methamphetamine. See 4 RT 673, 727. Richardson testified that after his arrest, he pleaded guilty to two felonies, received a suspended sentence, and agreed to cooperate with law enforcement by getting "three gun buys and two counterfeit money buys" so that law enforcement could "get cases on other people dealing guns and drugs." 4 RT 674-75. On cross-examination, Petitioner's trial counsel elicited Richardson's testimony that he had informed on people to avoid going to jail for his two felony convictions:

> Q    And it was clearly understood that unless these people were actually—unless there was action taken on the information that you gave, that you wouldn't get the benefit of your bargain which was a suspended prison sentence, right?
>
> A    If you want to call that a bargain.
>
> Q    You don't think it was a bargain?
>
> A    I believe it was a good deal.

4 RT 726-27.

Thus, the jury was presented with evidence tending to show that Richardson may have had a motivation to fabricate evidence in Petitioner's case in order to receive a benefit from law enforcement. Evidence that Richardson received payments in exchange for providing information therefore would not have provided a "new and different ground of impeachment." Barker, 423 F.3d at 1097-98 (citation omitted); Heishman v. Ayers, 621 F.3d 1030, 1035 (9th Cir. 2010) (holding that there was no likelihood that the suppressed evidence, including proof of perjury, criminal activity, and remuneration for testimony, would have changed jury's verdict because it was "similar to and cumulative of the extremely thorough impeachment during [the witness's] cross-examination"); cf. Horton v. Mayle, 408 F.3d 570, 578-79

(9th Cir. 2005) (holding that prosecution's failure to disclose leniency deal was material because witness's testimony was "central to the prosecution's case" and "the deal would have provided powerful and unique impeachment evidence demonstrating that [the witness] had an interest in fabricating his testimony"). The jury also heard other evidence bearing on Richardson's credibility, including that he had been convicted of two felonies for possession of counterfeit money and methamphetamine and that he had engaged in criminal conduct with Petitioner.

Moreover, although Richardson was a key prosecution witness, other evidence introduced at trial supported his testimony and the jury's conclusion that Petitioner was the shooter. The evidence showed that Petitioner owned a dark-colored Camaro and had been driving it in Los Angeles while visiting his girlfriend shortly before the murder. The details Richardson provided about the shooting, as told to him by Petitioner, matched those provided by the Avaloses and law enforcement.[15] The shooting took place in Paramount, in an area controlled by ESP, and the gang expert and others testified that Petitioner was an ESP member. Richardson testified that Petitioner said he had committed the murder with a nine-millimeter handgun with an extended magazine. The murder weapon, a nine-millimeter handgun, was later found in Macias's house; Macias told police that Petitioner had sold him the gun, and he later testified that Richardson had sold it to him but that Petitioner was present during the exchange. During a search of Petitioner's home, police found an extended magazine that fit the murder weapon. And when Richardson asked Petitioner, during a recorded conversation, about that "shit out back" with the

---

[15] As the California Court of Appeal found, moreover, although the Avaloses "failed to identify [Petitioner], they had reasons for not being forthcoming"—their association, through Catalina's ex-husband and Lawrence's father, with Petitioner's gang, ESP. See LD 6 at 5.

"dude" from Paramount, Petitioner referred to a "fool from Paramount" who was "from 18th," an apparent reference to the victim.

In light of the other impeachment evidence and all of the evidence introduced at trial, the California Supreme Court could have reasonably found that the evidence that Richardson was paid for providing information about the Paramount shooting would not have put the case "in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Hewson v. Key, 683 F. App'x 578, 579 (9th Cir. 2017) (finding that suppressed information was not material "in light of the full body of evidence introduced at trial"), cert. denied, __ S. Ct. __, 2017 WL 3324737 (2017); United States v. Djeredjian, 532 F. App'x 732, 733 (9th Cir. 2013) (finding on direct review that prosecution's suppression of impeachment evidence was immaterial given the "ample impeachment evidence already introduced" and the "extremely strong evidence" of defendant's guilt); Williams v. Yarborough, 228 F. App'x 705, 707 (9th Cir. 2007) (finding on independent review that even "assuming that the State had a duty to disclose the witness protection program payments, the state courts reasonably could have determined that this evidence would not have put the entire case 'in such a different light as to undermine confidence in the verdict'" (citation omitted)).

Thus, although the prosecution's failure to disclose impeachment evidence is obviously troubling, "'troubling' is not the relevant standard. It is materiality, evaluated in light of AEDPA deference, that controls." Reis-Campos v. Biter, 832 F.3d 968, 978 (9th Cir. 2016), cert. denied, 137 S. Ct. 1447 (2017). Habeas relief is not warranted on this claim.

### 3.    Napue

Petitioner further asserts that Petitioner's convictions were based on false testimony because the prosecution elicited "testimony from Richardson that the entire extent of his bargain with law enforcement was that he would inform

25

on [Petitioner] in exchange for a reduced sentence." FAP at 97-98 (citing Napue v. Illinois, 360 U.S. 264, 269 (1959)).

a.      Applicable Law

To establish a constitutional claim based on the prosecutor's introduction of perjured testimony at trial, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003) (citing Napue, 360 U.S. at 269-71). In this context, false testimony is material "if 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Hayes v. Ayers, 632 F.3d 500, 520 (9th Cir. 2011) (quoting Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (en banc)). While this materiality standard is essentially a form of harmless error review, a far lesser showing of harm is required than under ordinary harmless error review. See Dow v. Virga, 729 F.3d 1041, 1048 (9th Cir. 2013). In other words, "Napue requires [the court] to determine only whether the error could have affected the judgment of the jury, whereas ordinary harmless error review requires [the court] to determine whether the error would have done so." Id.

b.      Discussion

Petitioner's Napue claim does not warrant habeas relief. Nothing in the record demonstrates that Richardson testified falsely. Rather, as previously discussed, he testified that he was arrested in October 2002 for possession of counterfeit currency and methamphetamine and that he received a suspended sentence in exchange for cooperating with law enforcement on other cases. See 4 RT 673-76. On cross-examination, Richardson confirmed that he had been arrested for possession of counterfeit money and methamphetamine and that he "didn't want to go to jail for that." 4 RT 727. Richardson confirmed that to avoid going to jail, he gave law enforcement information about other crimes,

26

and he said he would receive his suspended sentence only if law enforcement acted on the information he provided. See id. No one asked Richardson whether law enforcement had paid him to provide information, whether he had received any other benefit for his cooperation, or whether he had explained the full extent of his deal with law enforcement; nothing shows that his answers to the questions posed were false. Indeed, Richardson himself stated in his declaration that he would have "testified as to these things at trial, if asked about them." LD 16, Ex. 11.

Petitioner argues that he need not "establish that Richardson overtly lied on the stand in order to state a claim under Napue" because "Napue applies both to perjured testimony and to the failure to correct omissions which lead to false evidence." Traverse at 42. But nothing in the record shows that the prosecutor failed to correct omissions in Richardson's testimony.[16] Thus, it

---

[16] Petitioner relies heavily on Hayes v. Brown, but that case is readily distinguishable on its facts. In Hayes, the prosecutor had reached a deal with a witness's attorney to dismiss a felony charge and obtained a promise from the attorney that he would not tell his client about the deal. See 399 F.3d at 977. Then the witness could testify that there was no deal, unaware of the attorneys' arrangement. See id. The prosecutor then misled the court and defense counsel, affirmatively stating that there had been "absolutely no negotiations whatsoever in regard to [the witness's] testimony" and "no discussions in regard to any pending charges." Id. at 979-80. The prosecutor later elicited the witness's testimony that no one had made him any promises or offered him any benefits in exchange for his testimony. See id. at 980. The Ninth Circuit found that the state's actions violated the petitioner's rights under Napue because "the record [was] clear that: (1) before [petitioner's] trial, the State had made a deal with [the witness's] attorney for the dismissal of pending felony charges after his testimony; (2) the State specifically represented to the trial judge that there was no such deal; (3) the State elicited sworn testimony from [the witness] at trial that there was no such deal, both on direct and re-direct examination; and (4) the State failed to correct the record at trial to reflect the truth." Id. The Ninth Circuit rejected the state's argument that Napue was not

would have been reasonable for the California Supreme Court to reject Petitioner's <u>Napue</u> claim on the basis that Richardson did not testify falsely. <u>See Williams</u>, 228 F. App'x at 707 (finding that state court reasonably could have concluded that witness did not testify falsely about receiving witness-protection funds when she was not "squarely asked" whether she had received them and "her answers to the specific questions posed were not shown to be false"); <u>Schessler v. McDonald</u>, No. 11-9077, 2015 WL 10582201, at *15 (C.D. Cal. Nov. 2, 2015) (denying habeas relief on <u>Napue</u> claim in part because "neither the prosecutor nor trial counsel questioned [the witness] about the [pending charges that were allegedly dismissed], or asked her whether she had received any inducement to testify" and "[t]here was no testimony by [the witness] regarding the matter"), <u>accepted by</u> 2016 WL 1328051 (C.D. Cal. Apr. 4, 2016).

**B.    <u>Failure to Instruct the Jury Regarding Extrajudicial Admissions (Ground Five)</u>**

Petitioner contends that the trial court prejudicially erred in failing to <u>sua sponte</u> instruct the jury that it must determine whether Petitioner made an extrajudicial admission and, if so, that certain of the statements must be viewed with caution as set forth in CALJIC No. 2.71. <u>See</u> FAP at 118-23.

**1.    Relevant Facts**

CALJIC No. 2.71 provides as follows:

> An admission is a statement made by [a] [the] defendant which does not by itself acknowledge [his] [her] guilt of the crime[s] for which the defendant is on trial, but which statement tends to prove [his] [her] guilt when considered with the rest of the evidence.

violated because the witness did not commit perjury, finding that "<u>Napue</u>, by its terms, addresses the presentation of false <u>evidence</u>, not just subornation of perjury." <u>Id.</u> at 980-81.

> You are the exclusive judges as to whether the defendant made an admission, and if so, whether that statement is true in whole or in part.
>
> [Evidence of an oral admission of [a] [the] defendant not contained in an audio or video recording and not made in court should be viewed with caution.]

The California Court of Appeal rejected the state-law portion of this claim, finding that although the trial court's failure to <u>sua</u> <u>sponte</u> instruct the jury with CALJIC No. 2.71 was error under then-existing state law,[17] it was harmless:

> [A trial court's failure to <u>sua</u> <u>sponte</u> instruct the jury with CALJIC No. 2.71] is harmless if it is not reasonably probable that a result more favorable to the defendant would have been reached had the instruction been given. (<u>People v. Stankewitz</u> (1990) 51 Cal.3d 72, 93-94; <u>People v. Pensinger</u> (1991) 52 Cal.3d 1210, 1268-1269; <u>People v. Bunyard</u> (1988) 45 Cal.3d 1189, 1224-1225.)
>
> With regard to Richardson's testimony about [Petitioner's] statements, there was no issue about the precise words used, their meaning or content, or whether the statements were remembered

---

[17] California law no longer requires that a trial court <u>sua</u> <u>sponte</u> instruct the jury with CALJIC No. 2.71 whenever there is testimony regarding a criminal defendant's out-of-court admission. <u>See</u> <u>People v. Diaz</u>, 60 Cal. 4th 1176, 1189 (2015) ("We now conclude that in light of a change in the law that requires the general instructions on witness credibility to be given sua sponte in every case, the cautionary instruction is not one of the general principles of law upon which a court is required to instruct the jury in the absence of a request.").

and repeated accurately. (People v. Bunyard, supra, 45 Cal.3d at p. 1224.) Instead, the issue was whether the statements were made at all. As noted, Richardson's testimony was corroborated by the eyewitnesses and by the physical evidence found at the scene of the crime, in [Petitioner's] car, and at his house, and the issue of Richardson's credibility was one for the jury-and the jury was fully instructed to view Richardson's testimony with caution. (E.g., CALJIC Nos. 1.00 [jurors to determine what facts have been proved from the evidence], 2.13 [prior consistent or inconsistent statements], 2.20 [jurors are the sole judges of the believability of a witness], 2.21.1 [discrepancies in testimony], 2.21.2 [witness willfully false], 2.23 [a witness's conviction of a felony is a circumstance jurors may consider in weighing credibility].) It is not reasonably probable that [Petitioner] would have obtained a more favorable result had the court instructed the jury pursuant to CALJIC No. 2.71. (People v. Stankewitz, supra, 51 Cal.3d at pp. 93-94; People v. Bunyard, supra, 45 Cal.3d at pp. 1224-1225; People v. Williams (1988) 45 Cal.3d 1268, 1315.)

LD 6 at 7.

### 2.    Discussion

Whether a jury instruction violated state law generally is not a federal question or a proper ground for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005). Habeas relief is available only when a petitioner demonstrates that the instructional error "by itself so infected the entire trial that the resulting conviction violates due process." McGuire, 502 U.S. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). When the alleged error involves the failure to give an instruction, the petitioner's burden is "especially heavy"

because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). And even if the petitioner can demonstrate an instructional error that violated his right to due process, habeas corpus relief may be granted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

Habeas relief is not warranted on Petitioner's claim of instructional error. First, to the extent Petitioner argues that the trial court's failure to instruct with CALJIC No. 2.71 violated state law, that is not a cognizable habeas claim. And Petitioner has not carried his heavy burden of showing that the trial court's failure to instruct the jury with CALJIC No. 2.71 prevented him from having a fair trial. Rather, as the Court of Appeal found, see LD 6 at 7, Richardson's testimony was corroborated by eyewitness accounts and physical evidence recovered from the crime scene, Petitioner's car and house, and Macias's home. Moreover, the other instructions properly informed the jury how to assess Richardson's testimony. The jury was instructed that it determines what facts have been proved by the evidence (CALJIC No. 100); it was told how to evaluate prior consistent or inconsistent statements (CALJIC No. 2.13); the believability of witnesses, the weight to be accorded to their testimony (CALJIC 2.20), and discrepancies in testimony (CALJIC No. 2.21.1); and it was informed that witnesses who were "willfully false" in one part of their testimony were to be distrusted in others (CALJIC No. 2.21.2) and that it may consider the fact that a witness has been convicted of a felony in determining his or her believability (CALJIC No. 2.23). See CT 1079, 1090-95. Nothing shows that Plaintiff's trial was rendered fundamentally unfair by the trial court's failure to instruct the jury that it should view the evidence of Petitioner's admission with caution and that the jury must determine whether

31

Petitioner made such an admission. See Nunn v. Evans, No. 08-5284, 2011 WL 4949047, at *7 (N.D. Cal. Oct. 17, 2011) (finding that petitioner was not denied due process by court's failure to instruct with CALJIC No. 2.71 when jury was instructed with CALJIC Nos. 2.20, 2.22, 2.13, 2.21.2, and 2.27, because "[t]he combined effect of these instructions was to inform the jury as to as to how witnesses' credibility and the credibility of witnesses' testimony should be evaluated"), aff'd, 555 F. App'x 723 (9th Cir. 2014). Because the California state courts were not objectively unreasonable in denying this claim, habeas relief is not warranted.

## C.   Admission of Evidence of Petitioner's Possession of Firearms (Ground Four)

Petitioner contends that the trial court violated Petitioner's right to a fair trial by admitting evidence about his possession of several firearms when it was conclusively established that none was the murder weapon. See FAP at 100-17.

### 1.   Relevant Facts

The California Court of Appeal summarized the relevant facts as follows:

> *Admission of the Gun Found in the Buick.* [Petitioner] moved in limine to exclude evidence about the firearms found in his Buick Regal and at his house on the grounds that the evidence was irrelevant (since these were not the murder weapon), more prejudicial than probative, and improper propensity evidence ("intended to prejudice the jury against [him] for his apparent affinity to guns and the gun culture").
>
> The prosecutor's position was Richardson's credibility, as a key prosecution witness and a man with a criminal record, would be a significant issue at trial, and that the weapons evidence was

32

relevant to Richardson's credibility and to corroborate the information Richardson provided to law enforcement, including evidence that [Petitioner] was "always packing and always at the ready" and generally carried a weapon in his car. The court agreed that the evidence had "great weight" and suggested a limiting instruction to tell the jury that the evidence should be considered only for the limited purpose of assessing Richardson's credibility. The court allowed evidence about only one other gun, the one found in [Petitioner's] car, and the prosecutor later elicited testimony from Secret Service Special Agent Michael Gutierrez that he found a nine-millimeter semi-automatic handgun under the driver's side floor mat of [Petitioner's] Buick.

. . . .

*Admission of the Assault Weapon, Magazines, Ammunition, and the Photograph*. Following eyewitness testimony (from Catalina and Lawrence Avalos) and before Richardson testified, the court and counsel discussed the admissibility of the transcript of the tape-recorded conversation between Richardson and [Petitioner]. [Petitioner] claimed that a certain portion (page 18, lines 12 to 21) pertained to another incident, and objected on the ground that it was impermissible propensity evidence. The prosecutor claimed the discussion on page 18 related to several events, including the charged offense. Defense counsel told the court that, if it would not limit admission of the tape to the portions he requested, the entire tape should be admitted. After further discussion, the parties agreed to the admission of page 10, line 19, through page 25, line 1.

After copies of the transcript were distributed to the jurors

and the tape was played for the jury, the prosecutor asked the trial court to reconsider its prior rulings. In the recorded conversation (at page 11 of the transcript), he said, [Petitioner] mentioned he "only pack[ed] assault rifles" with "lasers" and said he had gotten rid of his ".40." Richardson had told federal agents and sheriff's deputies that he had seen [Petitioner] with a machine gun and a .40-caliber weapon. The prosecutor said the assault weapon and the photograph of [Petitioner] holding a .40-caliber weapon were consequently relevant to Richardson's credibility.[FN2] Defense counsel objected, claiming the evidence was irrelevant and unduly prejudicial. The court deferred its ruling until after Richardson's cross-examination.

> [FN2] During pretrial, the prosecutor had asked for permission to introduce the photograph as evidence of [Petitioner's] gang affiliation. The trial court denied the motion when [Petitioner] stipulated that the murder was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

On cross-examination, defense counsel inquired about a portion of the tape (pages 18 and 19) where [Petitioner] mentioned "40" and "running with [his] homies in [his] Regal." When defense counsel suggested the latter reference was conversation about the charged crime (an effort to discredit eyewitness descriptions of the car as a Camaro), Richardson said the conversation jumped from one incident to another and that the Regal reference concerned a different incident in Pomona.

At side-bar during re-direct, the prosecutor pointed to

34

references in the admitted portion of the transcript to the .40-caliber and assault weapons, and requested permission to ask Richardson about [Petitioner's] other weapons and to show him the photograph to see what he recognized. Over a defense objection, the trial court ruled that the jury could hear "everything reasonable" because it had to determine Richardson's credibility. The court found the evidence more probative than prejudicial.

Richardson testified that when [Petitioner] referred to a "40" during the taped conversation, he believed [Petitioner] was referring to his .40-caliber handgun, and he had seen [Petitioner] with a .40-caliber Smith and Wesson. The prosecutor showed Richardson the photograph, and Richardson identified [Petitioner] as the man holding the gun (which looked like a .40-caliber and resembled one of [Petitioner's] guns). Richardson also testified that when [Petitioner] stated during the taped conversation that "[t]his mother fucker explodes," he believed [Petitioner] was referring to an assault rifle (although he had not seen [Petitioner] with an assault weapon).

ATF Special Agent Greg Estes testified that during the search of [Petitioner's] house, he recovered an assault weapon with laser sights, an extended pistol magazine with a box of nine-millimeter ammunition, and a pistol magazine compatible with a .40-millimeter handgun. Estes also testified that the gun [Petitioner] was holding in the photograph found during the search of his house appeared to be a .40-caliber Smith and Wesson. Special Agent Gutierrez testified that all the information Richardson provided about [Petitioner's] involvement in Ortiz's murder was corroborated.

LD 6 at 3-4.

### 2. The California Court of Appeal's Decision

The California Court of Appeal rejected the state-law portion of this claim on direct review:

> We reject [Petitioner's] contentions (1) that the firearms evidence was not relevant to any material fact at issue in the case or, if relevant, (2) that it should have been excluded because it was more prejudicial than probative. The evidence was highly relevant and probative of Richardson's credibility, which was a critical issue at trial.
>
> The eyewitnesses failed to identify [Petitioner] at trial, and had told a defense investigator that he was not the shooter. Richardson testified that [Petitioner] admitted shooting Ortiz and shared details of the crime, showed him the murder weapon, and changed the appearance of his Camaro because he had been driving it at the time of the murder and it was "hot." But because Richardson had participated in other crimes with [Petitioner], cooperated with law enforcement, and received a suspended sentence in a recent case, and because the defense theorized that Richardson rather than [Petitioner] was the one to sell Macias the murder weapon, Richardson's credibility was very much in question.
>
> The firearms evidence corroborated the details Richardson provided to law enforcement, and thus was relevant and more probative than prejudicial. It follows that it was not an abuse of discretion to admit the evidence. (Evid. Code, §§ 210, 350, 351, 352; People v. Cox (2003) 30 Cal. 4th 916, 955 [abuse of discretion standard]; People v. Smith (2003) 30 Cal.4th 581, 613-614 [gun

36

other than the murder weapon was relevant to an issue of credibility and admissible on that ground]; see also People v. Carpenter (1999) 21 Cal. 4th 1016, 1052; People v. Lane (1961) 56 Cal.2d 773, 785.)

LD 6 at 4-6.

### 3. Discussion

As a preliminary matter, to the extent Petitioner contends that the trial court abused its discretion under California state evidentiary law, this claim fails to give rise to a cognizable federal habeas claim. See McGuire, 502 U.S. at 67-68; Rhoades v. Henry, 638 F.3d 1027, 1034 n.5 (9th Cir. 2011) ("[E]videntiary rulings based on state law cannot form an independent basis for habeas relief."). The California Court of Appeal held that the trial court did not abuse its discretion when it found the evidence relevant and not unduly prejudicial. See LD 6 at 4-6. This Court is bound by the state appellate court's conclusion that the trial court did not err, as a matter of California law, in ruling that evidence was admissible under California Evidence Code § 352. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007).

Generally, a state court's decision to admit specific evidence is not subject to federal habeas review unless the evidentiary ruling violates federal law or deprives the defendant of a fundamentally fair trial. See McGuire, 502 U.S. at 75 (finding federal habeas relief inappropriate where admission of evidence was not so unfair as to result in denial of due process); Dowling v. United States, 493 U.S. 342, 352 (1990) (analyzing "whether the introduction of this type of evidence is so extremely unfair that its admission violates 'fundamental conceptions of justice'" (citation omitted)). The Supreme Court has made "very few rulings regarding the admission of evidence as a violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009);

see McGuire, 502 U.S. at 70. The Ninth Circuit has found that a habeas petitioner bears a "heavy burden" in demonstrating a due process violation on the basis of a state court's evidentiary decision, as he must show that there were "no permissible inferences" the jury could draw from the challenged evidence and that it necessarily prevented a fair trial. Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005); accord Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998); Hovey v. Ayers, 458 F.3d 892, 923 (9th Cir. 2006).

Petitioner has not met this heavy burden. As the California Court of Appeal found, the jury could have drawn a permissible inference from the evidence that Petitioner possessed guns other than the murder weapon, magazines, and night sights because it corroborated Richardson's statements to law enforcement and at trial that Petitioner always had a gun with him, which he usually kept in his car, that he had seen Petitioner with a .40 caliber Smith and Wesson, and that Petitioner owned an assault rifle. See 4 RT 681-82, 686-88, 734-38. Because the gun evidence was probative of Richardson's credibility, the California Court of Appeal was not objectively unreasonable in denying this claim. See Starr v. Lindsey, No. 97-4154, 1999 WL 300661, at *7 (N.D. Cal. May 3, 1999) (finding no due process violation in admission of gun evidence when it was "probative on the question of witness credibility"), aff'd, 3 F. App'x 607 (9th Cir. 2001). On independent review, therefore, habeas relief is not warranted on this claim.

**D.   Trial Court's Denial of Counsel's Request for a Continuance (Ground Two)**

Petitioner contends that the trial court violated Petitioner's due process rights by denying defense counsel's request to continue trial. See FAC at 89-93.

**1.   Relevant Facts**

Petitioner's preliminary hearing was on May 22, 2003. See CT 1. He was represented by private counsel Diane Carey. See CT 1C. At the close of

evidence, the trial court held Petitioner to answer the charges, see CT 136-37, and the state filed the information against Petitioner on June 6, 2003, see CT 139. That same day, Petitioner, represented by private counsel Traci Jefferson, was arraigned and pleaded not guilty. See CT 141. The court's minute order indicates that the matter was continued to June 12, 2003, to "get discovery from private counsel." Id. The trial court set June 12, 2003, as the compliance date for discovery; scheduled a pretrial conference for July 8, 2003; and scheduled the trial for August 5, 2003. See CT 141-42.

On June 11, 2003, Deputy Public Defender Sanders Smith filed a written motion to continue the trial date to September 5. See LD 16, Ex. 32. Smith stated that he was "not prepared to announce ready for trial" on August 5 because he had been assigned the case on June 9 while he was engaged in another trial and he had not received any discovery from Carey.[18] Id.

On June 12, 2003, Petitioner appeared in court and was represented by Smith. See CT 143. The trial court ordered investigating officer "Zumwalt and/or Lugo" to appear at the July 8 pretrial conference "with the entire investigative file." Id.

On June 23, 2003, Smith sent the district attorney an "informal request for discovery," asking for Richardson's rapsheet, the "tape (and notes) of the FBI/ATF interview of Jimmy Richardson," and the plea agreement given to Richardson in exchange for his testimony, among other things. LD 16, Ex. 30.

On June 27, 2003, private attorney Vincent Oliver filed a motion to substitute attorneys. See LD 16, Ex. 33. That day, or the day before, Oliver had obtained Smith's file. See 3 RT 467.

On July 1, 2003, Petitioner appeared in court and was represented by

[18] Petitioner states that Smith's motion was granted, see Traverse at 29, but that is not reflected in the trial court's subsequent minute orders. See CT 143-44.

Oliver. See CT 144. The minute order from that hearing shows that the trial court "approved" Oliver's "request to substitute as counsel of record" because Oliver "represents [to] the court that he has received discovery from . . . Sanders Smith and will be ready for trial on 8-5-03." Id. The pretrial conference was continued to July 10, 2003. See id.

On July 10, 2003, Petitioner and Oliver appeared at the pretrial conference. See CT 145. The minute order shows that the parties conferred regarding discovery, that the prosecution made a plea offer, and that the offer would remain open until July 15, 2003. See CT 145.

On July 30, 2003, Oliver moved for a continuance. See Petitioner's LD 1 at 106.[19] The motion explained that Oliver had not received two items of discovery that had been requested from the state: "a copy of the FBI/ATF audio taped interview of [Jimmy] RICHARDSON and a copy of the plea agreement entered into between RICHARDSON and the government in exchange for his testimony." Id. (quoting Oliver's motion to continue). Oliver asked that the court continue Petitioner's trial "for a reasonable time and to enable the prosecution to comply with the court's discovery order and to give the defense a reasonable amount of time to obtain transcripts of the tape and to investigate further the extent of cooperation given to the government by

_____

[19] Petitioner quoted the motion to continue in his habeas petition to the state supreme court and in his FAP, citing "Ex. 33, Motion to Continue." See Petitioner's LD 1 at 121; FAP at 91. But Exhibit 33 to both petitions is Oliver's motion to substitute attorneys, and it does not appear that the correct exhibit was attached to either petition. See LD 16 at 234; FAP, Ex. 33. Petitioner, however, attached the motion for a continuance to his Traverse, and the Court has confirmed that Petitioner's summary of its contents is accurate. See Traverse, Ex. 113. In the motion, Oliver also confirmed that he had "received from Mr. Sanders [sic] two audio-tapes and transcripts of an interview of RICHARDSON by local law enforcement and an audio tape of an interview of witness MACIAS by local law enforcement." Id.

RICHARDSON, including the names and case numbers of all cases in which he has been a witness for the government." Id. (quoting Oliver's motion). Oliver stated that "[i]n the absence of the above requested discovery, I do not believe [Petitioner] will be afforded his constitutional due process right to a fair trial under either the California or the Unites States Constitutions." Id. (quoting Oliver's motion, alteration omitted).

Neither Respondent nor Petitioner was able to obtain a transcript of the August 5 hearing on Oliver's motion. See Traverse at 28 n.15; Answer at 28 n.16. A minute order shows that Oliver's motion to continue was "heard, argued and denied." CT 146. The trial court noted that the prosecution "answer[ed] ready" and the matter was "transferred forthwith to SC/J for trial." Id. The parties began jury selection later that day. See 2 RT 15.

### 2.     Applicable Law

Trial courts are granted "broad discretion" on whether to continue a trial. Morris v. Slappy, 461 U.S. 1, 11-12 (1983). Thus, "it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." Ungar v. Sarafite, 376 U.S. 575, 589 (1964).

In Ungar, the U.S. Supreme Court held that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." Ungar, 376 U.S. at 589. Rather, "[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Id. Similarly, in Morris, the U.S. Supreme Court held that "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." 461 U.S. at 11-12.

The Ninth Circuit has identified four factors to consider when determining whether a court's denial of a continuance was an abuse of

41

discretion: (1) the petitioner's diligence prior to the requested continuance; (2) whether a continuance would have served a useful purpose; (3) whether a continuance would have caused the court or the government inconvenience; and (4) the amount of prejudice suffered by the petitioner as a consequence of the denial of the requested continuance. See Armant v. Marquez, 772 F.2d 552, 556 (9th Cir. 1985) (citing United States v. Flynt, 756 F.2d 1352, 1359-61 (9th Cir. 1985)); see also Reynolds v. Gerstel, 624 F. App'x 522, 523 (9th Cir. 2015). Although the weight given to any one factor may vary from case to case, "at a minimum," the petitioner must show prejudice. Armant, 772 F.2d at 556-57; see also Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997) (no error to deny habeas relief when petitioner fails to show actual prejudice resulting from trial court's refusal to grant continuance).

### 3.   Discussion

Petitioner has failed to show that the California Supreme Court's rejection of this claim was an unreasonable application of the Supreme Court's holdings in Ungar or Morris. As an initial matter, given that neither Petitioner nor Respondent have been able to locate a transcript or any other evidence showing the trial court's reasoning in denying the continuance, nothing establishes that the trial court had an "unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" Morris, 461 U.S. at 11-12 (citation omitted); see Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("It is well-settled that '[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.'" (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994))).

Moreover, the California Supreme Court could have reasonably concluded that the trial court did not abuse its discretion in denying the continuance because Petitioner failed to show that he was diligent. See FAP at 92 (stating that trial counsel was not diligent). Oliver received Smith's file on

June 26 or 27, 2003; he therefore presumably knew, at that time, what discovery had been produced and what was missing. On July 1, 2003, the trial court approved Oliver's request to substitute in as Petitioner's attorney based on Oliver's representation that he had received discovery and would be ready for trial on August 5. Oliver appeared at a pretrial conference on July 10, at which the parties conferred regarding discovery. Oliver nevertheless waited until just a few days before the August 5 trial date to request a one-month continuance. See Corona v. Almager, 449 F. App'x 672, 675 (9th Cir. 2011) (finding that state court reasonably concluded that defense investigator "should have been more diligent in searching for the witness and that a one-month delay was unreasonable in light of the lack of diligence by" petitioner).

The California Supreme Court also could have reasonably concluded that the denial of Oliver's request for a continuance did not result in prejudice. Oliver stated that he needed the continuance in order to obtain "a copy of the FBI/ATF audio taped interview of [Jimmy] RICHARDSON" and "a copy of the plea agreement entered into between RICHARDSON and the government in exchange for his testimony." LD 1 at 121. But at trial, Oliver questioned Richardson about his statements to ATF Agent Estes on November 20, 2002; it therefore appears that Oliver at some point may have received either a recording or a transcript of the "FBI/ATF" interview. See 4 RT 721 (Oliver asking Richardson, "And isn't it true that on November the 20th, 2002, you met with special investigator Estes and you told him then that . . . [Petitioner] had sold the gun to an individual he works with named Gabriel?"). And in any event, Petitioner has not shown what that evidence or Richardson's plea agreement would have revealed or how they would have affected his trial, particularly given that both parties questioned Richardson about his plea agreement and Oliver had already received audio tapes and a transcript of local law enforcement's interview of Richardson. See Traverse, Ex. 113. In his

43

motion, Oliver also argued that he needed a continuance so he could "investigate the extent of cooperation given to the government by RICHARDSON, including the names and case numbers of all cases in which he has been a witness for the government," LD 1 at 121, but it is not clear what that investigation would have entailed or how the case numbers of other cases would have assisted in Petitioner's defense. Indeed, it is not even clear whether Oliver ultimately received the information he cited in his motion.

Because nothing indicates that the additional discovery cited by Oliver in his motion for a continuance would have been helpful to the defense, habeas relief is not warranted on this claim.[20] See Phillips v. Yates, No. 10-1368, 2012 WL 2995675, at *6 (E.D. Cal. July 23, 2012) (denying habeas claim based on trial court's denial of continuance when "there is no evidence in the record of any further investigation or interview of potential expert witnesses, and thus no showing of how the additional evidence would have been helpful to the defense"); Walton v. Clark, No. 08-1527, 2010 WL 4672251, at *9 (C.D. Cal. July 20, 2010) ("a trial court does not err in failing to grant a continuance to allow further defense investigation when there is no evidence the investigation will favor the defense"), accepted by 2010 WL 4672353 (C.D. Cal. Nov. 8, 2010).

///

///

---

[20] Petitioner argues that, had the trial court granted the continuance, Oliver would have interviewed Richardson and "discover[ed] that the prosecution had given Richardson monetary inducements" and that Oliver would have "obtain[ed] testimony from witnesses described in the public defender investigator's reports." FAP at 92-93. But that is pure speculation given that Oliver did not state that he needed to interview Richardson or other witnesses, and given that Oliver could have interviewed Richardson at any point before the August 5 trial date but apparently did not do so.

44

**E.** **Ineffective Assistance of Counsel (Ground One)**

    **1.** **Applicable Law**

A petitioner claiming ineffective assistance of counsel must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). "Deficient performance" means unreasonable representation falling below professional norms prevailing at the time of trial. Id. at 688-89. To show deficient performance, the petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90; see also Richter, 562 U.S. at 105 ("Even under de novo review, the standard for judging counsel's representation is a most deferential one."). Further, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. The initial court considering the claim must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id.

To meet his burden of showing the distinctive kind of "prejudice" required by Strickland, the petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Richter, 562 U.S. at 111 ("In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."). A court deciding an ineffective assistance of counsel claim need not address both components of the inquiry if the petitioner makes an insufficient showing on one. See Strickland, 466 U.S.

at 697.

Where, as here, the state court has rejected an ineffective assistance of counsel claim, AEDPA requires an additional level of deference:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. . . . Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

562 U.S. at 105 (citations omitted).

### 2. Failing to Obtain Investigative Notes from the Public Defender's Office (Subclaim D)

Petitioner contends that trial counsel should have obtained interview notes from the Public Defender's office. See FAP at 51-52. He argues that "presenting testimony by other neighborhood witnesses would have bolstered" the Avaloses' testimony "that the shooter's car was green (instead of burgundy or grey like [Petitioner's]), and that the shooter drove by the location numerous times during the day on July 14, 2002, when [Petitioner] had an alibi." Traverse at 15.

#### a.    Relevant Facts

Oliver became Petitioner's counsel of record on June 27, 2003, and the record shows that he obtained Petitioner's file from Smith on or before that date. See 3 RT 467; LD 16, Ex. 33. But Smith's investigator, R.J. Fox, remained unaware that the Public Defender's office no longer represented Petitioner; as a result, he went to Paramount on July 3 and 8 to interview several witnesses who lived on the block where Ortiz was shot: Catalina

46

Avalos, Lawrence Avalos, Esperanza Ozuna, Loise Stitt, Bernadette Mendoza, Eloise Rambo, Mary Lou Stout, Leo Garcia, Carlos Ortiz, and Richard Adams. See 3 RT 465-66; FAP, Ex. 31. Fox tape-recorded his interviews with the Avaloses. See 3 RT 465. Fox's notes summarized his interviews. See FAP, Ex. 31. Fox stated that Ozuna, Stitt, Rambo, Stout, Garcia, and Ortiz reported that they had heard gunshots on the night of the shooting but did not see anything. See FAP, Ex. 31. Mendoza reported that he had been at work and that his wife heard the gunshots but did not see anything. See id. Rambo, who lived at the same house as Catalina and Lawrence, said she heard "a lot of gunshots and a vehicle speed away" but did not go outside until the suspect had driven off. Id. Rambo reported that "[h]er daughter and her son," presumably Catalina and her ex-husband, "witness[ed the] shooting." Id. Adams stated that he heard two volleys of gunfire from "a large caliber gun" and saw a "dark color vehicle speeding away as he went to his front door." Id.

On July 9, 2003, Smith notified Fox that Petitioner had retained private counsel and instructed him to stop his investigation. See FAP, Ex. 31. Fox apparently did not provide Oliver with his notes or the taped interviews of the Avaloses. See 3 RT 465.

After trial began, Catalina testified that after the preliminary hearing, she had talked with a defense investigator at her home and that the interview had been taped. See 3 RT 427. At a subsequent sidebar, the prosecutor asked Oliver for a copy of the "tape and the report." 3 RT 463. During the ensuing discussion, Oliver informed the trial court that he "just got [a copy of the tape] this morning" and had not yet listened to it. 3 RT 463, 466. Oliver explained that he had contacted Smith a couple weeks after he took over the case, and that at that time Smith had told him that Fox had continued working on the case after Smith was relieved and had conducted interviews of witnesses, and

that at least some of those interviews were tape-recorded. See 3 RT 466, 470-71. Oliver stated that he had repeatedly asked Smith to give him the tape, including by going "screaming" to the Public Defender's office the previous day and then again that morning, at which time he threatened to go to the state bar. 3 RT 466, 470, 473, 477. Oliver said he "knew [he] wouldn't get the tape," so had sent his own investigator out to interview witnesses. 4 RT 471. The court then contacted a representative of the Public Defender's office, who confirmed that the tape that had been turned over to Oliver that morning contained statements from both Catalina and Lawrence. See 3 RT 472, 480, 503. The representative confirmed that there were "no other tapes that contain statements from any other witnesses." 3 RT 503. The court and parties listened to the tape the next morning before resuming trial. See 4 RT 601-02. It does not appear that Oliver ever obtained Fox's notes.

          b.    Discussion

The California Supreme Court's rejection of this claim was not objectively unreasonable. First, the California Supreme Court could have reasonably concluded that Petitioner failed to establish that counsel performed deficiently by failing to obtain Fox's report. The report was generated after Oliver obtained the Public Defender's file and took over Petitioner's case, as such, Oliver would have had no reason to suspect that such a report existed. Moreover, according to Oliver's account of his conversation with Smith, Smith mentioned only that his investigator had interviewed witnesses and taped interviews of the Avaloses; Oliver did not represent that Smith revealed the investigator had written a report summarizing interviews of the Avaloses and their neighbors.[21] Oliver diligently sought to obtain that tape from the date of

---

[21] The only report Oliver referenced during the conversation about the tapes was his own investigator's report of his interviews with the Avaloses. See

48

that conversation until the first day of trial, when it was finally provided to him. Given that nothing seems to have alerted Oliver to the report's existence, his failure to obtain a copy was not unreasonable.

Second, the California Supreme Court also could have reasonably concluded that Petitioner failed to establish any prejudice resulting from counsel's alleged failure to obtain Fox's report. The report summarized Fox's interviews with the Avaloses, but Oliver was provided the recordings of those interviews and Oliver's own investigator also interviewed them and obtained statements. The report therefore would not have provided any additional information about the Avaloses. And almost all of the other people Fox interviewed only heard gunshots and did not see the shooting, the shooter, or the shooter's car. In fact, only Adams provided any information about the shooting, stating that he had seen a "dark color vehicle" speeding away, which was consistent with the prosecution's theory that Petitioner had been driving a burgundy-colored Camaro. Thus, nothing supports Petitioner's argument that had Oliver obtained the report, "other neighborhood witnesses" could have "bolstered" the credibility of the Avaloses' exculpatory testimony that the shooter's care was green and that the shooter had driven by the shooting location "numerous times" on the day of the shooting. See Traverse at 15; Womack v. McDaniel, 497 F.3d 998, 1004 (9th Cir. 2007) (petitioner's own self-serving statements insufficient to support claim of ineffective assistance of counsel without corroborating evidence). Habeas relief is not warranted on this ground.

///
///
///

---

3 RT 464, 471, 474.

49

**3.     Failing to Introduce Catalina's Photographic Lineup Statement to Corroborate Her Testimony that Petitioner Was Not the Shooter (Subclaim E)**

Petitioner contends that trial counsel should have introduced a photographic lineup showing that Catalina had not identified Petitioner but had instead selected a different person, who she said looked "similar" to the shooter. FAP at 53-55. Petitioner argues that Catalina's selection was "leaner and darker" than Petitioner, which was consistent with Catalina's testimony at trial.[22] See Traverse at 17. Petitioner argues that introducing the photographic lineup therefore would have rebutted the prosecutor's argument that Catalina and Lawrence fabricated their trial testimony about the shooter's appearance due to pressure from members of Petitioner's gang. See FAP at 53-55.

**a.     Relevant Facts**

On direct examination, Catalina testified that the events surrounding the shooting happened "very fast." 3 RT 443. When asked, "[A]s far as the shooter, did you ever get a look where you were comfortable being able to identify anybody?" Catalina answered, "Not positively." 3 RT 443-44. She later testified that after seeing Petitioner at the preliminary hearing,

> A part of me was, like, what if . . . it is not the guy because from
> . . . what I had seen that night, it did not look like the person I saw

---

[22] Petitioner attached to the FAP and his California Supreme Court petition a black and white photocopy of the "six-pack" photographic lineup. See FAP, Ex. 25; LD 16 at Ex. 25. The person Catalina identified appears to have a thinner face than Petitioner, at least as he is reflected in the photo used in the six pack. See FAP, Ex. 25; LD 16 at Ex. 25. It is difficult to tell from the photocopy which person has the lighter complexion, but the Court assumes without deciding that the identified person is in fact darker. In the photos, the man Catalina selected and Petitioner appear to be about the same age. See FAP, Ex. 25; LD 16 at Ex. 25.

50

that night. But then the same thing, maybe I did not see what I thought I saw. Maybe this is the person according to what evidence has [sic].

3 RT 447.

On cross-examination, Petitioner's counsel elicited that she had told the defense investigator that Petitioner was not the person she saw commit the shooting. See 3 RT 458-59. She testified that the shooter was a "cholo, a Mexican" who was "darker" and "very older looking . . . maybe almost 30," with a "narrow" face. 3 RT 459-60. She testified that Petitioner "looks like a kid" and was "only 21, 22 maybe." 3 RT 460.

On redirect, Catalina testified that she had told Zumwalt on the night of the shooting that the shooter was a male Hispanic, 18 to 21 years old, wearing a baseball cap and a brown silky shirt. See 3 RT 462. She testified that about six months later, officers had shown her a "six-pack" and she had circled the photograph of a man who "look[ed] similar" to the shooter. 3 RT 483-84; see also FAP, Ex. 25. The prosecutor questioned Catalina about this identification:

Q     And in that six-pack, you recall looking at individuals and indicating one looks similar?

A     Similar as in face shape.

. . . .

Q     . . . You circled somebody just about face shape?

A     Yes.

Q     Didn't you tell the investigator that based upon the time you saw the person and where you were standing, the distance, that you really weren't comfortable making any kind of an identification?

A     Yes.

Q     . . . [W]hat has changed now that makes you feel

51

comfortable in either identifying somebody or uncomfortable for [Petitioner], who is on trial?

A    I keep playing it back in my head. What I keep seeing back in my head, it becomes clear, more accurate.

Q    Has anything changed about where your position was and the time of night and how fast the incident happened? Have any of those facts changed as you have played it over in your head?

A    No.

3 RT 483-84. The prosecutor later asked, "And you can't say whether [Petitioner] was the shooter on July 14th, 2002, can you, because you didn't get a good look at him?" 3 RT 495-96. Catalina responded, "No, I can't." 3 RT 496.

A photograph of Petitioner was included in the "six-pack" but Catalina did not select it. See FAP, Ex. 25. It appears that the jury did not hear testimony establishing that Petitioner's photograph was included.

b.    Discussion

The California Supreme Court's rejection of this subclaim was not objectively unreasonable. First, the Supreme Court could have reasonably concluded that trial counsel's decision not to introduce the photographic lineup was a reasonable professional judgment. Counsel was aware of the photographic lineup, as it was contained in his file and Catalina testified about it at trial. See FAP, Ex. 4; 3 RT 457-58, 483. And the jury heard Catalina's testimony that six months after the shooting, she was shown the photographic lineup and identified someone other than Petitioner as looking "similar" to the shooter. Given Catalina's testimony that, at that time, she was unable to make an identification because she had not gotten a good look at the shooter but that her memory had become "more accurate" over time, and given that the person she selected appears to have been about the same age as Petitioner was in his

52

photo, see FAP, Ex. 25, counsel could have reasonably decided not to emphasize the photographic lineup itself and to instead focus on Catalina's statements at trial that Petitioner was not the shooter and that the shooter was older, taller, thinner, and darker than Petitioner. Counsel's decision not to introduce the photographic lineup into evidence therefore was not "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.

The California Supreme Court also could have reasonable concluded that Petitioner had not shown a reasonable probability that the outcome of his trial would have been different had his counsel introduced the photographic lineup to bolster Catalina's testimony. Catalina was fully questioned on both direct and cross-examination about her statements to police, to investigators, and at the preliminary hearing. And Catalina testified that when she viewed the photographic lineup in January 2003, she told the investigator that she had not gotten a good enough look at the shooter to make an identification.

Moreover, the other evidence that Petitioner was the shooter was strong. The shooting occurred in ESP territory in Paramount and Petitioner was an ESP member with ties to that area. Shortly before the shooting, Petitioner, who lived in Rialto and drove a gray or burgundy Camaro, was in Los Angeles with his girlfriend. Shortly after the shooting, Catalina told police that the shooter was a Hispanic, 18-to-21-year-old man wearing a brown silky shirt and a baseball cap, and Lawrence described the shooter as a light-skinned Hispanic man in his twenties wearing blue or black pants. Both testified that the shooter drove a Camaro. Richardson testified that on a Monday in July 2002, Petitioner had said he had had to "smoke some fool" in Paramount over the weekend. Richardson testified that Petitioner had described the shooting, stating that he had driven up the block, turned around, gotten out of the car, and told the other man to put his gun away so they could handle the situation

like men; Petitioner then shot the man while he was standing and again while he was on the ground. Those details matched the Avaloses' account of the shooting. Richardson also stated that Petitioner had shown him the murder weapon, a nine-millimeter Berretta with an extended clip. Richardson told police that Petitioner had sold the murder weapon to Macias, who worked with Richardson and Petitioner at Thor California. Officers located the gun at Macias's house and ballistics testing revealed that the bullets retrieved from Ortiz's body and the casings and bullets recovered from the crime scene were fired from the gun found in Macias's home. Officers searched Petitioner's house and found, among other things, an extended clip that fit the murder weapon and nine-millimeter ammunition. Macias initially told police that Petitioner had sold him the gun, and then he later testified that Richardson had sold it to him while Petitioner and another man were present. And in a recorded conversation with Richardson, Petitioner referred to "that fool from Paramount." Given the substantial evidence establishing Petitioner's guilt, the California Superior Court could have reasonably concluded that the result of the proceeding would not have been different had the photographic lineup been introduced to bolster Catalina's testimony.

Habeas relief is not warranted on this subclaim of ineffective assistance of counsel.

### 4. Failing to Interview Witnesses (Portion of Subclaim F)

Petitioner contends that counsel should have interviewed three of the Avaloses' neighbors who could have corroborated that the shooter's car was green and that the shooter drove by the scene earlier that day. See FAP at 56-67. Petitioner argues his trial counsel's file "clearly shows he did not interview them" because "it contains no interview notes, memoranda, or other documentation reflecting [that] any interviews ever occurred." Traverse at 19.

///

a.      Relevant Facts

i.      Richard Adams

Zumwalt spoke to neighbor Richard Adams on the night of the shooting. See FAP, Ex. 23 at 7-8. Adams reported that at the time of the shooting, he had his doors open and heard five or six shots followed by four or five more. See id. at 7. He looked out his front door and saw a car go south on the street. See id. Adams reported that he then heard a neighbor say, "They shot him," and a call for help. Id. at 7-8. Adams "then heard another yell, 'green Camaro.'" Id. at 8. He then saw "the son-in-law of Eloise walking out to check the victim." Id.[23]

ii.      "Teri"

In Fox's July 2003 tape-recorded interview with Catalina, Catalina described a conversation with a neighbor on the night of the shooting:

> that very night she told me, I go, "It was a dark green Camaro." She goes, "It was." She goes, "I saw it." And she, she said it was a dark green, like an emerald green or forest green car, Camaro. And she was like, I go, "I bet you money it was that color, that color."

Supp. CT at 19. Later Fox asked, "you had mentioned this young lady and, and said that it was definitely a forest green?" Supp. CT at 24. Catalina replied, "Teri, she lives down the street." Id. Petitioner has been unable to obtain a declaration from "Teri." See Traverse at 21.

iii.      Frederico Hernandez

On the night of the shooting, Frederico Hernandez stated that he had heard shots but had not seen a vehicle leaving the area. See FAP, Ex. 22a.

_____

[23] Petitioner states that he was unable to obtain a declaration from Adams because he died in 2009. See Traverse 21, Ex. 110 (Adams's death certificate).

Hernandez stated that he "recall[ed] seeing a similar veh[icle] fitting the description of the one given by [Catalina], driving past the location numerous times, at approximately 1500 hours on the date of this incident." Id.

In a declaration obtained by Petitioner's habeas counsel in October 2016, Hernandez stated that

> [d]uring the daytime on July 14, 2002, I saw a dark-colored Camaro car driving slowly down the block. I saw the car drive by about five times throughout the day. Only one person, the driver, was in the car.
>
> Sometime after ten o'clock p.m. on July 14, 2002, I was at my home on Virginia Avenue. I heard several gunshots and then heard a car drive away. I am familiar with the way Camaro cars sound, and the car that drove away sounded like a Camaro to me. Soon after that, I learned that someone had been shot and killed on my block.

Traverse, Ex. 109; Petitioner's LD 5, Ex. 109.

b.    Discussion

The California Supreme Court's rejection of this claim was not objectively unreasonable. As an initial matter, the California Supreme Court could have reasonably concluded that counsel's performance was not deficient due to a failure to interview either Adams or "Teri." The police report shows only that Adams saw a car drive by after the shooting and heard an unidentified person yell, "green Camaro." The fact that Adams heard an unidentified person yell "green Camaro" after the shooting would have been of little value; the unidentified person could have been Catalina, who consistently reported that she believed that the car was green. It would have been reasonable for counsel to decide to forego interviewing Adams and focus instead on Catalina and Lawrence's testimony about the shooting and the

56

color and type of the shooter's car.

Nor does the record support a finding that counsel's performance was deficient for failing to locate and interview "Teri." Nothing indicates that counsel knew or should have known that someone named "Teri" allegedly had seen that the shooter drove a green Camaro. Petitioner cites Fox's interview of Catalina, in which she said a neighbor named "Teri" had seen the green Camaro, but as discussed in Section V.E.3, counsel was initially unaware that Fox, the Public Defender's investigator, had interviewed the Avaloses. Once counsel discovered that information, he diligently sought to obtain the tape recording of the interview and he sent his own investigator to interview the Avaloses. But the Public Defender's office did not provide the tape to Oliver until trial had already started. And nothing indicates that Catalina told Oliver's investigator about "Teri" or what she had allegedly seen. See FAP, Exs. 12-13 (Catalina's and Lawrence's statements obtained by Oliver's investigators). Given that nothing shows that counsel would have been aware, until after trial was underway, that "Teri" existed or saw the shooter's car, he was not ineffective for not interviewing her. See Weber v. Sinclair, 679 F. App'x 639, 640 (9th Cir. 2017) (finding that district court did not err in concluding trial counsel was not constitutionally ineffective for failing to interview potential alibi witness when "[c]ounsel had no reason before trial to search for the [witness], as there was no prior indication that he had witnessed the crime"); Khan v. Glebe, 633 F. App'x 879, 881 (9th Cir. 2015) (stating that to show counsel was ineffective for not calling particularly witness, petitioner "had to demonstrate that his trial counsel knew of [the witness] or should have known of [the witness]").

But even if counsel rendered deficient performance by failing to interview one or more of these three witnesses, it would not have been objectively unreasonable for the California Supreme Court to conclude that

57

Petitioner has not shown a reasonable probability that but for counsel's errors the outcome of the trial would have been different. At most, these witnesses would have corroborated the Avaloses' testimony that the shooter's car was green and that a similar car had been seen in the neighborhood earlier in the day. But as discussed above in Section V.E.4, the evidence that Petitioner was the shooter was strong: the shooting occurred in ESP gang territory and Petitioner was an ESP gang member, Petitioner had been in Los Angeles shortly before the shooting and had been driving a gray or burgundy Camaro, eyewitnesses testified that the shooter drove a green or dark colored Camaro, Richardson testified that Petitioner admitted to committing the shooting and provided details about the shooting that were consistent with eyewitness accounts and evidence, and the murder weapon was found at the home of one of Petitioner's coworkers, who stated that either Petitioner or Richardson—in Petitioner's presence—had sold him the gun. Given the strength of that evidence, the California Supreme Court could have reasonably concluded that even if counsel had interviewed the additional witnesses, the result of the trial would not have been different.

Habeas relief is not warranted on this subclaim of ineffective assistance of counsel.

### 5. Failing to Interview Richardson (Subclaim G)

Petitioner contends that trial counsel should have interviewed Richardson, who would have revealed that (1) law enforcement paid him to provide information implicating Petitioner in the shooting, (2) he had not understood one of Petitioner's statements during their recorded conversation—"[t]he last one I did—will be the last of the month, 40"—to be a confession, and (3) Richardson's coworker drove a green Camaro. FAP at 67-70.

Even if the Court assumes that Petitioner's counsel rendered deficient performance by failing to interview Richardson, see Baumann v. United States,

692 F.2d 565, 580 (9th Cir. 1982) ("We have clearly held that defense counsel's failure to interview witnesses that the prosecution intends to call during trial may constitute ineffective assistance of counsel."), it would have been objectively reasonable for the California Supreme Court to conclude that Petitioner failed to establish a reasonable probability that the outcome of the trial would have been different. As discussed in Section V.A.2 above, even if the jury had been presented with evidence showing that law enforcement paid Richardson for providing information regarding the shooting, the outcome of the proceeding would not have been different given that defense counsel presented other impeachment evidence and that substantial other evidence supported Richardson's account.

Moreover, the California Supreme Court could have reasonably concluded that the result of the trial would not have been different had the jury been presented with evidence that Richardson did not believe that Petitioner's recorded statement that "[t]he last one I did—will be the last of the month, 40" was a confession. During the taped conversation, Richardson tried to bring up Ortiz's murder, asking, "Ain't no shit ever happened over that shit out back? Remember that." 4 RT 715-16; CT 166. Petitioner responded, "From 18th?" and asked, "What dude?" CT 166. Richardson said, "Out there in Paramount." Id. Petitioner responded, "The last one I did—will be the last of the month, 40." Id. Richardson laughed, and Petitioner said, "Oh yeah, that fool from Paramount?" Id. Richardson testified that he had not understood what "18th" meant at the time. 4 RT 716. Richardson's further testimony that he did not understand Petitioner's next sentence—"The last one I did—will be the last of the month, 40"—would not have undercut the prosecutor's argument that Petitioner's reference to "18th" was a reference to Ortiz's murder. Moreover, Richardson never recanted his testimony that in July 2002, Petitioner expressly confessed to the murder, and as previously discussed,

59

extensive evidence demonstrates that Petitioner was the shooter.

Finally, the California Supreme Court could reasonably have found that the outcome of the trial would not have been different even if the jury had heard evidence that Richardson had worked with someone who drove a green Camaro. Richardson stated in his declaration that "[t]here was another employee at Thor, who I was friendly with, who owned a different Camaro car that was green. I do not remember that employee's name." FAP, Ex. 11. Petitioner argues that "[i]nformation that Richardson actually knew and worked with the owner of a green Camaro—the same type and color of car observed at the shooting—together with Raul Macias's testimony that Richardson was in possession of the murder weapon, would have indicated to the jury that Richardson himself was the likely shooter." FAP at 70.

But nothing shows that Richardson ever drove his coworker's green Camaro, let alone that he was driving it in Paramount on the night of the murder. Moreover, Richardson was a "light-skinned Black man," FAP at 61, but the eyewitnesses consistently identified the shooter as Hispanic. For example, Catalina told Zumwalt on the night of the shooting that the shooter was a Hispanic man and Lawrence said the shooter was a light-skinned Hispanic man. See 5 RT 1075-76; 4 RT 630. Catalina later selected a Hispanic man in a photographic lineup, stating that he looked similar to the shooter. See FAP, Ex. 25, 3 RT 457-58, 483-84. When interviewed by the Public Defender's investigator, Catalina stated that the shooter was Hispanic and looked like a "wetback." Supp. CT 16-17. At trial, Catalina described the shooter as a Hispanic male who was "kind of dark," but "not dark as to be a black man but brown color like a Hispanic or Latin," 3 RT 434, 442, 447-48, and said he looked like "[a] cholo, a Mexican," 3 RT 459. Although Catalina at one point testified that it was possible that the shooter was a light-skinned African American, not a Hispanic man, see 3 RT 453-54, she later testified that the

60

shooter was a "different color than a lighter black man," 3 RT 498-99. And Lawrence described the driver as a tall, thin Hispanic man in his 20s. See 4 RT 630-33. Moreover, as previously discussed, the evidence showed that Petitioner, a Hispanic man, was in the Los Angeles area, driving a dark Camaro on the night of the murder; the shooting occurred in ESP gang territory and Petitioner was an ESP gang member; and a clip and ammunition fitting the murder weapon was found in his house. Because Petitioner failed to show a reasonable probability that the result of his trial would have been different had the jury known that one of Richardson's coworkers drove a green Camaro, the California Supreme Court did not err in denying this subclaim of ineffective assistance of counsel.

**6.     Failing to Rebut Richardson's Claim that Petitioner Altered His Camaro Because It Was "Hot" (Subclaim H)**

Petitioner contends that counsel was ineffective for failing to rebut Richardson's claim that Petitioner altered his Camaro because it was "hot" with Richardson's prior inconsistent statement and records from the body shop that performed the work. FAP at 70-72.

**a.     Relevant Facts**

At trial, Richardson testified that a couple of weeks after Petitioner told him about the murder, in July 2002, Petitioner had his burgundy Camaro painted "smoked gray" and a new "front cap" put on. 4 RT 681, 684. Later, Petitioner had other work done on the Camaro, including installing new exhaust and rims. See 4 RT 681, 685. Richardson testified that Petitioner told him that he had had the Camaro's appearance changed because the Camaro was "hot" because he had used it in the shooting. 4 RT 681.

Richardson testified that he made a phone call to Petitioner on January 8, 2003, which was recorded by police. See 4 RT 702. During the call, Petitioner commented about getting work done on his Camaro and stated that

61

it was still in the shop. See 4 RT 703, 705; CT 159-62 (transcript of call). The prosecutor asked Richardson, "And did [Petitioner] get in any kind of a car accident or get body damage to his car?" Richardson answered, "No," and said he "guess[ed]" that Petitioner was getting a "painted front end." Id. On January 9, 2003, Richardson, wearing a wire, met up with Petitioner in person. See 4 RT at 714-15. Petitioner again talked about his Camaro being in the shop. See id.

On cross-examination, defense counsel asked Richardson,

> Q    Now, you told Zumwalt that [Petitioner] had the car painted and changed because it had been in a murder; is that what you said?
>
> A    Yes, sir.
>
> Q    Did you ever tell Zumwalt that [Petitioner] had crashed the car, and that's why he was getting it painted and remodeled?
>
> A    He crashed the car after he already had got it painted and remodeled.

4 RT 726-27.

An affidavit for a search warrant stated that on December 30, 2002, investigators interviewed Richardson. See FAP, Ex. 26. The affidavit said "[Richardson] stated that after the murder [Petitioner] painted the car red. He recently crashed the Camaro and it is in an unknown body shop being repaired." Id.

b.    Discussion

The California Supreme Court's rejection of this ineffective assistance of counsel claim was not objectively unreasonable. Petitioner argues that counsel's performance was deficient on the basis of counsel's failure to rebut Richardson's claim that Petitioner altered the Camaro because it was "hot"

62

with his statements to law enforcement that the Camaro was in the shop because Petitioner had crashed it. FAP at 71. But counsel did, in fact, ask Richardson whether he had told Zumwalt that Petitioner was having work done on the Camaro because he had crashed it. See 4 RT 726-27. Richardson responded that Petitioner had crashed the Camaro after he had already had painted and remodeled, which was consistent with his earlier testimony that Petitioner had had the Camaro painted and remodeled a couple weeks after the shooting. Although Richardson was somewhat inconsistent about whether the Camaro was in the shop around December 2002 and January 2003 because it had been in a crash or for some other reason, Richardson was not inconsistent in his testimony that Petitioner had had the Camaro repainted a couple weeks after the shooting because it was "hot." The California Supreme Court therefore could have reasonably concluded both that counsel was not ineffective for further questioning Richardson about whether the Camaro had been in a crash and that his failure to do so did not result in prejudice.

Petitioner also argues that counsel was ineffective for failing to introduce records from the body shop to show the dates and substance of the repairs. But he has offered no evidence of what the records would have shown or how they would have helped the defense. Because this portion of his claim is speculative and conclusory, the California Supreme Court was not objectively unreasonable in rejecting it. See Dows v. Wood, 211 F.3d 480, 486-87 (9th Cir. 2000) (conclusory allegations of ineffective assistance of counsel which are not supported by statement of specific facts or affidavits do not warrant habeas relief).

Habeas relief is not warranted on this claim.

///

///

///

63

### 7. Prematurely Declaring Ready for Trial, Without Having Conducted Any Investigation (Subclaim C)

Petitioner argues that trial counsel should not have declared ready for trial only a few weeks after substituting in as Petitioner's counsel and without having conducted an adequate investigation. See FAP at 49-50.

#### a. Relevant Facts

As explained in Section V.D, Petitioner's preliminary hearing took place on May 22, 2003. He was represented by a private attorney for the hearing and for a period of time after the hearing, until Deputy Public Defender Smith assumed representation. Trial was set for August 5, 2003. On June 11, 2003, Smith moved for a continuance, stating that he would not be ready for trial on August 5 because he had just been assigned the case and had not received discovery from Petitioner's previous counsel. On June 12, 2001, the trial court ordered Zumwalt or another officer to appear in court on July 8 with the entire investigative file.

On June 27, 2003, Oliver moved to substitute in as Petitioner's attorney, and he obtained Petitioner's file from the Public Defender on or before that date. On July 1, 2003, the trial court granted the substitution, stating that Oliver had stated that he would be ready for trial on August 5. On July 30, 2003, Oliver moved for a continuance, stating that he had not received certain discovery from the prosecutor. On August 5, 2003, the trial court denied the motion; voir dire began later that day. During a sidebar discussion on August 6, 2003, Oliver commented, in regard to his inability to obtain tapes from the Public Defender's office, that he had been "rushed and pressured to go to trial." 3 RT 467.

#### b. Discussion

Reasonable arguments support the California Supreme Court's denial of this claim. First, the California Supreme Court could have reasonably found

64

that trial counsel did not act deficiently. Oliver was involved in the case and in possession of the Public Defender's file by June 27, 2003; on July 1, he stated that he would be ready for trial on August 5, nearly six weeks after he filed his motion to substitute. Oliver later sought a continuance because the government had failed to provide certain items of discovery, but the trial court denied that motion for reasons that are not clear from the record. Nothing shows that Oliver's actions in stating he would be ready for trial on August 5 was outside of the wide range of professional assistance. Second, the California Supreme Court could have reasonably found that, given the strength of the evidence showing that Petitioner was the shooter, the outcome of the trial would not have been different even if Oliver had not stated that he would be ready for trial on August 5, 2003.[24]

In his Traverse, Petitioner argues for the first time that Oliver was constitutionally ineffective for not visiting Petitioner in jail, pointing to his own declaration stating that Oliver "never came to the jail to visit me before my trial or during my trial." Traverse, Ex. 105. Petitioner, however, may not raise new grounds for relief in the traverse. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (holding that traverse is not proper pleading to raise additional grounds for relief or amend petition). And in any event, in his declaration, Petitioner also stated that Oliver spoke with him "in court and in lockup before court." Traverse, Ex. 105. Nothing indicates that Oliver was unable to sufficiently interview Petitioner during those times or that the outcome of Petitioner's trial would have been different had Oliver visited Petitioner in jail. Because this portion of Petitioner's claim is speculative and

---

[24] In his Traverse, Petitioner points to Oliver's failure to interview various witnesses or obtain the Public Defender's investigative report. See Traverse at 7, 10. But to the extent those claims survived the earlier motion to dismiss, they are discussed separately in previous sections. See id.

conclusory, the California Supreme Court was not objectively unreasonable in rejecting it. See Dows, 211 F.3d at 486-87.

**F.     Cumulative Error (Ground Six)**

Finally, Petitioner contends that the cumulative effect of the constitutional violations listed above rendered Petitioner's trial fundamentally unfair. See FAP at 123-26.

The Ninth Circuit has found that "even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'" Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002) (quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996)). However, as discussed above, there were no substantial constitutional errors at Petitioner's trial; and if there was any error, it was harmless. Thus, the California Supreme Court reasonably rejected Petitioner's cumulative-error claim. See Hayes, 632 F.3d at 524 ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."); United States v. Pineda-Doval, 614 F.3d 1019, 1036 (9th Cir. 2010) (finding that even three errors by the trial court, where all were independently harmless, resulted in "no prejudice, cumulative or otherwise"). Therefore, Petitioner is not entitled to federal habeas relief with respect to his allegation of cumulative error.

**G.     Request for Evidentiary Hearing**

Petitioner requests an evidentiary hearing. See Traverse at 57. An evidentiary hearing is not required on issues that can be resolved by reference to the state-court record under § 2254(d), as Petitioner's claims can be. See Pinholster, 563 U.S. at 183 ("[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" (quoting Schriro v. Landrigan, 550 U.S. 465, 474 (2007))). Petitioner's request for an evidentiary hearing therefore should be

denied.

## V.

## CONCLUSION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Final Report and Recommendation; (2) denying Petitioner's request for an evidentiary hearing; and (3) directing that Judgment be entered denying the FAP and dismissing this action with prejudice.[25]

Dated: January 30, 2018

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge

---

[25] The Court issued its original Report and Recommendation on December 15, 2017. Dkt. 203. Petitioner filed objections. See Dkt. 205. Respondent also moved to clarify the Report and Recommendation, correctly noting that page 22 of the original Report and Recommendation omitted the word "not," thus changing the import of a critical sentence. The Court now withdraws the original Report and Recommendation and issues this corrected Final Report and Recommendation. Because the Court's recommendation is entirely unchanged, the parties have not been given an opportunity to file additional objections.